UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA, BUTTE DIVISION

---

KEVIN BRIGGS,

Plaintiff,

vs. Case No. 18-0010-BU-BMM-JCL

GALLATIN COUNTY AND JOHN DOES 1-8, AS INDIVIDUALS AND IN THEIR OFFICIAL CAPACITY AS DETENTION OFFICERS,

Defendants.

---

DEPOSITION UPON ORAL EXAMINATION OF

JASON JARRETT

---

BE IT REMEMBERED, that the deposition upon oral examination of JASON JARRETT, appearing at the instance of Plaintiff, was taken at 510 West Hemlock, Suite B1, Bozeman, Montana 59715 on the 18th day of July 2019, beginning at the hour of 1:00 p.m. pursuant to the Federal Rules of Civil Procedure, before Marla Jeske, Court Reporter - Notary Public, CSR.

APPEARANCES

ATTORNEY APPEARING ON BEHALF OF THE PLAINTIFF, KEVIN BRIGGS:

Mr. Daniel V. Biddulph, Esq.
Ferguson Law Office, PLLC
P.O. Box 8359
Missoula, Montana 59807
(406) 532-2664
dan@fergusonlawmt.com

ATTORNEYS APPEARING ON BEHALF OF THE DEFENDANTS, GALLATIN COUNTY AND JOHN DOES 1-8, AS INDIVIDUALS AND IN THEIR OFFICIAL CAPACITY AS DETENTION OFFICERS:

Mr. Alex Stacey, Esq.
Stacey, Funyak & Kautz
P.O. Box 1139
Billings, Montana 59103
(406) 259-4545
astacey@staceyfunyak.com

Mr. Sean Bowen, Esq.
Civil Deputy County Attorney
Gallatin County Attorney's Office
1709 W. College, Suite 200
Bozeman, Montana 59715
(406) 582-3745
sean.bowen@gallatin.mt.gov

INDEX

EXAMINATION OF JASON JARRETT BY — PAGE

Mr. Daniel V. Biddulph, Esq............4, 99
Mr. Alex Stacey, Esq......................97

EXHIBITS REFERRED TO:

Exhibit 6...................................65-67
Exhibit 8.....................................65
Exhibit 9.....................................65
Exhibit 10...............................61, 64-65
Exhibit 11.....................................61
Exhibit 12...............................59, 61-62
Exhibit 13.....................................78
Exhibit 14.....................................69
Exhibit 16.....................................92

DEPOSITION EXHIBITS:

Exhibit 17 Team Meeting notes.....29, 42, 88, 91
Exhibit 18 E-mail from Cari Ray regarding updated List............30
Exhibit 19 Gallatin County Detention Center Incident Report/Rule Infraction dated 11/16/2014..................42
Exhibit 20 Inmate Manual.....................50
Exhibit 21 Notes generated through the Inmate kite system................51
Exhibit 22 Notes generated through the Inmate kite system.........56, 74, 77
Exhibit 23 Kevin Briggs' cell assignment history...........................76
Exhibit 24 Policy and Procedure Manual March 25, 2015....................81
Exhibit 25 E-mail chain dated June 13, 2015...94

WHEREUPON, the following proceedings were had and testimony taken, to-wit:

* * * * *

JASON JARRETT,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BIDDULPH:

Q. Good afternoon, Captain Jarrett. My name is Dan Biddulph. I'm an attorney for Mr. Kevin Briggs in his case of Mr. Briggs versus Gallatin County Sheriff.

Just for the record, could I get you to state and spell your name?

A. Jason Jarrett J-A-S-O-N J-A-R-R-E-T-T.

Q. And have you ever been deposed before?

A. Yes.

Q. And when was that or how many times?

A. Once, and it's been years ago. I don't recall even the case that I was on.

Q. Have you ever provided testimony at trial before?

A. Yes.

Q. And was that a frequent event or how often have you done that?

A. Frequently.

Q. Okay. So basically, as I'm sure from your prior experience, a deposition is, you know, under oath on the record. But just for our record I want to go over a few ground rules just so that we have it down.

So first of all, both of us can speak clearly today and we'll try and also make sure we speak slowly enough so that our court reporter can record what we're saying.

Let's not try to talk over each other. So I will try and wait for you to answer a question prior to me asking the question, and if you can wait for me to get the question out before you answer, that way we're not talking over one another.

Also, I ask that if there's any yes or no questions, if we can answer yes or no, not head nods or huh-uh's or uh-huh's, so that we can get a clear record that way.

Also ask, if any of my questions are unclear or you have a question about my question,

please feel free to ask. I want to make sure that you understand what I'm asking so that we're both on the same page as far as your response to my question and your responses in direct reference to what I'm asking. So if you don't ask for any clarification, I'm just going to assume that you understand the question as it relates to what I asked.

Also, if we need to take any breaks during this, for whatever reason, rest room, you need to stretch your legs, or if you do need to speak with your attorney as well, feel free to do so, but I just ask that we take the break -- if I've asked a question, that that question gets answered prior to taking a break, okay?

Any questions about that?

A. None.

Q. All right, great.

So also, do you mind if I call you Jason or Mr. Jarrett or captain? How would you prefer to be referred to?

A. Informal is fine.

Q. Thank you.

So prior to today what did you do to prepare for today's deposition?

A. I met with counsel and I have reviewed some of the documentation.

Q. And when you say "some of the documentation," what did you review?

A. We have a case file prepared of all the stuff that we have sent and I briefed through it recently and have looked at some of the documentation that I have personal knowledge of.

Q. Okay. Have you reviewed any audio or video recordings prior to to prepare for today's deposition?

A. No.

Q. And other than your attorneys, did you speak with anybody else to prepare for today's deposition?

A. To prepare?

Q. Correct.

A. Other than to present documentation that has been requested in discovery or evidence, no.

Q. Okay. Have you spoken with anybody else about this case other than your attorneys?

A. Staff.

Q. Okay. Is that just as it relates to the case?

A. Correct. And the requirements to get

the required documentation or arrange for staff to be present at required meetings or depositions.

Q. Okay, thank you.

So, Jason, I just want to get somewhat of a sense of a little bit of your background. So if we could just start, what's your just education, work history? So if we can start with education, what's your educational background?

A. Some college, all the law enforcement and continuing education classes and 35 years in law enforcement and public safety.

Q. Okay. Where did you go to school?

A. Montana State.

Q. And have you gone to higher education anywhere else besides Montana State?

A. No, I haven't.

Q. You said 35 years in law enforcement, is that all with Gallatin County?

A. No.

Q. Where else have you served?

A. National Park Service, Yellowstone.

Q. Okay. Anywhere besides that?

A. No.

Q. Did you ever serve in the military?

A. No.

Q. So what's your current position and title?

A. I'm the jail commander, search and rescue commander, captain for the sheriff's office.

Q. And how long have you served in that position?

A. I'll refer -- I know it's written down here somewhere.

Q. I'm just trying to get a sense.

A. That's fine. My best recollection was the fall of 2013 I was assigned to the detention center.

Q. Okay. So this case involves events that took place roughly March of 2014 through, I would say, maybe fall of 2015, summer/fall of 2015. So at that time that was -- you were the jail administrator at that time?

A. I was the jail commander. The sheriff is the jail administrator.

Q. And for the record then -- and my understanding -- what's the difference between the two?

A. The administrator has the statutory responsibility assigned by the Gallatin County Commission to manage the jail. The sheriff has

divisions that each have captains assigned to them. I am the captain that is assigned to the detention division.

Q. So in your role as jail commander then, maybe to put it in layman's terms, would you then be I guess the boss over the jail?

A. I am in direct supervision of the detention center, correct.

Q. Okay. So if the sheriff is the jail administrator and you are the jail commander, does he cede or put any authority on you that he would normally have as jail administrator?

A. Yes.

Q. What would that be?

A. The operation of the jail.

Q. Okay. So any decisionmaking and that sort of thing?

A. He has authority to change decisions, set policy. That's a good way to say that.

Q. Okay.

A. I have the responsibility for the day-to-day operation.

Q. And then you'd be over staff and personnel as well?

A. That is correct.

Q. Okay. Are there any decisions that you would need to -- and I'm speaking in general terms, that you would need to defer to the sheriff just as the jail commander?

A. Typically, yes.

Q. What would those decisions be?

A. Any changes in policy. That would be about it.

Q. So if we can get I guess into this. This case involves my client Mr. Briggs. How did you first become aware of Mr. Briggs?

A. I became aware of Mr. Briggs through law enforcement incidents that I was aware of because of my position as a sworn law enforcement officer.

Q. And when were you first aware of --

A. I don't recall. Prior to his incarceration.

Q. And you mean his incarceration in or around March of 2014?

A. If that's when it was, yes.

Q. I guess I'm talking about his incarceration where he was in custody in Gallatin County jail?

A. Correct, I was aware of him before then.

Q. Okay. How were you aware of him before

that?

A. Because I know of the incidents of his arrest and his escape from police custody.

Q. Okay. So that's what you're referring to as his arrest and his escape?

A. Correct. I don't recall if I knew of him before or not.

Q. Okay. And so his arrest and his escape, how did you hear about that?

A. I knew because of the information that is passed between law enforcement officers.

Q. And what information was passed to you regarding his arrest and his escape?

A. That he had been arrested for sex assault, agg assault, and I believe assault on a peace officer, and then had subsequently escaped custody from the police department.

Q. And was that custody, Gallatin County Sheriff or Bozeman PD?

A. Bozeman Police.

Q. So was the Gallatin County Sheriff involved in that arrest at all?

A. I don't know if we assisted or not.

Q. Did the jail assist at all in any aspect of his escape?

A. No.

Q. Did you ever have any sort of communications with the Bozeman PD after his escape?

A. Not that I recall.

Q. Did you ever discuss with the Bozeman PD with regards to, say, like jail security or policies and procedures or protocol?

A. No.

Q. How did you become aware that Mr. Briggs was back in custody after his escape?

A. I don't specifically know. I know I was aware that he had been arrested in Oregon, I believe.

Q. And so at that time were you informed then that he would be transferred to Gallatin County Detention?

A. I knew he would be coming back to Gallatin County and we would hold him, but I don't know how I had heard or from who.

Q. Did you feel the need to make any special arrangements with regards to Mr. Briggs?

A. At some point we made -- we had discussion about his security based on his charges and his escape.

Q. And what were those discussions?
A. That he would be in a high classification and we would observe his behavior for a period of time to determine where he best fit and would be taken care of appropriately at what security level.
Q. And so what determinations were made based on those conversations?
A. That he would be placed in our high security APOD and observed for a period of time to see how he acclimated and how he behaved.
Q. So you mentioned classifications, could I just get from you I guess what classifications are and what the differences are between those classifications?
A. At that time, and it's changed, so I can't give you 100 percent accurate. But I believe we had general population, low security or workers, inmate workers, medium classification, special management, administrative segregation, high security and disciplinary.
Q. So then as far as low, medium and high, what would be the differences between those three as far as why an inmate would be placed in low, medium or high security?

A. It depends on what period of time the inmate is there for their incarceration. They will be screened based on prior knowledge of inmate behavior, charges, and a full litany of decision trees that occur for all inmates that come into the facility.
Q. And so you said Mr. Briggs was placed on high security?
A. He was.
Q. Okay. But when he originally showed up I believe you said he was placed in observation. So would that be a different classification?
A. I'd have to refer to the notes to see what the actual classification was for him when he first got there so I get the terminology right.
Q. Okay. But he wasn't put immediately into the -- I guess you could refer to it as general population?
A. No. It is a behavior based jail and you don't -- you have to earn your way into that. Nobody goes directly there historically.
Q. So is general population a different classification than low, medium and high?
A. It is. It's an open pod design with direct supervision.

Q. Okay. So then Mr. Briggs was classified as high security. Explain to me then what a behavior based system is?
A. A behavior based jail takes the inmate's behavior into account, not just charges, not just a history but allows inmates to earn their privileges and more freedom within the facility based on their behavior, demonstrated behavior.
Q. Okay. So if an inmate comes in and has a clean record, then they can move down in security classification? I just want to make sure.
A. There are multiple factors that go into that determination, but a clean record is not a good one to describe it. It would be more appropriate to say their behavior is appropriate, their behavior is conducive to orderly operation of the facility and ability to interact around other inmates.
Q. And then you also mentioned there was disciplinary and administrative segregation?
A. Correct.
Q. What are the differences between those two?
A. Disciplinary is multiple tiered levels in terms of minor, major infraction and those can

be placed in a high security housing unit or some disciplinaries can be left in their -- in the housing unit they were normally in and just loss of privileges. So it depends on the severity of the disciplinary.
Q. So then where would administrative segregated, inmates in that classification, what pod would they be in?
A. They can be in just about any pod. Historically they end up in our high security pod where the lockdown times are consistent.
Q. So as I understand from kind of reading through this, there's also an APOD. Is APOD specific for administrative segregation?
A. No.
Q. Who else could be held in APOD?
A. Disciplinary.
Q. Okay. And is APOD an open -- I guess it's not an open pod, is it?
A. It is designed similar to all the pods.
Q. So inmates though in APOD, are they all on lockdown?
A. Typically, not necessarily.
Q. And just for the record then, if an inmate is on lockdown, what are the restrictions

placed on the inmate?
A. It depends on the inmate and the circumstance. A disciplinary inmate can be on lockdown 23 hours and loss of privileges, like visitation or phone access or commissary.
Q. So if an inmate's in high security, what type of, say, movement or privileges or time out of cell do they have?
A. Ask that again.
Q. Sorry.
If an inmate is, say, on high security, how much time are they allowed out of their cell and are they allowed privileges?
A. It depends. There are high security pods other than APOD and those can have varying time outs and the same with APOD.
Q. So it just depends on the inmate in APOD?
A. Potentially, yes.
Q. Okay. With Mr. Briggs though, he was classified as high security. Did he ever go down to any lower level, say, medium or low security?
A. Yes.
Q. And what levels did he go down to?
A. Without referring, I'm afraid I couldn't



be accurate to tell you exactly what we called it at that point.
Q. Okay.
A. Or what it entailed during that period of time.
Q. Right. Would he have ever gone down to medium security?
A. I think at that time we would have -- he did achieve a medium security classification.
Q. Would he have ever gone down to low security?
A. No.
Q. Why wouldn't he have ever gone down to low security?
A. Escape attempts and his history, and his behavioral history within our facility. So --
Q. Okay, so --
A. -- he could have -- sorry.
Q. I apologize, I cut you off. Go ahead.
A. He could have been at any level if his behavior justified that.
Q. Well, you mentioned his escape attempts, what impact would that have on his security classification long term?
A. Long term, relatively speaking, it



wouldn't have any impact on it. If his behavior was such over a significant period of time to demonstrate that he could function appropriately at any other security level, he could have achieved that.
Q. When evaluating an inmate's classification, is there any set period of time where that evaluation takes place?
A. Evaluations are conducted regularly. That doesn't mean that the classification will change regularly.
Q. And that's -- I guess that's my question then is, you don't look at, say, a set amount of time over a -- and I'm going to say a hypothetical here. If inmate X is at high security, so long as we evaluate and there's clear conduct over 14 days then he could move down? There's nothing hard and fast like that, if my question makes sense?
A. It is reviewed on a regular basis every 7 to 14 days, and I don't recall specifically. But that doesn't necessarily mean that it will be changed during that -- after every review.
Q. So, also just from reviewing the documents that have been provided, there's also something I've seen that's called CPOD. What is



CPOD?
A. They refer to the special management in the levels of security that occur. It is typically our special management housing unit.
Q. And what types of inmates are classified into CPOD?
A. Typically ones that would be vulnerable to being taken advantage of by general population or that would not fit into general population. Typically sex offenders that don't do very well, child sex offenders, those kinds of crimes that we keep isolated from the general population.
Q. So why would you keep sex offenders or child sex offenders isolated from the general population?
A. Sometimes, and it's not all the time, their cases have elements that other inmates find pretty offensive.
Q. So are those inmates then at risk of violence towards them?
A. Not all the time at all.
Q. So is there a concern though that those inmates could get I guess, hurt or harassed based on the nature of their offense?
A. It's evaluated, but is not a given or an

automatic that occurs. There are -- were and currently are sex offenders that are in general population, as I recall. And it depends on the type and notoriety of a particular crime potentially.

Q. So when you say "notoriety," do you mean if a crime is high profile?

A. No, not necessarily. Meaning that it is well known within the jail potentially.

Q. Okay. So if the general jail population knows about it?

A. Potentially. The other important factor on that is their vulnerability. The special management pod typically houses developmentally delayed, medical patients, people that may be at risk for abuse or being taken advantage of by general population inmates.

Q. If there's an inmate who is being, say, targeted for, you know, violence or harassment by other inmates, would CPOD be a placement for them?

A. It would be a potential placement for them, not an automatic placement.

Q. What other options would be available?

A. We have various tier systems in the regular housing units. We have administrative

segregation. We have movement to other facilities. We have lots of options open to us.

Q. Was Mr. Briggs ever considered for CPOD?

A. He was considered.

Q. And was CPOD ever an option for him?

A. Not in my opinion.

Q. Why not?

A. He was not the type that would be taken advantage of. His character was one who would take advantage of others.

Q. Why do you say that he would take advantage of others?

A. His specific history within the jail.

Q. Okay. And I'm just curious, so. Is that a determination that you made when he arrived at the jail?

A. No, not when he arrived.

Q. So you're saying you came to this conclusion over time?

A. Correct.

Q. So then what, I guess, objective facts, factors or circumstances did you rely on to make that determination, that he would not be eligible for CPOD?

A. I'd have to do a lot of referring to all

the specific incident reports, his behaviors, and so I don't know that I can give you the objective ones right off the top of my head with any kind of clarity or specific.

Q. In some discovery that was provided there was a -- if I can find it. I believe it was team meeting notes that listed Mr. Briggs as a predator. Is that a characterization that you would agree with?

A. It's a characterization that is -- follows pretty logically with his conviction on the sex assaults, yes.

Q. And what is a predator? Is that a defined term within jail policy?

A. Not that I am aware of.

Q. So what, I guess again objectively, would cause an individual to be classified or characterized as a predator?

A. The totality of their behavior and their history. And I wish I could spout each individual incident report that were five, six years ago, and I don't have that at the top of my head.

Q. Do you recall ever reviewing Mr. Briggs' inmate history at any other institutions prior to his arrival at Gallatin County jail?

A. I do not recall that.

Q. Did you ever receive any sort of advice or warnings or notices from any other detention facility?

A. The facility may have, I don't specifically recall having it brought to my attention.

Q. Do you recall Mr. Briggs ever involved in an incident where I guess he slit his tongue? Does that ring a bell for you?

A. It does.

Q. From your recollection, can you recall what happened there?

A. Not with any clarity. I know that the event happened and I know that there's an incident report on it and that we discussed it in team but, the specifics of the event, I'm not confident I can recall.

Q. In those discussions in team, was Mr. Briggs -- was there a concern or belief that Mr. Briggs had faked his injury?

A. Which injury are you speaking?

Q. I'm sorry, slicing his tongue. And let me rephrase that question. That's not well done.

Was there any concern in team meetings

when Mr. Briggs sliced his tongue, that he -- I kind of chopped this up and compartmentalize it. Was there a concern that he made an attempt on his life at that point?

A. I don't specifically recall.

Q. Was there any concern or belief that he had done that, say, to get attention?

A. There may -- I believe so.

Q. Why would there be a concern or belief that he'd done that to get attention?

A. I don't recall now the sequence of events if this was pre or post, some of his other incidents in the jail. And so I don't know that I can answer you with good recollection on that.

Q. Was there any sort of belief that he did that to attempt to escape again?

A. On the splitting of his tongue, I don't believe so.

Q. If an inmate has to go to, say, the E.R. for something like splitting their tongue, what sort of policies or procedures does the jail follow to ensure security?

A. It depends on the security level of the inmate. They will be escorted whether it's by detention or sworn staff, the level of restraint,

the number of people, and it all depends on the inmate and any information that we have regarding that inmate.

Q. So was there a concern then that Mr. Briggs was doing this to escape again?

A. On the splitting of the tongue, I don't remember.

Q. Okay. Did you have any personal interactions with Mr. Briggs?

A. Not that I remember.

Q. Never any one-on-one conversations with him?

A. I don't believe so.

Q. So would it be fair to say then that any of your -- anything that formulated opinion about him would come from reports from other staff?

A. Correct.

Q. Do you ever recall Mr. Briggs requesting to be placed in CPOD?

A. I'd have to refer to the team notes because that is where those requests would typically be brought forward.

Q. If Mr. Briggs were to, say, request placement in CPOD, would that be evaluated at the time or was he just never eligible for CPOD?

A. It would be evaluated, with the evaluation would be what his eligibility was.

Q. And when you say "eligibility," does that mean there are certain classifications he would not be eligible for?

A. Correct.

Q. If you'd like I can -- let me ask you this: If an inmate does want to be, say, considered for CPOD or a classification down, how would an inmate go about requesting that?

A. The most effective way would be through our kite system, but I have seen it in multiple other ways directly asking officers or other staff and to take that before supervision or the team meeting.

Q. Okay. And I'm just going to hand you a -- because you've mentioned referring to team meeting notes. So what I've got here is just a printout of team meeting notes that were provided to us as part of Mr. Briggs' file, so.

If you want a copy of that.

MR. STACEY: I have one.

MR. BIDDULPH: Oh, you've got one.

I suppose, actually, what exhibit are we on?

THE COURT REPORTER: 17.

MR. BIDDULPH: 17. If we can just enter this in as Exhibit 17.

(Whereupon, Deposition Exhibit Number 17 was marked for identification.)

BY MR. BIDDULPH:

Q. So Exhibit 17 would be team meeting notes which is CCJI292 through CCJI310.

And do you need a moment to go through those? I'm more than happy to give you a second if you need to.

A. I think I'm okay.

Q. Okay. So there's a few of these notes in here I just want to kind of take a look at. Starting on the first page there, I guess these are in chronological order, on 4/7/14 on CCJI292 of Exhibit 17 it states that no IR's or I guess discipline. He's stated to his attorney he is worried about previous charges and inmates knowing. He's been told to speak with an officer if there's a specific issue or use the kite system. He has asked that a prior counsel come in and meet with him.

So at this time, I guess this would be

early in his incarceration, was there a concern about Mr. Briggs being targeted based on other inmates knowing of his charges or history?

A. There -- he may have been concerned. We had no information to substantiate that.

Q. And I also want to hand you here, which is just a copy of an e-mail that was provided as part of discovery. If we can enter this as Exhibit 18.

(Whereupon, Deposition Exhibit Number 18 was marked for identification.)

BY MR. BIDDULPH:

Q. And this looks like it's an e-mail from Cari Ray sent to, well, a number of different folks. It's cc'd to Rick Lower at Gallatin County. Who is Rick Lower?

A. Rick Lower.

Q. Lower, excuse me. And who's Rick Lower?

A. Rick Lower is the transportation sergeant, an administrative sergeant for the detention center.

Q. Okay. And so have you ever seen this e-mail before?

A. Not that I recall.

Q. Okay. And so on this e-mail it states that "Inmate Kevin Briggs will need to be kept separate from all other inmates. Given his high profile case, he has had several threats on his life. He will be picked up on Wednesday by Gallatin County Sheriff's Officer Rick Lower, Cari."

Were you informed by Mr. Lower that, I'm guessing, Cari Ray provided information that he needed to be kept separate or had several threats on his life?

A. I don't recall.

Q. Does Rick Lower, is he a part of the team that would get together for these team meetings?

A. Not consistently.

Q. Sometimes he would though?

A. Correct.

Q. Okay. If you can -- on the Exhibit 17, if you could turn to the second page which is CCJI293. It looks like there's a team meeting note on 5/19 of '14. Do you see that?

A. I do.

Q. In there there's a statement this says if we were to house him in APOD, would be isolated

which would have a negative impact on his mental health. Was there a concern at that time that Mr. Briggs' isolation would have a negative impact on his mental health?

A. There's a concern always with putting people in limited out time because of its potential impact on mental health.

Q. So I guess explain that to me. Why is there that concern?

A. It is fairly well recognized that any isolation can have a negative impact. For our facility that level of isolation is not what it is in most places. They have contact with other inmates, just not physical contact. They have -- they have contact with officers, they have contact with mental health staff, they have contact with medical staff, they have access to phones, they have time out. So isolation is not a good word because it's not really isolation.

Q. Was there anything in Mr. Briggs' history that you knew of that would give cause for concern that -- and I'm just going to quote from here, isolated would have a negative impact on his mental health?

A. Ask me the question again, please.

Q. I said was there anything I guess what was -- what went into this determination objectively? Were there reports or anything to make that determination that housing him in APOD where he would be isolated would have a negative impact on his mental health?

A. I do not know. Knowing that the notes are not verbatim, they're taken by typically Jackie Lemon based on the general feel of the conversation, but not verbatim, and directives that we give. I can't say that that is a complete statement based on the full set of conversations with Mr. Briggs or about Mr. Briggs.

Q. If an inmate had made attempts at suicide, would there be concerns of placing him in isolation?

A. It depends on the inmate.

Q. And so how do you go about evaluating that inmate?

A. We use various resources, including our mental health staff, to help us come to conclusions based on the individuals and the individuals' needs.

Q. How often do the mental health staff meet with inmates when they're in APOD and in an

isolated cell in APOD?
A. It depends on the inmate.
Q. Do you recall how often Mr. Briggs was met with?
A. I do not.
Q. Do you know what they typically look for?
A. Yes.
Q. And what is it that they typically look for?
A. Decompensation, positive movement, all the things that mental health people look for.
Q. If an inmate were to, say, be complaining about panic attacks or anxieties or anything like that while they're in isolation, what would the jail do at that point?
A. We would treat with mental health resources.
Q. Would that inmate remain in an isolation in APOD?
A. It depends on the inmate.
Q. If you can turn to CCJI294, I believe is the third page. I believe it's 6/16/2014. It says here "Eilissa received a phone call from his father with concerns over isolations. Briggs is refusing

to work with our mental health staff. Eilissa asked if Stef can please review again mental health medications. Eilissa believes a double bunk would be the safest option for him if we can find the right cellmate. His history does lead for concern. He did receive another write up on the 11th and it out of L/D on 7/7/14."
Do you -- I guess first and foremost, who's Eilissa?
A. One of our mental health professionals.
Q. Okay. Were you made aware that she'd received a phone call from his father regarding isolations?
A. Without seeing the header on this team meeting to know if I was there, I can't tell you specifically.
Q. And it says here too, "His history does lead for concern." Do you know what they're referring to there?
A. No.
Q. Would it be his history with other cellmates?
A. Or -- no, I don't know if that's the case.
Q. Did he have a history at this point in

time of getting along with other people?
A. I don't have a time line in front of me to be able to tell you effectively where in his stay this was in comparison to his incidents with -- throughout his jail stay.
Q. And then if you can turn to what is marked CCJI295, it looks to be a team meeting 7/22/14. It says, "Has a black eye, staff unable to see an incident on video as to how this happened. Possible self injury. He has been using the law library and watching movements through the sally ports. Please keep a close on him."
Do you recall Mr. Briggs getting a black eye in or around July of 2014?
A. I do.
Q. And was there a concern that this was self injury?
A. There was.
Q. And why was there concern that it was self injury?
A. Based on his behavior before, it was leading us to believe that this was a ploy to help him with his court case. We had no evidence that anybody had done it to him by reviewing the videos. We had officer reports that there was nothing that

would have accounted for that eye other than self injury.
Q. Was there ever concern that Mr. Briggs would appear on television with a black eye?
A. No.
Q. Was there ever concern that Mr. Briggs would appear in court with a black eye?
A. No.
Q. So in looking at this same page and it looks like through -- well, the next page it says "Nothing noted." If it says "nothing noted" in these team meeting notes, does that mean there's no incidences, no discipline, no write-ups?
A. It means that there was nothing noted that was apparently of interest to the team at that point.
Q. What would the team be looking for?
A. Team looks for about everything that may indicate special needs, anything that would need supervisory authorization for, anything that needed to be clearly brought to the attention of the staff.
Q. So is every inmate evaluated at these team meetings?
A. No.

Q. Why would an inmate be evaluated at these team meetings?
A. If they were behavior, mental health or medical issues that made staff believe that we should use multiple resources to evaluate how we manage them.
Q. So it appears to me that Mr. Brings was evaluated in a team meeting his entire time there?
A. Correct.
Q. Is that normal for an inmate that is a subject of a team meeting to be the subject of team meetings through their entirety of incarceration?
A. It's not abnormal. It's unusual.
Q. So then why was Mr. Briggs evaluated the entirety of his time there?
A. His behavior put him on our list virtually the entire time he was here.
Q. And when you say "behavior," is that prior to incarceration or ongoing?
A. Both.
Q. So prior to incarceration what are you referring to?
A. His charges.
Q. Anything else?
A. Not that I'm aware of.

Q. So his charges which were I guess sexual charges in nature, was there anything else outside of that?
A. Assaultive charges against officers, I believe there might have been a witness tampering but I can't specifically recall.
Q. So then sex charges not necessarily would put an inmate on a team meeting watch?
A. Not necessarily.
Q. So then sex charges coupled with assault on an officer, would that put an inmate on team watch?
A. Not necessarily.
Q. So then outside of sex charges and assault on an officer, was there anything else that would give reason for Mr. Briggs to continually be the subject of team meetings?
A. His behavior.
Q. On the next page of 296, on 9/8/14, it says "He is up for classification but administration has determined he is not allowed to move lower than a medium."
Was there any request at that time, do you recall, that Mr. Briggs made for a lower classification?

A. Not that I recall.
Q. So when it says "he is not allowed to move lower than a medium," does that mean that that's the lowest he could ever go?
A. At that time, yes.
Q. So that's not necessarily a directive in perpetuity, it's as of 9/8/14?
A. That is correct.
Q. And then going through these 9/14 through, it looks like, 12/14, so a period of roughly almost four months, there doesn't seem to be anything there. Do you know if Mr. Briggs was reclassified at any point in that time?
A. He had been reclassified. He was in a high or medium classification pod and had been for some time, since July, before July 22nd.
Q. Okay.
A. And I'd have to refer to our records to see when he was actually moved and reclassified. But he'd been on a lower classification for some time based on his behavior.
Q. So I'm going to hand you a -- and I'm assuming you have. Have you reviewed any -- well, any and all incident or disciplinary reports with regards to Mr. Briggs?

A. I know they exist. I have seen some of them, but review would be a pretty broad word.
Q. And in your job as jail commander, do you review all incident or disciplinary reports?
A. No.
Q. Do you ever take it upon yourself to review some?
A. Yes.
Q. Under what circumstances?
A. Random quality assurance or anything that brings it to my attention or would indicate that I should review it.
Q. In these team meetings if an inmate's the subject of a team meeting, does the team review incident reports or disciplinary reports as they come up?
A. Mostly.
Q. And do you attend every team meeting?
A. Most of them.
Q. If you don't attend a team meeting, what's the mechanism for you to obtain an update on what was discussed?
A. They're published.
Q. So it's just essentially what we're seeing right here with regards to the inmate?

A. Except it has all of the inmates we discuss.
Q. Correct, yeah. So Exhibit 17, that's all you would see? I guess my question is, there's no other minutes or notes or account of what was discussed?
A. No, unless I get a verbal report from somebody who's at that meeting.
Q. Okay. So I want to hand you -- and perhaps you haven't seen it before, but we'll enter it in as Exhibit, I believe, 19.
(Whereupon, Deposition Exhibit Number 19 was marked for identification.)
BY MR. BIDDULPH:
Q. Do you recall ever reviewing this report with regards to, it looks like, a number of inmates on or around 11/16/14?
A. I don't recall. It wouldn't surprise me, but I don't recall.
Q. And if you need to read the attachments as well?
A. I'm familiar, but.
Q. Well, and the reason I want to ask is I believe it is in the attachments A1. This inmate

looks like makes a complaint to a Corporal Evans about an inmate bulldogging? What is bulldogging, do you know? Is that a term you're familiar with?
A. Yes.
Q. What is bulldogging?
A. Bullying, trying to establish control or authority over others within the pod.
Q. And it looks like he's making a claim that maybe this Inmate Haldeman has been bulldogging the gentleman that made this complaint, as well as Mr. Briggs, possibly some others. In a situation where inmates are being bulldogged, what's typically done in that situation?
A. It depends on the situation. The officers are made aware of it. If they have evidence, they'll do disciplinary. If -- so it depends on the circumstance.
Q. So would inmates be moved out of a pod if they were bulldogging?
A. Not as a general rule.
Q. Would the victim of bulldogging be moved out of a pod?
A. Not as a general rule.
Q. Are there any circumstances where an inmate doing the bulldogging would be moved out of

a pod?
A. Protection.
Q. Just generally speaking, what would those circumstances typically be?
A. Where we had evidence of it clearly occurring, that would be a disciplinary infraction. It is a fairly common ploy to remove inmates that you don't like to make complaints of bulldogging or to try and get a -- yourself moved to a different pod to be with people you like by complaining of general assaults or bulldogging. That is a fairly typical jailhouse method of inmates to control their environment so we have to -- we look and pay very close attention to gather any evidence of that besides just statements.
Q. So then it looks like Mr. Bullock made this complaint. So just so I understand what you're saying, in a hypothetical sense, I'm not saying this is what happened here, it's possible then that Inmate Bullock was trying to get himself moved out of a pod and was complaining about another inmate bulldogging?
A. Potentially.
Q. Okay. So if there is a complaint like this, are inmates questioned or is it just a video

review? What goes into that investigation?
A. Both. It's a complex social environment within jail pods. The officers have direct supervision and direct observation of the inmates. They do a very good job of being able to manage the behavior in the pod and of the people. And that authority has delegated them to manage those pods for the best result.
Q. If there is a report such as this one that an inmate is a victim of bulldogging, is that something that would, say, come up in a team meeting?
A. It depends on the circumstance.
Q. Do you recall in any of these team meetings if it was ever discussed that Mr. Briggs was a victim of bulldogging?
A. I do not specifically recall, no.
Q. Does the fact that Mr. Briggs is not the one levying this complaint -- let me withdraw that.
So in this complaint though Mr. Briggs is characterized as a victim of bulldogging. Would you, say, move Mr. Briggs based solely on a complaint like this?
A. No, I would not.
Q. Would you at least -- or would you

investigate as it relates to Mr. Briggs based on a compliant like this?
A. I probably would not be involved at all. That would be an officer and floor supervisor responsibility to watch and manage.
Q. So they would watch and manage and then move inmates as necessary?
A. If needed.
Q. Is that typically a decision that you're involved with, what pods or housing locations?
A. Only when it comes to the level of specific override of standard policies or procedures or if it is a case that is coming -- the team meetings, where I can interject a way that we want to manage a particular inmate.
Q. I'm looking on CCJI298. And as around about January of 2015, it says January 27, 2015. It says "Briggs, his attorneys have decided not to represent him. Keep on medium classification." I'm assuming, "per JJ," would that be per you?
A. That is correct.
Q. Okay. Was there any concern about Mr. Briggs' mental health or stability at the time, around January 2015, when his attorneys have decided to not represent him?

A. That would be a circumstance where we would want to try and reach out to them for mental health assistance. It can be a -- historically that could be a stressor. But as it relates to overall mental health or a significant event, I don't recall if we had any data or information that that was the case for Mr. Briggs. It would have been a precautionary tale for us to make sure that we knew that happened and could watch for anything that may or may not happen as a result.
Q. And then I'm noticing on some of these subsequent ones it still says "keep in a medium classification, per JJ." So is his classification regularly discussed?
A. No. Historically that is a carryover until it changes. So it would just be transferred from one meeting to the next.
Q. Okay?
A. As an ongoing order. And he is in -- has been out of -- in a new classification for -- during this period also.
Q. I want to go into February of 2015. Do you recall Mr. Briggs being in any sort of incidents, which could be characterized as a fight or an altercation or an assault in or around

February of 2015?
A. I remember some incidents. I don't recall which dates they were.
Q. Were you involved personally in any of those disciplinary proceedings?
A. No.
Q. Do you ever become involved in disciplinary proceedings?
A. Rarely.
Q. What circumstances would you become involved in a disciplinary proceeding?
A. Appeals that the officer that is in charge of all the security matters needed counsel or advice on.
Q. So if the disciplinary officer came to you, that's when you would become involved?
A. No. When it would be appealed by the inmate, it would go to my security director. If he had questions or wanted guidance, that's where I would get involved.
Q. Okay, thank you. Makes sense.
Do you recall Mr. Briggs being found guilty of fighting in February of 2015?
A. Yes.
Q. Do you recall Mr. Briggs appealing that

decision in 2015, February?
A. I remember that there were a couple of appeals. I don't recall specifically which one this was.
Q. So what's the process for an inmate to appeal a disciplinary decision?
A. It's best articulated in the inmate handbook and in policy procedure. It has specific elements that must be met to be considered a valid appeal or grievance. But me reciting them here is asking for inaccuracy.
Q. So would you want to refer to the inmate handbook or?
A. That's what I would do.
Q. Okay. And just as a matter of clarification, this was an Inmate Manual that was provided to us. It's dated March 3rd of 2015. But would this Inmate Manual substantively apply to February of 2015 as well?
A. I can't assure that. It gets modified and changed just like policy and procedure, just like all of our things. We all make the assumption that you were provided with the documentation that was in effect at the time.
Q. How often does the inmate or detention

center policies and procedures get updated?
A. Policy doesn't get updated very often. We've done a hundred and -- over 180 procedural changes since my arrival. The Inmate Manual has probably been revised between three and four times in my tenure.
Q. Okay. So if we can enter this as Exhibit 20. This is a copy of the Inmate Manual that we've received.
(Whereupon, Deposition Exhibit Number 20 was marked for identification.)
BY MR. BIDDULPH:
Q. And I've just kind of thumbed to the page which is Bate Stamped 194, but it looks like page 22 of the manual. So I'm going to assume that's the disciplinary appeals section at the bottom. Do you need to take time to read it?
A. It looks like it.
Q. So then how would an inmate go about filing an appeal in a disciplinary proceeding?
A. By following the instructions in the Inmate Manual.
Q. And what do those instructions say?
A. "The inmate may appeal the decision of

any disciplinary action by submitting the appeal in writing within 24 hours of the conclusion of the Disciplinary Hearing to the Administrator or designee, who will review the findings for the disciplinary action and render his or her decision. The Facility Administrator's decision is final."
Q. So then I'm going to hand you another document here which was produced to us as part of Mr. Briggs' confidential criminal justice file. I believe we'll do this as Number 21.
(Whereupon, Deposition Exhibit Number 21 was marked for identification.)
BY MR. BIDDULPH:
Q. Exhibit 21. So at the top of this page it says "I would lie to appeal my writeup for fighting, please." I'm assuming this is through the inmate kite system --
A. Correct.
Q. -- is that correct?
A. Correct.
Q. Is that how an inmate would go about doing an appeal through the inmate kite system?
A. Yes.
Q. So then Mr. Briggs --

A. It's one way, I'm sorry.
Q. Okay. I don't mean to cut you off.
A. Sorry about that.
Q. What's the other way?
A. Or in writing, with a handwritten on paper.
Q. Okay. The old fashion way, we could say?
A. Yes.
Q. So if Mr. Briggs sent this through the grievance. It looks like subject, grievances; to, grievances/general group. So if this is his appeal, does it need to then be responded to?
A. If it met the criteria for what an appeal means in terms of what is he appealing, what is his requested solution, and that it didn't.
Q. Sorry, you're saying it didn't?
A. Correct.
Q. I don't want to put words in your mouth.
A. I will let you on that one. Correct, it did not. It had no -- no indication of what he was appealing, what his desired outcome was of the appeal, so it -- that's what I can tell you about that one.
Q. What would you -- or what is the

expectation that should be contained in an appeal?
A. What he wants to appeal about it, whether it's the find of guilt or innocence, the length of sentence, the punishment, anything other than I just want to appeal.
Q. And so then if an inmate does an appeal, where does that appeal go to? Who does that go to?
A. It comes to the administrator or their designee. And at that case it would be Lieutenant Young and/or myself.
Q. And what's Lieutenant Young's title?
A. Director of security and operations.
Q. Okay. So I'm just trying to understand the hierarchy. Is Lieutenant Young underneath you as jail commander?
A. Correct.
Q. Okay. And then when the Inmate Manual says administrator then, is that referring to the sheriff?
A. That is correct.
Q. Okay. So then that role or that job has been ceded to Lieutenant Young?
A. Designated.
Q. Designated, excuse me, to Lieutenant Young in that circumstance?

A. Correct.
Q. So then in an instance such as this, if you're saying this was not an adequate appeal, would there be a response at all to the inmate?
A. Could be, could not be. I don't know specifically on this case.
Q. If an inmate files a grievance, is there any requirement that that grievance is responded to?
A. If it meets the requirements our policy is to respond.
Q. Is there even ever a response that says we need more information or?
A. In this case I couldn't tell you what specifics we were running under at the time.
Q. Okay.
A. Now a good time for a break?
Q. If you need to take one, yeah. Certainly.
A. I just need to go pee.
Q. That's why I say it's not an endurance test. We can go off the record.
(Whereupon, a brief recess was taken.)
///

BY MR. BIDDULPH:
Q. So I believe we were talking about just appeal process. So I do want to go forward. So does Staff Sergeant Young typically handle appeals or is that you?
A. Typically then Staff Sergeant Young, now Lieutenant Young.
Q. Lieutenant Young?
A. Yes.
Q. He would handle those?
A. Typically.
Q. Would they ever make it onto your desk?
A. Potentially.
Q. Under what circumstances would they typically make it?
A. If he wanted counsel or he believed that it merited my attention.
Q. Okay. So are you familiar with an incident with Mr. Briggs in March of 2015?
A. I'm much better with incident descriptions than dates.
Q. Well, it was an incident involving an inmate by the name of Smith where I believe Mr. Briggs was struck, although it may be characterized as a fight or an altercation.

A. I am familiar.
Q. And I believe Mr. Briggs got some disciplinary time out of it as well as Mr. Smith?
A. I would have to look, but I believe you're correct.
Q. You'd have no reason to doubt me on that one?
A. I don't.
Q. Okay. So I do want to ask you on that. On this appeal it looks like Mr. Briggs filed an appeal. Let me just put a paperclip on this one. So what are we up to 22? If I could tag that as 22.
(Whereupon, Deposition Exhibit Number 22 was marked for identification.)
BY MR. BIDDULPH:
Q. And this is another list of, it looks like, kite entries regarding Mr. Briggs on Exhibit 22 that I will hand to you.
If you can look at the top here of CCJI85, it looks like Mr. Briggs is requesting an appeal of that disciplinary action.
A. I see it.
Q. And right before it it looks like there

is another discipline or disciplinary review where a grievance was filed and something was amended; is that correct, that you did?
A. I recall something about him reading about it now, yes.
Q. So -- hang on, I need to go one more page back on this one, if I can. On this one it just says "I'd like to appeal the writeups for lying or being rude a number of times" and then ultimately there is a response. So I'm just kind of curious the difference whether it would be a response ultimately in this incidence in April and not a response in February?
A. It would be an educated answer that -- on this one Mr. Briggs was more specific. Staff Sergeant Young then decided to try and elicit more information from him, at which time he got the information he needed in order to actually take that as an appropriate request and then process it.
Q. Excuse me for a few seconds. So if I can actually add to that exhibit, which I believe is the page prior. These go in reverse chronological order, which would be page 87 whereon 4/29/2015 Mr. Briggs says "I would like to appeal my writeups for lying and fighting, please." We'll

just add that to the back end of that exhibit.
And so again, I guess the same question, it doesn't seem to be in a specific appeal but it does elicit a response?
A. I don't have an answer for you.
Q. Later on in those appeals Mr. Briggs says that -- or it was amended to lying or being rude to another inmate. Do you recall why it was amended to -- or excuse me, why it was amended to rude and disrespectful to another inmate?
A. I do not.
Q. Your name is on there, would you have reviewed the reports --
A. Typically.
Q. -- from the disciplinary action?
Would you have reviewed the video from the disciplinary action?
A. Not necessarily.
Q. Do you recall reviewing the reports from this April incident?
A. Not specifically.
Q. Do you recall contacting Officer Slyngstad to provide you information on that appeal?
A. It wouldn't surprise me, but I don't

remember doing it.
Q. So if I can refer you to -- I'm going off of memory -- I believe it's exhibit -- I believe it's Exhibit 12, if we have that stack of exhibits.
A. I have it.
Q. Do you recall receiving that information -- or that e-mail from Brett Slyngstad?
A. No.
Q. Would it be safe to assume then that based on this e-mail was your recommendation in response to Mr. Briggs?
A. Yes.
Q. I want to chat with you just a couple seconds about the disciplinary team and how that works.
Who's on the disciplinary team? Not specifically, but I guess how is it made up?
A. Of officers and often supervisors.
Q. Is it a rotation of officers or is it a specific assignment?
A. It's an assignment and sometimes there are ad hoc members based on staffing for the day.
Q. And then how does a disciplinary hearing work, in general? How many officers are assigned

to it and what are their respective roles?
A. Typically two, one is a primary and one is a witness.
Q. And so is the primary, is that the person that makes the decisions?
A. No. Both of the disciplinary officers reach consensus, is probably not the best way to say that but a way to describe that.
Q. So then would an officer who is on that detention committee, would that officer then be involved in an appeal?
MR. BOWEN: Objection, form.
Go ahead and answer the question.
THE WITNESS: No.
BY MR. BIDDULPH:
Q. I can rephrase it if you'd like me to?
A. No, the appeal goes beyond, above the hearing officers.
Q. Okay. So then if an officer was on a detention committee, then they would not be involved in any sort of appellate determination?
A. That's not accurate. They would not be involved in making the decision. We would rely on them to give us their version or their thoughts. They are the most familiar with the incident.

Q. Okay. But ultimately the appealed decision would be made by you or Staff Sergeant Young at the time?
A. Correct.
Q. So then Exhibit 12, which was Sergeant Slyngstad. I'm just curious. He's making a recommendation to you but you're coming up with the overall decision?
A. I don't know that Sergeant Slyngstad was on that disciplinary hearing, if you have the documentation on it.
Q. Well, that's what I want to ask you about. So I have here what we previously marked as -- hang on one second, let me make sure I get the right one. I believe it's Exhibits 10 and 11. It looks like Exhibit 10 is the Major Rule Infraction Report Hearing for April -- a hearing held on April 29, 2015, which is entered as Exhibit 10. Do you recognize that signature at the bottom?
A. No.
Q. Do you know who officer 36 is?
A. Not off the top of my head.
Q. If --
A. At that time.

Q. Okay. So if Officer Slyngstad previously testified in a prior deposition that that was his signature, would you have any reason to not believe that?
A. I would not.
Q. So then by signing this, was he the detention officer or was he the witness?
A. He would have been acting as the hearing officer.
Q. Okay. So as the hearing officer then, would it be appropriate for him to then give you a recommendation based on an e-mail which I was referring to, I think Exhibit 12, what he saw on the video and what the new outcome should be?
A. Yes.
Q. You believe that is appropriate?
A. Yes.
Q. How so?
A. He is very familiar with the case, with what he heard, what he saw. He's a senior supervisory officer that has historically exercised excellent judgment and a good perspective.
Q. So I guess the question that leads me to then is if Officer Slyngstad was the detention officer making that determination at the time of

the hearing and he made a finding of fighting but then later reversed that to rude or disrespectful, I guess I'm just curious why there was no finding of rude or disrespectful at the time of the disciplinary hearing, why was it fighting?
A. The elements very well could have been met during the hearing for the fighting and it's not a court. It has different burdens of proof. We try and do right by the inmates without any undue burden of process because it is a closed system. And so the ability to move quickly is important for us to maintain good order and try and manage that place very effectively.
The difference is Sergeant Slyngstad was not involved, that I recall, in writing the person up. He was the hearing officer. So the difference between him being the person that alleged or charged the inmate with the violation and then offering me suggestions, and him being the hearing officer I think is worthy of consideration.
Q. So then as the hearing officer though he could make a recommendation as to what it should be changed to on appeal?
A. Potentially, yes.
Q. As far as disciplinary hearings go, and

we'll stay here on this April 1, which is Exhibit 10, it says here "Inmate refused to enter plea." Does an inmate have to make a plea at a detention hearing -- or excuse me, disciplinary hearing?
A. No.
Q. If an inmate does not make a plea, is that an absolute determination of guilt?
A. It can be a consideration of guilt by the policy and by the rule book, yes.
Q. Are the detention -- excuse me, disciplinary hearing officers still supposed to look at other evidence?
A. Yes.
Q. Do you know in this April 2015, did the detention or disciplinary officers look at other evidence?
A. I do not.
Q. So based on Exhibit 10 -- can you tell on the face of Exhibit 10 what Mr. Briggs was found guilty of?
A. No, it's an incomplete record.
Q. Why do you call it an incomplete record?
A. It's missing the page that talks about what the violation was.
Q. And what would that page be?

A. It would be the report from the initiating officer.
Q. So would that be Exhibit 9?
A. Probably.
Q. I'm assuming there would be other reports attached to that as well, Exhibit 9?
A. Not necessarily.
Q. Based on a Major Rule Infraction Report, can you tell what evidence was reviewed to make a determination of guilt, which would be Exhibit 10?
A. Not with what has been provided to me.
Q. Can you tell based on Exhibit 10, the Major Rule Infraction Report Hearing, what audio or video recordings were used?
A. No.
Q. I'm looking at the signature, the hearing officer's signature. If there's two people assigned to a disciplinary hearing, should both of those officers sign that report?
A. Not at that time apparently.
Q. Well, and the reason I ask is from the February hearing, which was Exhibit 6 in that pile -- excuse me, I take that back, it is Exhibit 8. That looks like there's a number of signatures on that one?

A. Yes, it does.
Q. So would that be more typical?
A. Depending on the staffing for that day it would be typical.
Q. So you could have more than two officers in a disciplinary hearing then?
A. We could or we could just have one based on the staffing and the need for time length to meet time guidance.
Q. So it could just be one officer?
A. It could.
Q. Okay. Preferably two though at least?
A. Preferably.
Q. Okay. Actually, I do want to ask you with regards to -- if you can look at Exhibit 6, with regards to an inmate infraction report. This was for the February 26, 2015 hearing. Are inmates allowed to call witnesses on their behalf at a disciplinary hearing?
A. Yes, with caveats though.
Q. And what are those caveats?
A. You can't call your mother as a witness, you can't call necessarily somebody that isn't in the facility with you, you can't call Gandhi.
Q. Sure. It would need to be somebody that

witnessed the event?
A. And that was in the facility, yes.
Q. Okay. So if I can get you to turn the page on Exhibit 6, there's a disciplinary offense report that was completed on the third page. It looks like it was signed by Mr. Briggs. Well, page 1 was signed by Mr. Briggs.
So at the bottom of the first page which is -- the first page of the disciplinary offense report which is CCJI290, under inmate witnesses it has Michael Fuchs listed. Would Mr. Fuchs then be called as a witness?
A. Potentially.
Q. Is this the spot where an inmate would put in a request to have a witness?
A. As I recall at that time they had to identify and ask for that witness prior to the hearing.
Q. So if this would have been returned to disciplinary staff with Mr. Fuchs name on there --
A. I don't know specifically what happened with this one.
Q. Sure. But if it was provided then that would give notice that Mr. Fuchs should be a witness?

A. But I don't know when it was provided.
Q. Okay. I guess what's the general process? Are these -- report and/or disciplinary offense report, is that given to the inmate?
A. Yes.
Q. And then it looks like the inmate signs it, would that be correct?
A. Correct.
Q. And it looks like this one was served on 2/22/15. But then would a copy then be returned to staff with the inmate's signature on it?
A. I don't know what happened with this one.
Q. I'm just asking in general though?
A. I don't know.
Q. In a general hypothetical sense, the inmate would sign the disciplinary offense report and that would be kept in their file or returned to detention staff?
A. But I don't know when they would get that. They will give notice of the hearing and we ask if they want witnesses. They are typically given a copy of the offense reports so that they can prepare themselves for that and then the hearing occurs. When the signature occurs, when it

comes back to staff, I don't know the timing, especially specifically on this case.
Q. Okay. Do you know who was on the disciplinary team for this April of 2015 disciplinary hearing?
A. No.
Q. If I can turn you to Exhibit 14.
A. (Witness complies.)
Q. This looks like an e-mail from a Brian Taylor, I believe is an officer at the detention center or was at the time, to a -- between him and a Matthew Porter. At the top of that Mr. Taylor indicates -- I believe this is talking about Mr. Briggs or if you need to review Exhibit 14 prior to me asking questions about it, let's take a moment to do that.
A. I see it.
Q. Yeah. Have you ever seen this document or Exhibit 14 before?
A. Yes.
Q. And when have you seen it before?
A. In preparation with counsel.
Q. Okay. So then the beginning of this e-mail you'd agree that Mr. Taylor is sending out I guess a notice of the results of some disciplinary

hearings?
A. That is correct.
Q. And then it looks like there's some back and forth between him and an Officer Porter?
A. Correct.
Q. And Officer Porter asks, "I understand the lying and getting time for that, I was just surprised he got the same time for getting his ass kicked."
And then Officer Taylor states "He refused to make a plea so we take it as a guilty."
Is that detention center's policy that not making a plea is a guilty plea?
A. It can be considered as a guilty plea, yes.
Q. How so?
A. Refusing to make the statement -- and I'll try and rephrase this in a way that it says in the policy on that. It can be considered as a guilt, as guilt, yes.
Q. So not saying anything can be taken as an admission of an offense?
A. That is correct.
Q. There's also I believe in the policy that any event or incident that happens in jail

could result in criminal charges; is that correct?
A. Potentially.
Q. So hypothetically if inmate X hits inmate Y with his fist, that could result in an assault charge?
A. Potentially.
Q. So then obviously detention center staff would not prosecute that, that would be referred outside?
A. That's correct.
Q. All right. But any statement that an inmate made in their disciplinary hearing could be used against them in a future court proceeding, criminal court proceeding?
A. Potentially, not usually.
Q. Are inmates Mirandized or given Miranda rights warning before their disciplinary hearings?
A. There is a set of things that are read to them and the Miranda is part of that at that time.
Q. So then if an inmate just elects to remain silent, they haven't made an admission to any sort of behavior or act, would that be correct?
A. I'd like to consult with counsel real quick.

Q. Well, can you answer the question?
A. Not until I talk to counsel.
Q. Well, if you recall the rules, once the question is asked you need to answer the question and then we can take a break.
A. It depends.
Q. What does it depend on?
A. There is criminal sanction -- or there's violation of criminal law that results in penal punishment. There's violation of rules that result in jail sanctions that involve privileges typically. They're very separate items.
Q. Okay. But I don't think that answers my question. My question is though, is not making a statement an admission to an act?
A. I'm not sure I can answer the question as phrased. If you can try and rephrase that for me?
Q. So if an individual, specifically let's say Mr. Briggs, opts to remain silent, has he necessarily pled guilty or admitted to any wrongdoing?
A. It can be an element to consider for internal sanctions in the jail center.
Q. But it is not an admission?

A. I'd have to look at the specific language in the policy to tell you how that's articulated.
MR. BOWEN: Did you want to take a break, JJ?
THE WITNESS: I would.
MR. BIDDULPH: Okay.
THE WITNESS: Just because I want to be specific --
MR. BIDDULPH: I understand.
THE WITNESS: -- on how we do that.
MR. BIDDULPH: I'm not trying to bully you.
THE WITNESS: I gotcha.
(Whereupon, a brief recess was taken.)
BY MR. BIDDULPH:
Q. And so I guess I will just kind of clear this up though.
A. Please.
Q. Yeah. So if an inmate refuses to make a plea or enter a plea, that is not an absolute determination of guilt?
A. It is not an absolute. It is considered with all other factors.
Q. So the officers at the detention committee or the detention officer needs to

evaluate other reports or videos or statements?
A. Yes.
Q. Okay. So after this April incident though, Mr. Briggs did file an appeal and that was --I think we -- on a separate exhibit that was changed, the fighting was amended to being rude or disrespectful; is that correct?
A. Yes.
Q. And then Mr. Briggs made some attempts to appeal that being rude or disrespectful, do you recall that or were you ever made aware of that?
A. I may have been. I don't have an independent recollection of it.
Q. Okay. And I am looking at -- I'm just going to grab this to make sure I'm looking at the right one -- Exhibit 22 here.
On the first page here it looks like Mr. Briggs finally receives a response. I believe it's the second section or paragraph down. And it says here "I've reviewed the reports and" -- this is I believe from Young -- "spoken to the disciplinary team regarding your grievance appeal. The disciplinary sanctions will not be overturned. In addition, based on your recent behavior, administrative segregation is the best

classification for you at this time?"
Do you recall when Mr. Briggs was placed on administrative segregation?
A. No.
Q. If I were to say that based on prior interrogatories and admissions that we submitted, it was on or around May 4th, would that be correct?
A. I have no reason to doubt you.
Q. Okay. But this is a response to Mr. Briggs on or around 5/18. Would an inmate receive some sort of notification that they were placed on administrative segregation at the time that determination was made?
A. Usually at the time the move occurred.
Q. So where Mr. Briggs was already in APOD for discipline, would he have been then moved anywhere for placement on -- classification to administrative segregation?
A. I don't know if he was. I'd have to refer to his cell assignment history and I don't see that real handy here.
Q. Okay. Actually we were just provided with this yesterday. So if I hand this to you, this is the cell assignment you gave to me.
MR. STACEY: Yeah.

(Whereupon, Deposition Exhibit Number 23 was marked for identification.)
BY MR. BIDDULPH:
Q. If I gave this to you, I was just given this yesterday. It looks like it's a report that was created to show Mr. Briggs' history. Do you recognize that?
A. I recognize it as a report that is generated manually in our system, yes.
Q. Okay. But would it be an accurate representation of Mr. Briggs' cell assignment history?
A. Most likely.
Q. Okay.
A. With the caveat that it has handwritten notes that look like Jackie Keery's writing.
Q. Correct. So then I believe at the bottom there is some handwritten notes that indicate when there was a change from discipline to administrative segregation. So if that could assist you in your -- just in answering the question if he was moved, when he was reclassified to discipline to Ad Seg?
A. 5/4 of 2015 is the first I see where it

indicates Jackie's notes saying that my direction was that he was to be on administrative segregation.
Q. I believe -- so then would Mr. Briggs have been notified on 5/4 that his classification had changed to administrative segregation?
A. I do not know.
Q. Is there any policy or mechanism in place that would notify an inmate that their classification had changed?
A. I don't know.
Q. On 5/18 on Exhibit 22 Mr. Briggs is informed that "based upon your recent behavior, administrative segregation is the best classification for you at this time." Do you know what exactly what is being referred to there "recent behavior"?
A. I don't know specifically what staff sergeant -- then Staff Sergeant Young was referring to, but I'm aware that he had incidents that made us worry about his ability to be safely not on administrative segregation.
Q. So I guess what were those concerns? I mean why was he placed on administrative segregation?

Exhibit D

A. On what date?
Q. On May 4 of 2015.
A. I don't have a time line of incidents. I'm referring to some of Jackie's notes. And I know that there were strangulation marks on him on 4/19, that there were -- there was an incident with a razor on or about that period of time and some other things, but I don't have a time line of all the events and the incident reports or team notes that would make it easy for me to give you a list of the things that would enter into that factor.
Q. So is there anything specific that would have put Mr. Briggs on administrative segregation?
A. There's very rarely any one thing that creates a condition like that by itself. It's a culmination of behavior, history, mental health, physical health, and a variety of things that go into that decision.
Q. So then previously entered Exhibit 13, if I could get you to flip back to it.
A. (Witness complies.)
Q. Do you recall sending, receiving, or being a part of this e-mail chain?
A. Not specifically, no.
Q. And these are documents that were turned

over to us it looks like from -- originally from Brett Slyngstad. Attached is the second page of the exhibit, was attached to the e-mail, if you need to read that to familiarize yourself.
A. Are you speaking of this --
Q. Yes, I am.
A. -- April 28th narrative?
Q. Yes.
A. Give me a second. I have read it.
Q. So are you -- are you familiar with that I guess exchange or conversation?
A. Yes, I am.
Q. And did you have any conversations with Officer Slyngstad about what appears to be maybe an April 28 conversation with Inmate Smith?
A. I don't have a specific recollection of it, but it happened I'm sure.
Q. And then it looks like it was forwarded to a few people which would be Marty Lambert, Brian Gootkin and Dan Springer. Who were those individuals?
A. Marty Lambert is the county attorney and Brian Gootkin is the sheriff, Dan Springer is the undersheriff and my direct supervisor.
Q. And did you have any conversations with

these gentlemen about the contents of this e-mail and its attachment?
A. I don't recall.
Q. Was this e-mail and its attachment the basis for Mr. Briggs being placed on administrative segregation?
A. It would have been a factor, yes.
Q. Who made that determination that he should be placed on administrative segregation?
A. It would have been me.
Q. So was there any incident report or anything put in the jail management system --
A. This.
Q. -- for the basis of Mr. Briggs' placement on administrative segregation?
A. There were lots of incident reports and information that -- or in the system that factored into that decision.
Q. But there wasn't ever any one report that maybe detailed the reason why?
A. No, not that I'm aware of.
Q. So I'm going to hand to you which is a section or an outtake of the policy and procedure manual which was provided to us. It's Bates Stamped 1 through -- well, the table of contents is

Bates Stamped 1 through 4 and it's pages 97 through 101, which we'll enter as Exhibit, what are we at, 24?
(Whereupon, Deposition Exhibit Number 24 was marked for identification.)
BY MR. BIDDULPH:
Q. So the Policy and Procedure Manual details I guess placement on administrative segregation. And it gives some pretty, what I believe are, specific criteria and I'll just read from page 99, bullet point 2. "Inmate must present a serious threat to life, property, self, staff, or other inmates, or to the security or orderly operation of the facility."
Was there a determination made as to what category Mr. Briggs fit in there?
A. Yes.
Q. And what was that?
A. Danger to himself and the orderly operation of the facility.
Q. And how was he a danger to himself?
A. Attempts at potential suicide.
Q. And those were prior attempts at suicide?

A. Yes.
Q. Okay. Those were some months before this placement though?
A. In addition to the self harm that we determined was likely.
Q. And when you say "self harm" what are you talking about?
A. Provoking fights, showing up with black eyes that we couldn't correspond to anything other than self inflicted.
Q. And then you said "orderly operation of the facility," what are you referring to there?
A. In a facility that's behavior based it is determined that -- it is important that people follow the rules, get along, do their own time -- and I'm paraphrasing.
Q. Uh-huh.
A. And utilize the resources that are available to them. They are 40 some different programs. There's mental health counseling, there's mental health counseling. The officers are really good at helping counseling people through stuff. Mr. Briggs did not avail himself of all those opportunities and created a circumstance that made us not -- fearful isn't the right word, but

concerned about his ability to not disrupt the operation, not disrupt other inmates, not try and harm himself. And so that all goes into the decision and meets those criteria.
Q. And just per point 3, was there ever any incident report in the JMS specific as to the reasons for placement on administrative segregation?
A. There is no such report. There is notes in the team meeting that are our documentation of those decisions. There are all the incident reports that support that decision.
Q. And when the manual here says the JMS, is it referring I guess to jail management system?
A. Correct.
Q. And what is the jail management system?
A. It was and is an ex jail product.
Q. And is that where these incident reports and disciplinary reports are generated?
A. Potentially, yes. Yes.
Q. Are any e-mails between staff, do they go directly into the JMS?
A. No.
Q. So if notice was provided by e-mail of Mr. Briggs' placement on administrative

segregation, it would not go into the JMS?
A. It's not completely accurate.
Q. Okay. How is that not accurate?
A. An e-mail direction could then be transposed into the JMS that indicates his housing status, his move, or special conditions.
Q. Okay. If so, if it were transposed though, would it show up as an incident report or a disciplinary report or?
A. No, not necessarily.
Q. Where else would it show up in the system?
A. In his housing notes, in his classification notes, in various ways through the system.
Q. Okay.
A. Keep separates.
Q. But this here says an incident report, so then it would have to be specifically transposed to an incident report, would that be correct?
A. If that's the way you interpret that, but we don't interpret it that way.
Q. Okay. How do you interpret it?
A. That our documentation -- an incident report translates to a documentation of the

incidents and then a decision.
Q. When Mr. Briggs was in administrative segregation, was he evaluated for removal from administrative segregation?
A. Yes.
Q. How often was he evaluated for removal or reclassification?
A. Every week by the team.
Q. Was there anything that the team was looking for that would prompt his removal from administrative segregation?
A. Yes.
Q. What was it the team was looking for?
A. It would have been the totality of his behavior and any new incident reports, reports by mental health, reports by staff that he could -- and we knew he could because he had a period of conduct where he was out and capable of managing himself appropriately within the facility. So we were looking for indicators that would tell us that he has -- he can manage himself appropriately and that would not be a threat to the orderly operation or himself or other inmates.
Q. And so was there ever an expectation that was communicated to Mr. Briggs of what he

needed to do?
A. Often times there is. I can't tell you specifically on Mr. Briggs.
Q. Did the jail staff believe then -- or you or the jail staff believe that these April and February incidences were I guess a self harm?
A. We had reason to believe they were manipulative in nature.
Q. Why do you believe they were manipulative in nature?
A. The totality of the circumstances and his continuing behaviors, coupled with the reports we had, our experience with manipulative personalities, which we have a lot of experience with, comments and recommendations from staff, from mental health, medical staff. It's a lot of information that goes into making that decision.
Q. So was there a belief then that Mr. Briggs instigated these assaults on him?
A. Yes.
Q. And why was there that belief? What objective facts led to that?
A. The video evidence, the statement from other inmates, officers' observations of Mr. Briggs every day all day.

Q. So the video evidence, have you reviewed those videos?
A. If I did it was a really long time ago. I have a vague recollection of actually seeing at least one of them.
Q. Do you recall any of those videos showing Mr. Briggs strike either Mr. Smith or Mr. Steele?
A. I do not.
Q. So then any instigation of that, those assaults on him would have been either verbal or some other means?
A. Correct.
Q. And do those videos contain any audio?
A. No.
Q. So there would be no record or report of what was actually said?
A. That's inaccurate.
Q. How so?
A. There is video evidence of him speaking without the audio. There is officer reports and other inmate reports that go with that, as I recall.
Q. And those other inmate reports, do you recall who those were?

A. No, I don't.
Q. So if those other inmates reports were, say, either Mr. Smith or Mr. Steele, would those be a reliable source of information?
A. Not as standalone. But with supporting information, could be considered as supporting of that, yes.
Q. So then there was information obtained from others besides Mr. Smith or Mr. Steele?
A. As I recall there is.
Q. Do you happen to recall who those persons were?
A. No.
Q. Okay. And the reason I'm asking is I haven't seen anything in his, say, criminal justice file or incident reports or disciplinary reports that would indicate any other persons were spoken to. So if they were spoken to, would that go into an incident report or a disciplinary report?
A. May or may not. It may be just off of reports from officers reporting conversations that they had.
Q. I notice the team meeting notes indicate that when Mr. Briggs went on --
A. What exhibit is that?

Q. I'm sorry. Exhibit 17.
MR. BOWEN: Thank you.
THE WITNESS: I'm with you. I'm sorry.
BY MR. BIDDULPH:
Q. Okay, that's fine. I know it says team meeting notes start around maybe 4/20 of '15. Indication is charges to be dismissed for lack of speedy trial. This is page CCJ1300. And then there's some indication that detention staff later on would be subpoenaed or required testimony.
Was there a concern about Mr. Briggs having another incident between the filing of a speedy trial motion and that hearing?
A. In what context?
Q. Well, in the context of him getting hit again.
A. We have concern for the health and safety of the inmates. The legal and trial process is separate and rarely, if ever, is considered in how we house or manage inmates.
Q. Did you ever have any communication with the county attorney regarding Mr. Briggs' classification in Ad Seg?
A. Not that I recall. I'll stand corrected. He was -- I told him in an e-mail just