```
 1   UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
 2                MONTANA, BUTTE DIVISION
 3   _____
 4   KEVIN BRIGGS,
 5            Plaintiff,
 6      vs.                  Case No. 18-0010-BU-BMM-JCL
 7   GALLATIN COUNTY AND
     JOHN DOES 1-8, AS
 8   INDIVIDUALS AND IN THEIR OFFICIAL
     CAPACITY AS DETENTION OFFICERS,
 9
             Defendants.
10   _____
11         DEPOSITION UPON ORAL EXAMINATION OF
12                    DAVID LAUCHNOR
13   _____
14       BE IT REMEMBERED, that the deposition upon oral
15   examination of DAVID LAUCHNOR, appearing at the
16   instance of Plaintiff, was taken at
17   510 West Hemlock, Suite B1, Bozeman,
18   Montana 59715 on the 17th day of July
19   2019, beginning at the hour of 9:00 a.m. pursuant
20   to the Federal Rules of Civil Procedure, before
21   Marla Jeske, Court Reporter - Notary Public, CSR.
22
23
24
25
```

Exhibit E

Page 6

1 questions, if you need clarification or you don't
2 understand a question, if you can please ask so
3 that I can provide clarification or perhaps
4 rephrase it in another way so that you understand
5 what I'm asking and so that you can give an
6 appropriate answer.
7     If you don't ask for clarification or
8 ask a question, I'm just going to assume that you
9 understand the question and the answer you've given
10 relates to that question. Does that make sense?
11     A. It does.
12     Q. Okay. Lastly, since we are being
13 transcribed, we need to try and make sure we give
14 yes or no, audible, verbal answers, not head shakes
15 or huh-uh's or uh-huh's because those don't really
16 translate well to a typewritten format.
17     So with kind of those ground rules in
18 place, do you have any questions or do you
19 understand anything -- or understand everything?
20     A. I understand what you say, yeah.
21     Q. Okay, great.
22     Last, but not least, this is not an
23 endurance test. This is not -- you know, we're not
24 looking to sweat anybody out. If you need a break,
25 please feel free to ask for really any reason, just

Page 7

1 state that you need a break and we can take five,
2 ten minutes for whatever we need to do.
3     We'll probably take a break at some
4 point or another just to give everybody a chance to
5 stretch their legs.
6     One thing I do ask is if I have asked a
7 question and you do need a break, I ask that you
8 answer that question prior to us taking a break.
9     So getting into this, what have you done
10 to prepare for today's deposition?
11     A. I met with Alex and Sean at the
12 sheriff's office just to discuss the basics of the
13 case and look over some of our reports and e-mails
14 and the time line of what happened when Mr. Briggs
15 was in our detention center.
16     Q. And so what documents did you review in
17 preparation for this deposition?
18     A. Alex had a packet for me and it had a
19 lot of documents in it.
20     Q. Were they documents related to this
21 case?
22     A. Yes, sir.
23     Q. Okay. Did you review any audio or video
24 recordings related to the case?
25     A. Not recently. I think the last time I

Page 8

1 saw the video was when I spoke in court on this a
2 few years ago.
3     Q. Okay. Outside of that video -- and I
4 guess what video are you referring to?
5     A. It's the video recording of this fight
6 between Briggs and Smith, I believe.
7     Q. Okay. Have you reviewed any other audio
8 or video recordings outside of that, I guess it
9 would be surveillance video?
10     A. Not that I can recall.
11     Q. Okay. If I can just get a little bit
12 about your background. What's your educational
13 background?
14     A. I have a bachelor's in biological
15 science from MSU.
16     Q. Any other schooling outside of that?
17     A. Um, not other than law enforcement base
18 schools.
19     Q. What law enforcement base schools are
20 those?
21     A. I've been to Montana detention officer
22 Basic and the police and sheriff basic. I've been
23 to crisis response, um, a few others. Like our
24 physical fitness testing, there's a school for that
25 and Taser. I was a Taser instructor.

Page 9

1     Q. And are those just certificate programs
2 or is it part of a degree?
3     A. They're certificate programs.
4     Q. And is that part of an ongoing training
5 that you have as a detention officer?
6     A. Yeah.
7     Q. Okay. I guess I don't want to jump the
8 gun there, how are you currently employed?
9     A. I'm a stay-at-home dad.
10     Q. Sorry, what was that?
11     A. I am a stay-at-home dad.
12     Q. Oh, okay. And prior to that what was
13 your employment?
14     A. Sheriff's officer or sheriff deputy.
15     Q. And was that -- when you say sheriff's
16 deputy, was that a street deputy, a patrol deputy?
17 What was your capacity?
18     A. A patrol deputy for the sheriff's office
19 here in Gallatin county.
20     Q. Okay. And prior to that what was your
21 employment?
22     A. Right before that I was a sergeant in
23 the detention center.
24     Q. When did you end your employment as a
25 sergeant in the detention center?

Page 10

1  A. I believe it was around April 16th,
2  2016, somewhere in that month I believe.
3  Q. And prior to doing detention, how were
4  you employed?
5  A. Right before detention I worked at
6  Costco and before that I was a well site geologist
7  in North Dakota.
8  Q. If you don't mind me asking, why did you
9  leave law enforcement?
10  A. Because my wife has a good job and we
11  can afford for me to stay at home with our
12  daughter.
13  Q. Oh, great.
14  A. I think raising your own children is
15  preferable to paying someone to do it.
16  Q. I had twin boys and spent some time as a
17  stay-at-home father, so I fully respect what you're
18  doing. I think that's great.
19      Getting into this case, you're familiar
20  with the Plaintiff Mr. Kevin Briggs?
21  A. I am.
22  Q. And are you are you familiar with him?
23  A. I knew him from the time he spent in
24  Gallatin County Detention Center while I worked
25  there as a detention corporal, I believe.

Page 11

1  Q. And when did you first hear about
2  Mr. Kevin Briggs?
3  A. I was at work the morning that he
4  escaped from Bozeman PD, and I remember going into
5  central where our computers are to see if I could
6  see on our external cameras which direction he went
7  from the police department.
8  Q. So when he left the police department
9  was that the Gallatin County sheriff jail or was
10  that a separate facility?
11  A. So next door to the jail is a shared
12  building that has courts, Bozeman PD, and the
13  sheriff's office all in the same building and he
14  escaped from Bozeman PD's custody in an interview
15  room on their part of the building.
16  Q. And when you heard about that were you
17  assigned to review that video or did you take that
18  up on your own?
19  A. I was one of the two shift supervisors
20  on duty who have access to looking through all the
21  cameras and I was asked by Lieutenant Jarrett to
22  look through video and see if I could find
23  anything.
24  Q. Did you come up with anything?
25  A. I didn't.

Page 12

1  Q. Did you have any other participation in
2  that investigation?
3  A. No.
4  Q. And then when was your next interaction
5  with Mr. Briggs?
6  A. I met him when he came to the jail. I
7  don't believe I was there when he was booked in.
8  Q. But then you had interactions with him
9  while he was incarcerated there?
10  A. Yeah, he was there for quite awhile. I
11  saw him while I was at work quite a bit.
12  Q. Were you part of what's referred to I
13  guess as a treatment team at the Gallatin County
14  Detention Center?
15  A. I don't know what a treatment team is.
16  Q. I suppose that would be a team that
17  reviews classification and placement of individuals
18  within the jail facility?
19  A. We have a team meeting. It's a
20  combination of administration, officers,
21  supervisors, medical, and mental health. That's
22  probably what you're referring to; is that right?
23  Q. That's what I'm referring to, yes.
24  A. Yeah, I went to a lot of those meetings.
25  Q. Did you go to every meeting.

Page 13

1  A. No, they were on Mondays. And, like I
2  said, the supervisors would generally go, it would
3  either be myself or the sergeant and I went the
4  majority of the time but I did not go to all of
5  them.
6  Q. If you didn't attend a meeting, how
7  would you make yourself aware of what was discussed
8  at the meeting?
9  A. They e-mail out team notes after the
10  meeting, just updating everybody on any changes
11  they made or what the status is of people who were
12  reviewed.
13  Q. When Mr. Briggs was booked into the
14  Gallatin County Detention Center, do you recall
15  what his classification status was?
16  A. I believe they put him in alpha pod on
17  Ad Seg to figure out what he was going to be like
18  as an inmate.
19  Q. And I guess when I say "classification,"
20  do you understand what I'm talking about there?
21  A. I do. I don't know whether we're
22  thinking the same thing.
23  Q. Well, so let's clear that up.
24      Are inmates classified at Gallatin
25  County Detention Center?

Page 14

1  A. Yes. We have -- we had -- and I don't
2  work there anymore, we had a classification system
3  from inmate workers on the low end to disciplinary
4  at the high end and Ad Seg, high, medium, and low
5  in the middle there.
6  Q. So when you say high, medium and low,
7  what's the criteria or differences for those
8  classifications?
9  A. It's a behavior-based jail and depending
10 on what your charges are and what your situation
11 is, that determines where you start in the jail.
12 And how you behave as an inmate and how your time
13 is spent in the jail gets reviewed every 30 days
14 and, possibly, you can bump down a level lower and
15 work your way down to a more comfortable living
16 situation.
17 Q. So in a general sense then, what would
18 it take to bump -- does everybody start at high and
19 then move down or?
20 A. No, they don't. It depends on the
21 charges that you're brought in on, your history and
22 the jail and possibly other criteria.
23 Q. Do you recall -- you said Mr. Briggs was
24 Ad Seg when he got there. After he was out of Ad
25 Seg, do you recall what his classification was at

Page 15

1  that time?
2  A. I believe he went to high.
3  Q. And do you recall why he was placed on
4  high classification?
5  A. Because of the nature of his charges.
6  Q. Which were?
7  A. Um, I don't recall exactly what they
8  were.
9  Q. From your recollection then, did
10 Mr. Briggs go through 30 day reviews on his
11 classification?
12 A. He would have gone through 30 day
13 reviews. A lot of the time he was outside of that
14 system because he was getting reviewed every seven
15 days on Monday at the team meeting just because of
16 his situation.
17 Q. Did he ever go below high
18 classification?
19 A. Um, not that I know of. He might have
20 made it to medium. I know he did not make it to
21 low.
22 Q. Do you recall why he didn't make it to
23 low?
24 A. Because he had a lot of issues at the
25 detention center. There were some self harm events

Page 16

1  and some fights and defiant behavior.
2  Q. Would Mr. Briggs have ever been placed
3  on low classification?
4  A. Potentially, yeah.
5  Q. How would he have gotten there?
6  A. By behaving and not having issues and
7  disciplinary reports.
8  Q. I kind of want to fast forward, I know
9  you mentioned Mr. Briggs was there for awhile.
10 A. Uh-huh.
11 Q. But this case mostly involves around an
12 incident that happened in roughly April of 2015.
13 Do you recall that incident?
14 A. You'll have to give me more than that.
15 Q. Sure. There was an incident involving
16 an inmate named Smith.
17 A. Okay.
18 Q. Where there was some sort of an
19 altercation. Do you remember that incident?
20 A. I do.
21 Q. And what was your role in that incident?
22 A. So I didn't witness that incident live.
23 I found that while reviewing video footage of the
24 pod that he was housed in after he was discovered
25 to have a bruise on his face. Well, I've written a

Page 17

1  report about exactly what I saw on the video. I
2  believe the gist of it is that Briggs was sitting
3  at a table. He was approached by Smith, hit either
4  before or after he stood up, circled around the
5  table on the opposite side from Smith and then
6  Smith locked down and Briggs locked down.
7  Q. So you said you wrote a report. So that
8  would be an accurate recollection of what you saw
9  on the video?
10 A. Yes, my report would be the thing to
11 look at for what I saw happen on video.
12 Q. And were you the person to notice that
13 Mr. Briggs had a black eye?
14 A. I was not.
15 Q. Who was that do you recall?
16 A. I recall just from looking at our notes
17 here that Officer Eckhardt I believe is the first
18 person to notice.
19 Q. And did you have any conversation with
20 Officer Eckhardt about what she noticed?
21 A. I'm sure that I did, but I don't recall
22 the conversation.
23 Q. So then you said you reviewed the video?
24 A. Uh-huh.
25 Q. Did you -- I guess my first question is

Page 18

1  how long did it take you to go through the video to
2  find that incident?
3     A. That can take a few hours. It depends
4  on what kind of a time period you're looking at.
5     Q. Did Officer Eckhardt tell you what
6  Mr. Briggs was doing at the time she noticed the
7  black eye?
8     A. I'm sure that she did. I don't remember
9  that conversation. I believe from reading her
10 report that it was while taking him to medical to
11 see the nurses.
12    Q. You mentioned that you wrote a report.
13 I'm going to hand you three documents. If you
14 could take a look through those and tell me if you
15 recognize them.
16       And I have one for you there.
17    A. Yes, I do.
18    Q. And what are those documents?
19    A. The first one is an incident report
20 written by Officer Kohler about a conversation he
21 had with Inmate Briggs regarding his black eye.
22    Q. And what's the second document?
23    A. It's an incident report written by
24 Officer Eckhardt about when she discovered Briggs'
25 black eye.

Page 19

1     Q. And then what's the third one?
2     A. This is an incident report that I wrote
3  about Eckhardt telling me about the black eye.
4     Q. I have a question for you, have you
5  ever -- your role at this facility was a sergeant;
6  am I correct in that?
7     A. It says in this report that I was a
8  corporal at the time.
9     Q. Corporal.
10    A. But I eventually became a sergeant, yes.
11    Q. Excuse me, at the time.
12       Did you ever -- it mentions a medication
13 pass, did you ever participate in medication pass?
14    A. Yes.
15    Q. How does that usually happen in a
16 general sense?
17    A. A nurse will load up all of the meds in
18 a med cart that she takes to the individual pods
19 where the inmates are housed. And the pod that
20 Briggs was in would be a high security pod so the
21 inmates would lock down and they would take their
22 meds through the food port in their door one at a
23 time as the med cart was walked through the room.
24    Q. So the inmate would be inside their pod?
25    A. They would be -- the inmate is inside of

Page 20

1  their own cell and there's a food port in the door
2  that opens.
3     Q. Okay.
4     A. So that the meds can be passed in to the
5  inmate.
6     Q. Okay. Just so I'm clear, the door would
7  be closed, the port would be open and that's how
8  the medication would pass through?
9     A. That's correct.
10    Q. Okay. So I'm looking at Officer
11 Eckhardt's report here, which I believe was the
12 second document. And she states on April 15th
13 while conducting medication pass, I approached
14 Briggs in cell D1O1. I asked, "What happened to
15 your eye?"
16       He stated, "I caught an elbow in the rec
17 yard?"
18       I responded with "ouch that hurts."
19       So at that time then Mr. Briggs would
20 have been in his cell; is that correct?
21    A. No. She wrote the west slider. That's
22 in the hallway between the pods and where medical
23 is located in the center of the detention center.
24    Q. And I guess I'm looking at the second
25 paragraph. Maybe we're confused.

Page 21

1     A. Okay. Yeah, during med pass he would
2  have been in his cell D101.
3     Q. Do inmates ever talk between cells?
4     A. Yes.
5     Q. How do they go about that generally?
6     A. Well, depending on where the two cells
7  are located. Sometimes you can hear each other
8  through the walls, sometimes you talk underneath
9  the doors. There's a little gap underneath the
10 door and the rooms are mostly concrete and metal,
11 so sound echos well.
12    Q. Sure. So if Mr. Briggs is having this
13 conversation then with Officer Eckhardt, would
14 other inmates be able to hear that conversation?
15    A. Yeah, most likely.
16    Q. Did you ever do an initial review of the
17 video to investigate Mr. Briggs' claim about
18 catching an elbow in the rec yard?
19    A. I don't know the time line of when I
20 reviewed the video footage after this happened.
21    Q. But ultimately, you did find that he had
22 had that altercation with Mr. Smith?
23    A. Yes.
24       MR. BIDDULPH: I guess if we can enter these
25 three as Exhibit 1. Or actually, can we go off the

Page 22

1  record for two seconds?
2      (Whereupon, Deposition
3       Exhibit Number 2 was
4       marked for identification.)
5  MR. BIDDULPH: So we're back on the record.
6      Just for the record, we're entering
7  these three reports that we just identified as
8  Exhibit 2.
9  BY MR. BIDDULPH:
10     Q. And I want to look at your report, Davy.
11 If you could just read to me for the record what
12 your narrative was on your report? If we could go
13 back here. I believe it's marked as incident
14 report number 00002783 at the top.
15     A. I, Corporal Lauchnor DC59, was working
16 in the Gallatin County Detention Center on 4-14-15.
17 In the late afternoon approximately 1640 hours
18 Officer Eckhardt DC18 informed me that Inmate
19 Briggs #29033 had a black eye and that he didn't
20 have it that morning at med pass. I reviewed our
21 camera footage and did not see any incident [sic]
22 that Mr. Briggs had been attacked by another inmate
23 between med pass and when he was brought to the law
24 library at approximately 1637 hours when his eye
25 was discovered. End of report.

Page 23

1      Q. So then at that time you didn't
2  see -- and I guess that's what I was asking: You
3  did a video review and you didn't see anything at
4  that time?
5      A. That's correct.
6      Q. Okay. Do you recall if Mr. Briggs was
7  written up based on any of these reports?
8      A. I think Officer Eckhardt eventually
9  wrote him up for lying essentially based on what he
10 told her.
11     Q. And do you understand why he was written
12 up for lying?
13     A. Yeah, he told her that he caught an
14 elbow in rec.
15     Q. Okay. So I want to hand you another
16 document and this one is marked Disciplinary
17 00002323. And we'll enter this as exhibit -- well,
18 I guess I'll first ask you, can you identify that
19 document?
20     A. This is a disciplinary offense report
21 that I wrote about Mr. Briggs.
22     Q. And what was the basis for this
23 disciplinary offense report?
24     A. An altercation between Smith and Briggs
25 in the day room of DPOD.

Page 24

1      Q. And was this written after you reviewed
2  additional footage?
3      A. Yes. It says here that this was written
4  on April 27th, 2015.
5      Q. So you originally reviewed footage
6  regarding rec yard on 4-14-15. So then did you
7  wait another, what would that be, week and a half
8  to then review additional footage?
9      A. The issue came back up and that caused
10 me to go and look at a wider -- a larger amount of
11 video from a broader time period.
12     Q. Why did the issue come back up?
13     A. I don't recall exactly.
14     Q. Were you instructed to look at
15 additional video footage by a superior or another
16 officer?
17     A. I don't remember.
18     Q. Did you just do this on your own?
19     A. Yeah, I assume so.
20     Q. So then what would have been the cause
21 or impetus for you to just take this on yourself?
22     A. It was an unresolved issue and it's
23 possible that another inmate tipped me off to go
24 look or -- I don't recall.
25     Q. If it was another inmate, then you don't

Page 25

1  recall who that inmate was?
2      A. No, I don't.
3      Q. Did you have any conversation with
4  Mr. Briggs about this incident?
5      A. I'm sure that I did.
6      Q. Do you recall when that took place?
7      A. Before and after this incident report,
8  this disciplinary report.
9      Q. And so when you spoke with Mr. Briggs, I
10 guess what exactly did you ask him and what did he
11 say?
12     A. "What happened?" And I don't remember
13 if he told me about the fight or if he stuck to his
14 elbow story.
15     Q. Did you ever talk with Mr. -- or Inmate
16 Smith about this incident?
17     A. I don't recall. It would have made
18 sense to do that, but I don't know if I did. It
19 doesn't say that I did in this report.
20     Q. And just to be clear, did you talk to
21 any other inmates that were in that pod at that
22 time?
23     A. Those would have been the two that I
24 would have talked to unless someone else in there
25 volunteered something.

Page 26

1  Q. I'm just curious about the layout of the
2  detention center. It says Mr. Smith, based on your
3  report, was in cell D102 and Mr. Briggs is in D101.
4  Are those two cells next to each other?
5  A. Yes, those two would be adjacent.
6  Q. So if Mr. Briggs was having a
7  conversation with Officer Eckhardt about his black
8  eye, Mr. Smith could hear that conversation?
9  A. Very likely.
10  Q. And this is a disciplinary offense
11  report, these others are incident reports. What's
12  the difference between these two?
13  A. A disciplinary report for a major like
14  this one will be reviewed by a disciplinary team
15  and they'll invite the inmate in to give their side
16  of the story. And then they'll make a ruling on
17  whether or not the inmate is found guilty of the
18  disciplinary or not, and if they're found guilty,
19  how long they'll spend in APOD or what their
20  repercussions will be.
21  Q. And again, I guess for my benefit, if
22  it's an incident report, does it necessarily go to
23  a disciplinary committee?
24  A. No. An incident report is just a
25  written history of what happened and it could be

Page 27

1  reviewed at a disciplinary hearing, but it doesn't
2  necessarily cause a disciplinary hearing.
3  Q. Are inmates given a copy of an incident
4  report?
5  A. No.
6  Q. Are inmates given a copy of a
7  disciplinary offense report?
8  A. They are.
9  Q. And it looks to me as though this was
10  provided to Mr. Briggs; is that correct?
11  A. It would have been, yes.
12  Q. Is that why his signature is at the
13  bottom?
14  A. Yep.
15  Q. When you write a disciplinary report, do
16  you make a recommendation then for I guess the
17  violation and/or any sort of disciplinary action?
18  A. The violation, yes, is an important part
19  of the disciplinary report, but the recommendation
20  for what happens is totally up to the disciplinary
21  hearing.
22  Q. And then what did you recommend as a
23  violation on this -- for this incident?
24  A. Fighting and physical force.
25  Q. Why did you recommend that Mr. Briggs

Page 28

1  should be disciplined for fighting and physical
2  force?
3  A. In the detention center sometimes both
4  parties in a fight can be held responsible for the
5  fight regardless of what happened. Also, I felt
6  that it was important to lock down Briggs until we
7  figured out what was going on because there may
8  have been more to the fight than what was evident
9  on the video footage.
10  Q. So then I guess there's a lot to unpack
11  there. When you said "lock down" Mr. Briggs, is
12  that a disciplinary lockdown or is he locked down
13  under some other mechanism?
14  A. So when there's a major disciplinary
15  report on someone for something that involves
16  safety of the facility or the inmates or the
17  officers, that inmate will be locked down sometimes
18  in their own cell and sometimes in alpha pod until
19  we can investigate it and figure out what's going
20  to happen next.
21  Q. And is that when this investigation took
22  place, is when Mr. Briggs was locked down?
23  A. Yeah.
24  Q. Okay. And so then what did you see on
25  the video that led you to believe that Mr. Briggs

Page 29

1  was fighting or using physical force, I guess,
2  which would result in discipline?
3  A. The video doesn't show Mr. Briggs being
4  the aggressor at all.
5  Q. Okay. So then why would he be
6  disciplined for fighting or physical force?
7  A. I was aware of another fight that
8  happened between Briggs and another inmate where he
9  was actively taunting the other inmate and it was
10  also a topic of discussion at team meetings, that
11  Briggs was attempting to control his environment by
12  choosing who could live with him and where he was
13  living.
14  Q. What do you mean by that?
15  A. Often times inmates will try to control
16  who gets to live with them by getting people kicked
17  out of the pod that they're living in that they
18  don't get along with.
19  Q. And in a general sense, how would an
20  inmate control who gets to live with them?
21  A. You might -- it might say that someone
22  was suicidal to get them pulled out and put on
23  suicide watch. They might try to start a fight
24  with them and look like the victim so that the
25  other person's put on disciplinary. They might

Page 30

1  write us kites saying that someone was being
2  aggressive towards them so that they would be a
3  kept separate put in place. There are a lot of
4  different methods that an inmate might try and use
5  to get someone removed from the pod.
6     Q. I guess specific to Mr. Briggs, what was
7  the basis for the belief that he was trying to
8  control his placement?
9     A. His interactions with officers and other
10 inmates and his history in the detention center.
11    Q. Can you recall any specifics?
12    A. I can remember after the disciplinary
13 that Waliser wrote -- I don't remember Waliser's
14 rank at the time -- that it was surmised that he
15 may have been trying to control whether or not
16 Inmate Steele got to live with him or not through
17 the fight.
18    Q. So on your review of this video, did you
19 ever see Mr. Briggs strike Mr. Smith?
20    A. I did not.
21    Q. Did you ever see Mr. Briggs
22 verbally -- or taunt Mr. Smith?
23    A. No.
24    Q. Is there any audio on the recording?
25    A. No. In order for audio to be recorded

Page 31

1  someone would have had to press one of the intercom
2  buttons or it would have been turned on from the
3  central control computer.
4     Q. So would you have any basis to know if
5  he was verbally taunting Mr. Smith?
6     A. I would not.
7     Q. So then would Mr. Briggs then be
8  considered a victim of an assault by Mr. Smith?
9     A. He could be, and it deserved more
10 attention and more review. That's why I wrote this
11 report.
12    Q. I may have already asked though, did you
13 talk with Mr. Smith at all?
14    A. I don't remember if I did or not.
15    Q. Do you know if Mr. Smith was taunting
16 Mr. Briggs at all?
17    A. I do not.
18    Q. Do you know if Mr. Smith was calling
19 Mr. Briggs any sort of names?
20    A. I do not.
21    Q. I see in a few places in his criminal
22 justice file a term called bulldogging, are you
23 familiar with that?
24    A. I am, yes.
25    Q. Okay. What is bulldogging?

Page 32

1     A. An inmate will try and rule a pod by
2  intimidating other inmates, maybe taking their
3  desserts or other things like that.
4     Q. So is it usually through physical acts?
5     A. It can be, yeah.
6     Q. Could it also be mental?
7     A. Sure.
8     Q. Or emotional?
9     A. Right.
10    Q. Do you know if Mr. Smith was bulldogging
11 Mr. Briggs?
12    A. I don't.
13    Q. Was there any reports or evidence that
14 Mr. Briggs was bulldogging Mr. Smith?
15    A. Not that I'm aware of.
16    Q. Do you recall the sizes, the physical
17 stature of the two gentlemen?
18    A. I remember what Briggs looks like. I
19 don't remember Smith. There were too many Smiths.
20    Q. Do you recall if one was larger than the
21 other?
22    A. I don't.
23    Q. Did you have any conversations with
24 Officer Taylor or -- I want to get his name
25 right -- Slyngstad?

Page 33

1     A. Slyngstad was my sergeant at the time
2  and Officer Taylor was on our shift. He was part
3  of the disciplinary committee I believe.
4     Q. And did Sergeant Slyngstad and -- is
5  Taylor also a sergeant or is he a --
6     A. Taylor is an officer.
7     Q. An officer.
8        Were those two on the disciplinary
9  committee for Mr. Briggs?
10    A. I don't recall. I don't have a copy of
11 the disciplinary paperwork, but their names would
12 be on it if they were there.
13    Q. Okay. But did you speak to either of
14 them about this incident?
15    A. I'm sure that I did.
16    Q. Do you know if either of them reviewed
17 the video of this incident prior to his
18 disciplinary hearing?
19    A. Yeah, they would have done that. I
20 don't know for sure that they did, but that's part
21 of the disciplinary process.
22    Q. I guess just to be clear, do you know
23 for certain, did they review the video?
24    A. I do not know for certain.
25    Q. Okay. That's what I want to be clear