NICK WALISER

Page 1

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MONTANA, BUTTE DIVISION

KEVIN BRIGGS,

Plaintiff,

vs.     Case No. 18-0010-BU-BMM-JCL

GALLATIN COUNTY AND
JOHN DOES 1-8, AS
INDIVIDUALS AND IN THEIR OFFICIAL
CAPACITY AS DETENTION OFFICERS,

Defendants.

DEPOSITION UPON ORAL EXAMINATION OF
NICK WALISER

BE IT REMEMBERED, that the deposition upon oral
examination of NICK WALISER, appearing at the
instance of Plaintiff, was taken at the Holiday Inn
Express and Suites, 2305 Catron Street, Bozeman,
Montana 59718 on the 23rd day of September 2019,
beginning at the hour of 1:00 p.m. pursuant to the
Federal Rules of Civil Procedure, before Marla
Jeske, Court Reporter - Notary Public, CSR.

Page 2

1         APPEARANCES
2
    ATTORNEY APPEARING ON BEHALF OF THE
3   PLAINTIFF, KEVIN BRIGGS:
4
       Mr. Daniel V. Biddulph, Esq.
5      Ferguson Law Office, PLLC
       P.O. Box 8359
6      Missoula, Montana 59807
       (406) 532-2664
7      dan@fergusonlawmt.com
8
    ATTORNEYS APPEARING ON BEHALF OF THE
9   DEFENDANTS, GALLATIN COUNTY AND JOHN DOES
    1-8, AS INDIVIDUALS AND IN THEIR OFFICIAL
10  CAPACITY AS DETENTION OFFICERS:
11
       Mr. Alex Stacey, Esq.
12     Stacey, Funyak & Kautz
       P.O. Box 1139
13     Billings, Montana 59103
       (406) 259-4545
14     astacey@staceyfunyak.com
15
       Mr. Sean Bowen, Esq.
16     Civil Deputy County Attorney
       Gallatin County Attorney's Office
17     1709 W. College, Suite 200
       Bozeman, Montana 59715
18     (406) 582-3745
       sean.bowen@gallatin.mt.gov
19
20
21
22
23
24
25

Page 3

1            INDEX
2   EXAMINATION OF NICK WALISER BY        PAGE
3      Mr. Daniel V. Biddulph, Esq................4
       Mr. Alex Stacey, Esq.......................45
4
5   EXHIBITS REFERRED TO:
6   Exhibit 6...........................33-36, 45-46
    Exhibit 7.....................................36
7   Exhibit 8...................................37-38
8   DEPOSITION EXHIBITS:
9   Exhibit 26   Gallatin County Detention Center
                 Incident Report/Rule Infraction,
10               Dated 2/23/25.....................13
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1       WHEREUPON, the following proceedings were had
2   and testimony taken, to-wit:
3
4            * * * * *
5
6            NICK WALISER,
7   called as a witness herein, having been first duly
8   sworn, was examined and testified as follows:
9
10           EXAMINATION
11  BY MR. BIDDULPH:
12     Q.  Officer Waliser, if that's your name,
13  excuse me.
14     A.  Yes.
15     Q.  First of all, can I get you to state and
16  spell your name for the record?
17     A.  Sure.  It's Nick, N-I-C-K, Waliser,
18  W-A-L-I-S-E-R.
19     Q.  Thanks.
20         And may I call you Nick?
21     A.  Yeah, that's fine.
22     Q.  Thank you.
23         First of all, have you ever been deposed
24  before?
25     A.  No.

1 (Pages 1 to 4)

Exhibit F

NICK WALISER

Page 5

1  Q.  Have you ever provided court testimony
2  before?
3  A.  Yes.
4  Q.  Okay.  So what I'm going to do is just
5  go over a few rules or ground rules of a deposition
6  here.
7      Since we're on the record, one thing I
8  do ask is if we can both try and speak clearly, try
9  not to talk over each other and make sure we wait
10  for each other to get an answer and a question out.
11  So I'll try to wait for your answer before I ask my
12  next question and vice versa.
13      So of course, since we're trying to get
14  a verbatim record here, if we can try and speak
15  clearly.  But also, if there's a question that you
16  don't understand, please ask for clarification.
17  I'm going to assume that if I ask a question and
18  you don't ask for clarification, you're going to
19  understand the questions that I've asked, okay?
20      Also, if you need to take a break at any
21  point in time, please feel free to do so, for
22  whatever reason, if its a rest room or whatever.
23  But I do ask if there's a question on the table,
24  just answer the question before we take a break, so
25  not try to be an endurance test or anything like

Page 6

1  that.  So if you need to take a step out, that's
2  fine.
3      Do you have any questions for me before
4  we start?
5  A.  No, I don't.
6  Q.  Okay.  So for this deposition today,
7  what did you do to prepare?
8  A.  Everything I believe that our
9  representatives have e-mailed us in the past, I've
10  read over it and looked over my disciplinary
11  reports.
12  Q.  Okay.
13  A.  Tried to just refresh my memory and
14  everything.
15  Q.  So those are documents to review.
16      Besides your disciplinary reports, what
17  did you review?
18  A.  I believe just the paperwork that
19  Mr. Briggs filed, his allegations, and I read my
20  reports and I believe I had read over I think the
21  majority of his reports that were in his computer
22  file.
23  Q.  Okay.  And besides your attorneys, have
24  you spoken with this deposition about anyone else?
25  A.  No.

Page 7

1  Q.  Or with anyone else?
2  A.  No.
3  Q.  Have you spoken about this case with
4  anyone else?
5  A.  No.
6  Q.  If I could just get a little bit of
7  background for you, just your prior work and
8  education where you're currently employed and what
9  capacity?
10  A.  A detention officer with the Gallatin
11  County Detention Center.
12  Q.  And how long have you been employed
13  there?
14  A.  Since January 3rd, 2011.
15  Q.  And prior to that, what was your work
16  experience?
17  A.  I worked as a detention officer in
18  another state.
19  Q.  Where was that at?
20  A.  North Dakota.
21  Q.  And how long did you do that?
22  A.  I did that three years.
23  Q.  Okay.  And then as far as education
24  goes, what's your highest level of education?
25  A.  I've got a bachelor's in criminal

Page 8

1  justice studies and sociology.
2  Q.  And where did you obtain that degree?
3  A.  University of North Dakota.
4  Q.  Are you from North Dakota originally?
5  A.  Yes, I am.
6  Q.  Oh, great.
7      So if we can just kind of get into this,
8  it sounds like, you know, you're familiar I
9  represent Mr. Kevin Briggs in this matter against
10  Gallatin County.
11      As far as Mr. Briggs goes, it might seem
12  like a silly question but, when did you first
13  become aware of him?
14  A.  When he came into our facility.  I
15  believe shortly before he came to the detention
16  center, I caught the news about him leaving the
17  interview room.
18  Q.  Did you have any interactions with him
19  prior to coming into detention?
20  A.  No, no.
21  Q.  When you caught the news about him, did
22  you discuss that with anybody?
23  A.  No.
24  Q.  Did you discuss it with any other
25  officers or detention center staff?

2 (Pages 5 to 8)

Exhibit F

NICK WALISER

Page 9

1      A. No. I mean, at that point with my job
2   I -- you know, he wasn't an inmate yet. So it's
3   like there wasn't really much to talk about. I
4   mean, you know, I -- I mean, I try to keep up on
5   the news but I don't sit there and speculate, you
6   know, who's coming to our jail and, you know. So I
7   mean, once they come into our jail then it's my
8   responsibility to, you know, take care of them, do
9   my job.
10     Q. And now you're working for the Gallatin
11  County Sheriff. When he escaped, were you involved
12  in any sort of search when he did escape?
13     A. No, I wasn't.
14     Q. Prior to him coming to the Gallatin
15  County Detention, were there any meetings that took
16  place when they knew that he was going to be
17  returned?
18     A. No, not that I -- not that I know.
19     Q. No, no discussions about him being
20  placed?
21     A. If there was, I wasn't involved in any
22  discussions.
23     Q. As far as your role, what was, I guess,
24  your rank or level or roles and responsibilities
25  when Mr. Briggs arrived?

Page 11

1      Q. So when I say "disciplinary team," I
2   understand as individuals who would after, say, an
3   incident report had been completed by a detention
4   officer, would actually, say, meet with an inmate
5   and determine if there would be any sort of, say,
6   consequences as a result of that infraction?
7      A. We do have members of the detention
8   center that are -- either they volunteer or they
9   get assigned to a disciplinary team. I've never
10  sat on that panel or board of people who read.
11  Once the reports are written and they get reviewed,
12  I've never had any part of that.
13     Q. Okay. Do you deal with any sort of,
14  say, appeals that take place from a disciplinary
15  action?
16     A. No. I believe that any appeals go to
17  the jail lieutenant and/or the jail administrator.
18     Q. Okay. So I'm going to go back to about
19  February of 2015 when Mr. Briggs was written up for
20  an incident I believe between him and an inmate. I
21  want to say Mr. Steele. Are you familiar with what
22  I'm referring to?
23     A. Yes, I am.
24     Q. Okay. And how are you familiar with
25  that?

Page 10

1      A. I believe at that time I was a corporal.
2   I'm not exactly sure. I'd have to look back on my
3   promotion date, but I believe I was a corporal at
4   that time.
5      Q. And what did you do in the facility, the
6   detention facility?
7      A. I was a shift supervisor for detention
8   officers.
9      Q. And so as a shift supervisor, what were
10  your general roles, duties, responsibilities?
11     A. Make sure the officers are doing their
12  jobs and following policy procedure.
13     Q. Okay. Did you have any one-on-one
14  contact with inmates as a shift supervisor?
15     A. Yes. I mean, it was a little bit more
16  removed. The officers were the ones who had the
17  direct contact and I only had, you know, more
18  contact with -- if there was an issue that came up.
19     Q. So then as far as disciplinary actions
20  goes, were you any part of the disciplinary team?
21     A. I've never been on the disciplinary
22  team.
23     Q. Okay. And when I say "disciplinary
24  team," do you understand what I'm talking about?
25     A. Go ahead and clarify.

Page 12

1      A. I was the shift supervisor that shift
2   and Officer Beausoleil, who was working west
3   housing, told me that Kevin Briggs wanted to talk
4   to me about issues he was having or an incidence.
5   So when I was over on west housing, he told me
6   through the -- I believe the intercom from his cell
7   to the officer station that he had an incident with
8   Steele on three separate occasions where they had
9   issues. And so I wrote that down and then I
10  believe it was after that time I went to central
11  control and reviewed video footage of those dates
12  and times.
13     Q. And so Mr. Brings brought that to your
14  attention?
15     A. Correct.
16     Q. Was there anything that elicited or
17  brought that information from Mr. Briggs or did he
18  just volunteer that on his own?
19     A. He volunteered that on his own I believe
20  because we -- you know, he saw me up at the sub
21  west station and intercomed in and told me about
22  those three dates and that's the best I can recall
23  on that.
24     Q. Okay. So if I can, I want to refer to
25  an incident report I believe that you've authored.

3 (Pages 9 to 12)

Exhibit F

NICK WALISER

Page 13

1    I think we'll enter it as an exhibit. I'm going to
2    give you a copy of it.
3            Would you like one?
4        MR. BOWEN: Sure.
5    BY MR. BIDDULPH:
6        Q. If you can read through that document,
7    can you identify that? Are you familiar with that?
8        A. That's my report.
9        Q. That's your report that you wrote?
10       A. Uh-huh.
11       Q. So if we can enter this. I believe
12   we're up to Exhibit, by my count, 26.
13       (Whereupon, Deposition
14       Exhibit Number 26 was
15       marked for identification.)
16   BY MR. BIDDULPH:
17       Q. So on this incident report there's just
18   a few things that I more or less want some
19   clarification on.
20           At the top it says incident date and
21   time February 23rd, 2015, but your narrative starts
22   on February 21, 2015. Is there any reason for the
23   discrepancy in those dates?
24       A. From up here to --
25       Q. Correct.

Page 14

1        A. Um, I think this is -- this is when I
2    received that info. And I believe -- I think I
3    just wrote Tommy Steele up for the first day for
4    fighting and then I -- you know, I watched the
5    video a few more times I think the next day and
6    then I started kind of thinking about that's why
7    like -- that I came back with Mr. Briggs, you know,
8    what I felt was kind of instigating these
9    altercations. So that's why I believe I just put
10   the date and time that maybe I wrote it.
11           If you look on -- I usually will -- at
12   the end of my report will put the time that I
13   finished it. So yeah, I believe I may have started
14   it at like 9:16 and ended at 10:47, I'm guessing.
15       Q. All right.
16       A. I always try to put the time that
17   I -- you know, when I -- because, yeah, it might be
18   different than like the incident time.
19       Q. Sure. Yeah, and just clarifying.
20           And so you said you wrote up Mr. Steele.
21   Was that for assaulting Mr. Briggs, that you wrote
22   him up for or was it --
23       A. I believe so. Yeah, because I think
24   Tommy Steele was the first one who got moved and I
25   think Briggs was left in I believe it was DPOD.

Page 15

1        Q. Okay.
2        A. It was during that day or two.
3        Q. So then you wrote up Inmate Steele. How
4    did you become aware that Inmate Steele had
5    assaulted Inmate Mr. Briggs?
6        A. From Mr. Briggs telling me about the
7    incidents on the day and time for the video.
8        Q. That Mr. Briggs volunteered to you?
9        A. Just that all that stuff had happened
10   prior to me becoming involved with it.
11       Q. Did you notice any injuries on
12   Mr. Briggs prior to him giving you this
13   information?
14       A. No, I don't recall any injuries. Like I
15   said, with being a shift supervisor, I'm not
16   directly working in the pods pretty much as much as
17   an officer would be. You know, you're pretty much
18   removed, dealing with more administrative stuff in
19   the -- you know, the -- I'm going to say like not
20   in the pods but, you know, more removed from the
21   pods so I could be dealing with something in the
22   front lobby that day or something, so.
23       Q. Do you recall if any other -- any other
24   detention staff noticed any injuries on Mr. Briggs
25   prior to him volunteering this information to you?

Page 16

1        A. I do not. I think there was one officer
2    that noticed that Briggs had a bruise or a black
3    eye and he said something about it happened playing
4    basketball, if I remember hearing that correctly.
5        Q. Was that this time or could that have
6    been the April incident?
7        A. I think I'm referring to the April
8    incident.
9        Q. Okay.
10       A. I think, yeah.
11       Q. And I'm more -- because you did not
12   write up Mr. Briggs in that April incident, did
13   you.
14       A. No, no. No, with this incident would
15   have been February, no, I don't recall seeing any
16   injuries.
17       Q. Okay. So when Mr. Briggs volunteered
18   this information to you, then what steps did you
19   take to investigate this?
20       A. That was when I wrote it down. I went
21   to central control and accessed the video footage
22   that only the supervisors have access to and I
23   watched the three separate incidents. And I think
24   after that that's when I went and interviewed Tommy
25   Steele and I believe I got him quoted here with

4 (Pages 13 to 16)

Exhibit F

NICK WALISER

Page 17

1    what he said and what he did and that's when I
2    moved him from APOD for fighting.
3        Q.  And did you move Mr. Briggs into any
4    sort of segregation or different pod at that point?
5        A.  I don't believe so.  I believe he
6    remained in Delta pod, was where this happened, my
7    incident.
8        Q.  And so when you reviewed this video, I
9    guess what -- you said you reviewed it but then you
10   went back and reviewed it again a few times; am I
11   correct there?
12       A.  I believe that's what I did with your
13   earlier question about the difference in time, is I
14   just went back and watched it again just to kind of
15   make sure I, you know, made the right decision, you
16   know, and just wanted to see if there was something
17   I missed, so.
18       Q.  So then after writing up Mr. Steele, you
19   then decided to write up Mr. Briggs.  What was it
20   that made you decide to write up Mr. Briggs as
21   well?
22       A.  When I -- I believe it was the third
23   video in the chronological days of where they
24   were -- Tommy Steele was sitting to I think
25   Mr. Briggs' left I believe and he turned towards

Page 18

1    him and threw food at him.  So that's kind of when
2    I was like -- because at first I thought it was
3    just -- you know, Mr. Steele was the aggressor in
4    this whole matter and I just kind of felt like
5    if -- you know, if Mr. Briggs was 100 percent the
6    victim in this matter, why would he be throwing
7    food at some guy that just, you know, assaulted him
8    twice?  You know, it just kind of looked -- it just
9    didn't make sense that, you know, after reviewing
10   that footage a few times, why would somebody -- you
11   know, if they were getting picked on at school, why
12   would they, you know, throw food at their bully?
13   So that's when I came back and I talked to Briggs
14   and I told him that I was going to move him to
15   disciplinary as well pending review.
16       Q.  Did you talk to any other inmates that
17   were in the pod besides Mr. Steele and Mr. Briggs?
18       A.  I don't recall.
19       Q.  Okay.
20       A.  If I did.
21       Q.  Outside of Mr. Briggs telling you what
22   you recorded here or wrote down in paragraph one,
23   did you have any other discussions with Mr. Briggs
24   about what happened with Mr. Steele?
25       A.  I don't recall.  Usually after an

Page 19

1    officer, myself in this case, you know, when you do
2    your reports you step away from the process and you
3    forward it to the disciplinary team for the review
4    and I believe that's just what I did.
5        Q.  So let me find it here.  I believe you
6    note in here though that you did not see Mr. Briggs
7    hit Mr. Steele in any way; would that be correct?
8        A.  Right.  I did read that.  And the reason
9    I believe with the disciplinary charges we had at
10   that time, it wasn't as elaborate as we have it now
11   for like -- I believe now we have a disciplinary
12   charge of instigating.  We didn't have that back
13   then.  So since he was involved in a fight, you
14   know, I charged him as that for the disciplinary
15   team review.  But now we since -- I believe pretty
16   much stemming from this incident, now we added
17   that because I pushed for that because it was just
18   like, yes, he didn't actually assault Mr. Steele
19   but he was involved in fighting.  I believe that
20   since he was throwing food at him that that was
21   kind of -- in my viewpoint, it kind of
22   instigated -- you know, he may have been involved
23   with stuff with Steele.
24       Q.  Do you recall the two dates, the dates
25   that Mr. Steele hit Mr. Briggs?

Page 20

1        A.  I believe it's in the report here.  I
2    think I noted it.  Yeah, February 22nd, 2015 at
3    10:03 a.m.  And then -- no, that was -- scratch
4    that.  That was I believe where it was an e-mail
5    from Tommy Steele I believe -- or a phone call that
6    I believe Officer Beausoleil had got.  It looks
7    like February 8th, 6:45.
8        Q.  So February 8th would be the first one.
9    Do you recall when the second one was or can you
10   refer to your report?
11       A.  Well, the food throwing incident was
12   February 20th.  I have in the report written that
13   Briggs stated Wednesday or Thursday of last week
14   the 11th.  So it would have been -- could have been
15   the 8th, 11th and the 20th.
16       Q.  So then the 20th would have been
17   throwing the food and then the 8th and the 11th
18   would have been the days that Mr. Steele struck
19   Mr. Briggs?
20       A.  Correct.
21       Q.  Okay.  So -- and I guess here's my
22   question, I don't want to make it too long and
23   colluded -- or convoluted, excuse me.  If the
24   fights were on the 8th and the 11th, then why was
25   there video reviewed that went all the way up

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Exhibit F

NICK WALISER

Page 21

1 through the 20th?
2     A. Can you explain?
3     Q. Well, sure. I mean, Mr. Briggs had
4 informed you that some -- that he was hit on the
5 8th and --
6     A. Uh-huh.
7     Q. -- and the 11th, that would be correct,
8 right?
9     A. Correct.
10     Q. And so you went back through and
11 reviewed video that week?
12     A. Uh-huh.
13     Q. Would that be correct?
14     A. Yeah. Of those two days, correct.
15     Q. Right. So then why was there continued
16 video review up through and including the 20th?
17     A. I didn't come -- none of this came to my
18 knowledge until the 21st of February. Does that
19 answer?
20     Q. Well, sort of, I mean.
21     A. Prior to Briggs talking to me or with,
22 you know, Beausoleil kind of passing this on to me,
23 I had no idea that any of this stuff had happened.
24     Q. Okay.
25     A. Because watching the video is pretty

Page 22

1 short -- short lived incidents and, you know, I
2 mean the officers working over there that day could
3 have been doing any number of things to where they
4 didn't physically see it happen. So that's why all
5 three of those incidents had happened prior to my
6 knowledge and I came into the picture on February
7 21st with...
8     Q. Okay. So that's my question though, is
9 did somebody -- I guess, did somebody complain
10 about the food throwing incident?
11     A. No. You know, I may have stumbled on
12 that when I was watching video because I was, you
13 know -- I believe I watched the whole day on those
14 days that Mr. Briggs gave me the dates and time
15 just to see if there was anything happening
16 beforehand and, you know, during and after, you
17 know. But I remember just -- you know, I saw the
18 food throwing incident and, you know, so. But
19 yeah, I didn't know anything about this until the
20 21st.
21     Q. Okay. So that's my question then. So
22 you went back through and reviewed about what would
23 be 12 days of video from that pod?
24     A. Correct, in some fashion. I can't
25 recall if he told me about the 21st, you know, with

Page 23

1 the food throwing, but.
2     Q. Sorry, who told you?
3     A. If Mr. Briggs.
4     Q. Okay.
5     A. You know. But I believe that's what I
6 did, you know, I just kind of -- because we have
7 the ability to fast forward, so it's not like I was
8 just sitting in central control --
9     Q. Sure.
10     A. -- for hours on end. You know, I just
11 kind of was keyed in on trying to watch -- you
12 know, on watching Mr. Briggs and Mr. Steele in the
13 pod and their interactions. And any time, you
14 know, it looks like they were talking or getting
15 close to each other, I would, you know, go back to
16 normal speed, so. Because I was just trying to get
17 a -- you know, trying to get the bigger picture of
18 what lead up to all this.
19     Q. And does that video have any audio on
20 it?
21     A. It does not.
22     Q. Okay. And so then what was the basis
23 for saying that Mr. Briggs instigated these two
24 fights?
25     A. When I was trying to explain to Judge

Page 24

1 Salvagni, just -- I've done this job long enough to
2 kind of know, you know, when people kind of get
3 that fighting posture, kind of -- it just kind of
4 looked like he was kind of leading in towards, you
5 know, Mr. Steele, kind of talking back at him. You
6 can kind of know the difference between a casual
7 conversation at least, you know, detention officers
8 where we kind of see people kind of always -- a lot
9 of people butt heads, a lot of personalities there
10 and they don't always get along. So that's kind of
11 what we're kind of trained to look for, is to see
12 when -- we kind of catch people kind of having not
13 good interactions and peaceful interactions and we
14 can kind of just start to tell if something's about
15 ready to happen or... And just watching the video,
16 it just kind of looked like those two really didn't
17 like each other very much.
18     Q. Had there been any other incidences
19 between these two?
20     A. Not that I'm aware of.
21     Q. Had Mr. Briggs ever picked a fight with
22 Mr. Steele before in the past?
23     A. Not that I'm aware of, no.
24     Q. Had Mr. Briggs ever picked a fight with
25 another inmate in the past?

6 (Pages 21 to 24)

Exhibit F

NICK WALISER

Page 25

1    A.  I don't recall.
2    Q.  Had Mr. Steele ever got into any fights
3  or altercations with other inmates in the past?
4    A.  I don't recall.
5    Q.  Was Mr. Steele ever a disciplinary
6  issue?
7    A.  I believe he had been in disciplinary,
8  but I don't recall.  But yeah, Mr. Steele wasn't
9  necessarily a model inmate where he -- you know, he
10  was kind of I think had his issues where he didn't
11  necessarily like a lot of people or like staff, you
12  know.  But, you know, we try to manage everybody
13  the best we can.
14    Q.  Would Mr. Steele ever like pick on other
15  inmates?
16    A.  I don't recall.
17    Q.  Okay.
18    A.  I don't know.
19    Q.  I've heard a term thrown around though
20  this, say, an inmate would be a predator on other
21  inmates.  Would you have considered Mr. Steele a
22  predator?
23    A.  Not necessarily.  You know, he
24  just -- he struck me as the type of person who
25  didn't have a lot of self-control.  But, you know,

Page 26

1  I think he -- I think he tried to manage himself.
2  But I think he just kind of didn't have a lot of
3  self-control over himself and so I think that's
4  why, but.
5    Q.  So Mr. Steele I believe you quoted him
6  in here as something about "That fucking rape-o has
7  been taunting me!"  And I guess let me back that up
8  a bit.
9       When you initially spoke with
10  Mr. Steele, did he admit to striking Mr. Briggs?
11    A.  Inadvertently, I believe he kind
12  of -- basically inadvertently, he told me he did
13  because when I asked him the question he said, oh,
14  you don't have video evidence of me hitting him,
15  you know.  And I was like -- I had watched all the
16  video and I knew I had video evidence of him doing
17  that.
18    Q.  Okay.
19    A.  So, yeah, that was kind of him admitting
20  to it in a roundabout way that he -- you know.  I
21  don't know exactly the question, how I phrased it
22  but, yeah, he told me that.
23    Q.  Right.
24       And so I guess would it be fair to
25  characterize that though is that was his response

Page 27

1  or excuse that Mr. Briggs was taunting him?
2    A.  I believe it was either during that
3  initial conversation or I think I had talked to
4  Mr. Steele maybe once or twice and that's when he
5  said that Mr. Briggs was taunting him and kind of
6  getting at him.  And I had watched the videos and,
7  you know, it kind of did look like Briggs may have
8  been kind of --
9    Q.  Okay.
10    A.  -- kind of getting at him a little.
11    Q.  But just to be clear though, you didn't
12  ask Mr. Briggs about taunting Mr. Steele?
13    A.  I don't recall.
14    Q.  Okay.
15    A.  If I put anything in there, I mean.
16    Q.  And you didn't talk to any other inmates
17  about Mr. Briggs taunting Mr. Steele?
18    A.  Not that I recall, no.
19    Q.  At one point or another, and clear
20  me up if I'm wrong, it looks like Officer
21  Beausoleil -- is that how you pronounce the name?
22    A.  That's correct.
23    Q.  -- listened in on some phone calls of
24  Mr. Steele.  Was that Officer Beausoleil that
25  listened in or was that you?  I just want to be

Page 28

1  clear.
2    A.  I believe that was Officer Beausoleil
3  who listened in.
4    Q.  And are you familiar with I guess the
5  contents of those phone calls?
6    A.  I believe I put it down in the report.
7    Q.  Okay.  And how would you characterize
8  Mr. Steele's phone calls?
9    A.  You know, Mr. Steele was -- could be
10  bold at times and just unpredictable.  I think to
11  the best of my recollection, you know, Mr. Steele
12  had, you know, a lot of -- he would have his
13  threats on the phone or just as -- you know, as
14  you're walking to the pod just, you know.
15    Q.  Well, he says in here -- and I'm just
16  kind of quoting from the bottom of this page, I
17  suppose a couple of these he says, "I've got the
18  fucking tool right here in my hand.  I can't even
19  tell you what I've already come up with, I've
20  already plotted and planned what to do after the
21  2nd.  And that's just a one day disaster for this
22  place.  They have no idea what kind of a
23  motherfucker I can really be."
24    A.  Uh-huh.
25    Q.  Then it says in another instance, "If

7 (Pages 25 to 28)

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Exhibit F

NICK WALISER

Page 29

1 they come and take my canteen after they find me
2 guilty on this, that's gonna be the hard part for
3 me, not to retaliate in some way. I'm struggling
4 not to be a monster. These guys don't have any
5 idea what kind of shit I can do. Sons of Bitches,
6 they're not gonna get away with it. These
7 motherfuckers better pray to god I have a change of
8 heart when I get the fuck free this time."
9         So I mean as shift supervisor, did you
10 take this as some sort of threat against staff or
11 the facility or Mr. Briggs?
12       A.  I think in reading this he was referring
13 all this -- these threats to detention staff.
14       Q.  Okay.  So was he treated any different
15 because he was threatening detention staff?
16       A.  Well, he was put on disciplinary.  And
17 I'm not sure what happened with his classification
18 after that, if he was put on administrative
19 segregation or...
20         But yes, I mean we definitely kept a
21 watchful eye on Mr. Steele.
22       Q.  And you characterized that he could be
23 very volatile, is that -- I don't want to put words
24 in your mouth but is that what you said?
25       A.  Right.  Yeah, just that was one of the

Page 30

1 guys we just always kept a -- kept an eye on just
2 because we were never sure.  Like one day he would
3 be calm and one day he would be like this.
4       Q.  And when this occurred in DPOD, is
5 DPOD -- what classification is DPOD?
6       A.  Back then I don't recall.  I think it
7 was -- we've changed our classification a few
8 times.  I believe it was medium classification,
9 best of my recollection back in 2015.
10       Q.  Prior to this incident, do you recall if
11 Mr. Briggs ever requested to, say, be placed in a
12 protective custody status?
13       A.  I don't recall.  He may have.
14       Q.  Okay.  But to you, did he ever make that
15 statement?
16       A.  No, I'm not sure if he did.  Yeah.
17       Q.  And when this occurred here, did
18 Mr. Briggs ever request of you to view the
19 videotape of the incident?
20       A.  I'm not sure if he can -- or if he did.
21 So I'm not sure if we allowed that or not at that
22 time or.  I'm not sure.
23       Q.  That's why I just want to be clear, did
24 he request or did he not request?
25       A.  I don't know.

Page 31

1       Q.  Okay.
2       A.  I don't know.
3       Q.  Would he have been allowed to review
4 that videotape if he had requested to see it?
5       A.  I'm not sure if -- with the disciplinary
6 process if that was part of the due process with
7 that, if he could have.  I'm not sure what the
8 policy was on that back then.
9       Q.  And just to be clear, were you involved
10 at all in the disciplinary process after writing
11 your report?
12       A.  None.
13       Q.  Did you have any conversations with the
14 disciplinary team after writing your report?
15       A.  No, I didn't.
16       Q.  Do you recall who was on the
17 disciplinary team?
18       A.  I believe I gave an e-mail to Lieutenant
19 Young who was on it.  I don't recall though.
20       Q.  Okay.
21       A.  There was an e-mail that I gave him that
22 was, you know, from the disciplinary team who it
23 was.  I believe it was Sergeant Lower and I know he
24 was one of them and maybe officer Taylor I believe,
25 Brian Taylor.

Page 32

1       Q.  Are you sure about that or is that
2 just --
3       A.  I'm not sure.  I did see the e-mail
4 though.
5       Q.  Okay.
6       A.  So I do know that I forwarded that on a
7 few -- I think it was last year when some questions
8 were asked.  I remember Lieutenant Young came and
9 asked me about why I, you know, gave Mr. Briggs 35
10 days from the disciplinary team.  That's when I
11 first told him that I was never on the disciplinary
12 team and I found the e-mail.  Because I save all
13 the disciplinary e-mails of -- you know, they'll
14 say like such and such inmate got this many days
15 for this reason.
16       Q.  So giving him so many days in Ad Seg,
17 that was not your decision?
18       A.  No.
19       Q.  And you had not input on that decision?
20       A.  No, I actually found that too.  That
21 was actually Sergeant Fleeman who put him on Ad
22 Seg, so.  Per policy the decision puts him on Ad
23 Seg as -- you know, the lieutenants responsibility
24 or jail commander or the -- you know, the upper end
25 administration, not middle management such as

8 (Pages 29 to 32)

Exhibit F