```
 1    UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
 2                 MONTANA, BUTTE DIVISION
 3    _____
 4    KEVIN BRIGGS,
 5              Plaintiff,
 6         vs.               Case No. 18-0010-BU-BMM-JCL
 7    GALLATIN COUNTY AND
      JOHN DOES 1-8, AS
 8    INDIVIDUALS AND IN THEIR OFFICIAL
      CAPACITY AS DETENTION OFFICERS,
 9
                Defendants.
10    _____
11          DEPOSITION UPON ORAL EXAMINATION OF
12                      BRIAN TAYLOR
13    _____
14       BE IT REMEMBERED, that the deposition upon oral
15    examination of BRIAN TAYLOR, appearing at the
16    instance of Plaintiff, was taken at,
17    510 West Hemlock, Suite B1, Bozeman,
18    Montana 59715 on the 18th day of July
19    2019, beginning at the hour of 9:00 a.m. pursuant
20    to the Federal Rules of Civil Procedure, before
21    Marla Jeske, Court Reporter - Notary Public, CSR.
22
23
24
25
```

Page 6

1  clarification on or that you have questions about,
2  please feel free to ask me to clarify or ask a
3  question if you have one. I want to make sure that
4  you understand my questions so that we're both on
5  the same page about what we're talking about. If
6  you don't ask for clarification, I'm going to
7  assume that you just understand the question as
8  I've asked it and your answer relates to the
9  question as I've asked it.
10      Lastly, if you need a break at any time
11 during this, please feel free to ask. We're not
12 doing any sort of endurance test here. For
13 whatever reason, all I ask is that if I've asked
14 you a question and you do need to take a break,
15 that you answer the question before we go to break.
16      Do you have any questions before we get
17 started?
18     A. No.
19     Q. Okay. So prior to this deposition here
20 today, what did you do to prepare for today's
21 deposition?
22     A. We had a meeting with the county
23 attorney's office last week.
24     Q. And did you speak about this deposition,
25 prepare with anyone else besides the county

Page 7

1  attorney?
2     A. No.
3     Q. Did you review any documents prior to
4  today?
5     A. Just what we did at the county attorney
6  meeting.
7     Q. Okay. And what did you review?
8     A. Just discovery packet, I guess you'd
9  call it.
10    Q. Okay. Any other things besides the
11 discovery packet?
12    A. No.
13    Q. Did you review any audio or video
14 recordings prior to today --
15    A. No.
16    Q. -- to prepare?
17       Sorry, what was that?
18    A. No.
19    Q. Okay, thank you.
20       If I could get a little bit about your
21 background, what's your education history?
22    A. Some college.
23    Q. Where did you go to college?
24    A. Eastern Arizona.
25    Q. Anywhere besides Eastern Arizona?

Page 8

1     A. For college, no.
2     Q. And what did you study at Eastern
3  Arizona?
4     A. Business management.
5     Q. Did you graduate?
6     A. No.
7     Q. And where are you currently employed?
8     A. Gallatin County Sheriff's Office.
9     Q. And what's your role or capacity there?
10    A. Deputy.
11    Q. Is that a duly sworn deputy or are you
12 working at the detention center?
13    A. Sworn.
14    Q. So you're on the street as a street
15 officer?
16    A. Yes.
17    Q. Okay. And prior to that what was your
18 position?
19    A. Detention officer.
20    Q. And is that at Gallatin County?
21    A. Yes.
22    Q. And what time period did you work as a
23 detention officer?
24    A. March 2009 to February 2016.
25    Q. And then prior to being a detention

Page 9

1  officer, where were you employed?
2     A. I worked at the hospital as security and
3  Gallatin Insulation.
4     Q. And so your move from the detention
5  center to street or patrol work, why did you make
6  that move?
7     A. Something I wanted to do.
8     Q. Why did you want to do that?
9     A. Just what I wanted to do.
10    Q. Any particular reason or?
11    A. Nope.
12    Q. Let me ask you this: Why did you go to
13 work at the Gallatin County Detention Center?
14    A. Because it was a better paying job than
15 what I currently had.
16    Q. Did you have any goals or aspirations to
17 work in detention or law enforcement?
18    A. Law enforcement, yes.
19    Q. Okay. Why did you have that goal or
20 aspiration?
21    A. It's just what I've wanted to do since I
22 was younger.
23    Q. Okay. I'm just trying to get a sense,
24 that's all. I'm not trying to trip you up or
25 anything.

Page 10

1  Q. Did you ever serve in the military?
2  A. No.
3  Q. So I want to get into a little bit about
4  your time there at the Gallatin County Detention
5  Center.
6      Were you serving as a detention officer
7  when my client Mr. Briggs was there?
8  A. Yes.
9  Q. And do you recall how you first heard
10 about Mr. Briggs?
11 A. I don't.
12 Q. Did you hear about Mr. Briggs' escape
13 from the Bozeman Police Department?
14 A. I did.
15 Q. And how did you hear about that?
16 A. I don't remember.
17 Q. You don't recall at all?
18 A. No.
19 Q. Did you see it on the news?
20 A. I don't remember.
21 Q. Did you talk with anybody at the
22 sheriff's office?
23 A. I don't remember.
24 Q. Did you speak with anyone in the Bozeman
25 PD?

Page 11

1  A. I don't remember.
2  Q. When Mr. Briggs was brought into custody
3  what was your role at the Gallatin County Detention
4  Center?
5  A. A detention officer.
6  Q. And so what duties or jobs did you have
7  as a detention officer?
8  A. When was his booking date?
9  Q. I believe it was around about March of
10 2014?
11 A. So I might have been primarily a booking
12 officer at that point, which I would just book in
13 new -- new arrests and release people from jail.
14 Q. So as a booking officer would have any
15 interaction with inmates in the general population?
16 A. No, not as much as a housing officer
17 would.
18 Q. Did you ever move to be a housing
19 officer?
20 A. No.
21 Q. So your entire time at Gallatin County
22 you were a booking officer?
23 A. No. From the tail end while I was there
24 I was a booking officer, so I believe it was 2014.
25 Q. Okay.

Page 12

1  A. Is when I switched to booking full time.
2  Q. So then how long did you spend as a
3  booking officer?
4  A. 2014 to February 2016.
5  Q. And you were never a housing officer?
6  A. I was a housing officer before 2014.
7  Q. Oh, okay. Well, that's just what I'm
8  trying to clear up is the time line here.
9  A. Okay.
10 Q. So from your time there you were a
11 booking officer through 2014?
12 A. I believe it was 2014, yes.
13 Q. Okay. And then after 2014, did you ever
14 become a housing officer --
15 A. No.
16 Q. -- or serve as a housing officer?
17 A. No. I might have rotated in, but I was
18 never primarily stationed in housing.
19 Q. Okay. So you did have some rotations
20 in?
21 A. I did over time or if someone called in
22 sick.
23 Q. Okay.
24 A. It was pretty rarely though.
25 Q. Okay. Did you serve in any

Page 13

1  administrative capacity or supervisory capacity?
2  A. No.
3  Q. Did you have a rank there or were you
4  just an officer or sergeant?
5  A. Just an officer.
6  Q. Okay. So in your time there did you
7  have any interactions with Mr. Briggs?
8  A. Yes.
9  Q. How often would you interact with him?
10 A. Whenever you have a write-up, I would do
11 a disciplinary review hearing on him.
12 Q. So why would you do a disciplinary
13 review hearing on him?
14 A. Because my collateral duties was a
15 disciplinary officer.
16 Q. And that's part of being a booking
17 officer or is that part of being a housing officer
18 or?
19 A. Neither.
20 Q. Was that just something you were
21 assigned?
22 A. Yes.
23 Q. Okay. Who assigned you to that
24 position?
25 A. I don't remember.

Page 14

1  Q. Is that something you sought out?
2  A. I don't remember.
3  Q. How often did you interact with
4  Mr. Briggs as a disciplinary officer?
5  A. Whenever he would have write-ups.
6  Q. Do you recall, I mean is that monthly,
7  daily, weekly?
8  A. I don't know. Whatever the records
9  state.
10  Q. Okay. So there's a few instances that
11  we mostly want to discuss here today, perhaps you
12  recall them, one which occurred in February of
13  about 2015 involving Mr. Briggs and an inmate by
14  the last name of Steele. Do you recall that
15  incident?
16  A. Vaguely.
17  Q. Vaguely?
18  A. Vaguely, yes.
19  Q. Did you review discovery before you
20  came?
21  A. Just what the reports were written.
22  Q. And did you review your police -- any
23  reports you wrote before you came?
24  A. No.
25  Q. Did you review any reports by other

Page 15

1  detention officers before you came?
2  A. Just what we did at the county attorney
3  office or county attorney meeting.
4  Q. Right. That's not my question though.
5  Did you review any other officers' reports before
6  you came today?
7  A. No.
8  Q. Okay. The other incident we want to
9  discuss is in April of 2015, an incident involving
10  an inmate by the last name of Smith. Do you recall
11  that incident?
12  A. Vaguely.
13  Q. Did you review any reports of that
14  incident, the April 2015 incident, prior to coming
15  today?
16  A. No.
17  Q. You didn't review any other officer
18  reports?
19  A. No.
20  Q. Did you speak with any of the other
21  officers involved?
22  A. No.
23  Q. So let's focus on the April of 2015
24  incident. Did you serve as the disciplinary
25  officer on that incident?

Page 16

1  A. Yes.
2  Q. Was there anyone else that was on a
3  disciplinary team with you?
4  A. Yes.
5  Q. And who was that?
6  A. Pretty sure Sergeant Lower, Brett
7  Slyngstad, David Lauchnor, Bernadette Beausoleil,
8  Eric Veca. I'm sure there's others, but it was so
9  long ago I don't remember all the people that were
10  on that team.
11  Q. So help me understand that disciplinary
12  team process, as far as how does that work? Do you
13  guys receive a report and then what's the process
14  from there?
15  A. Yeah, so if someone gets a major
16  write-up rule infraction, then we would be notified
17  through the briefing, and then we would have X
18  amount of hours or days to provide the inmate with
19  the hearing date. And then after we provide them
20  with a hearing date, we'd have X amount of hours to
21  provide them with a hearing.
22  Q. Okay. So prior to the time that the
23  inmate's noticed and then you have that hearing, is
24  there anything that you, as a disciplinary officer,
25  do to prepare for that hearing?

Page 17

1  A. We read the reports and watch video
2  footage.
3  Q. So this February of 2015, did you
4  read -- I believe it was Officer Waliser that wrote
5  the reports, did you read those reports?
6  A. I'm sure I did.
7  Q. Okay. And did you watch the videos of
8  the incident?
9  A. I'm sure I did.
10  Q. Did you speak with any other inmates
11  regarding those incidents in February of 2015?
12  A. That's with Steele?
13  Q. Correct.
14  A. I can't say for certain.
15  Q. Would it be possible that you would have
16  talked with any other inmates?
17  A. Yes.
18  Q. Do you recall if Mr. Briggs asked for
19  any witnesses to be present?
20  A. I believe so, yes.
21  Q. And did you speak with any of those
22  witnesses that he asked to be present?
23  A. I don't believe so, no.
24  Q. Is there any reason that you wouldn't
25  have asked or spoken with those witnesses?

Page 18

1   A. If they have a special relationship, if
2   they're super good friends or brothers or related,
3   we typically don't go and ask what -- we typically
4   don't go ask those witnesses.
5   Q. Why is that?
6   A. Favoritism.
7   Q. So are you saying if there's a blood
8   relationship or?
9   A. Blood, family, brother-in-law, whatever,
10  friends, enemies. That way it's not biased.
11  Q. How do you make that determination?
12  A. Talk to the housing officers and see who
13  the inmates are hanging out with on a regular
14  basis.
15  Q. So if that person was there at that time
16  though, you wouldn't want to speak with them even
17  though they were present during some sort of
18  incident?
19  A. Not if they're really good friends, no.
20  Q. So would you speak with anyone else that
21  was there during that incident?
22  A. If they choose to provide testimony.
23  Q. Do you let the inmate who's the subject
24  of a disciplinary hearing know that they cannot
25  bring in a friend or family member as a witness on

Page 19

1   their behalf?
2   A. No. I'm pretty sure the policy states
3   that it's up to the disciplinary officer's
4   discretion to bring in a witness.
5   Q. Do you ever allow inmates to bring in
6   witnesses?
7   A. Yes.
8   Q. And so I guess if it's up to your
9   discretion, what criteria do you use?
10  A. I just told you the best friends, family
11  members.
12  Q. So as long as they're not a best friend
13  or a family member, you allow the witness to
14  testify?
15  A. If they want to.
16  Q. Okay.
17  A. Then they also have to provide witness
18  notification within a certain amount of time as
19  well.
20  Q. And do you recall if Mr. Briggs provided
21  witness notification within a certain amount of
22  time?
23  A. I don't believe so.
24  Q. How would Mr. Briggs or any other inmate
25  go about providing witness notification?

Page 20

1   A. When we serve them their initial
2   paperwork for their hearing.
3   Q. And what's -- sorry, I didn't mean to
4   speak over you.
5   What's their initial paperwork for their
6   hearing?
7   A. Is there an exhibit I could look at to
8   refresh my memory?
9   Q. Sure, yeah. What we'll do is we'll look
10  at Exhibit 6. I believe it should be in here. Let
11  me get some stuff out of the way. You can just
12  flip them over so they stay in order.
13  Do you recall this document that's been
14  previously entered into our record as Exhibit 6?
15  A. Yes.
16  Q. And what is Exhibit 6?
17  A. It's a notification of a disciplinary
18  hearing.
19  Q. So is this what the inmate would receive
20  to notice them?
21  A. Yeah.
22  Q. Okay. And then would the inmate be
23  required to sign that in receipt?
24  A. Yes.
25  Q. Okay. And so I'm looking on the first

Page 21

1   page there of Exhibit 6, it looks like Mr. Briggs
2   signed that form?
3   A. Correct.
4   Q. And then in the middle of the form it
5   looks like it says description of the incident,
6   see report. So I believe that would be on the next
7   page of Exhibit 6?
8   A. Correct. Anytime an inmate is written
9   up they receive a copy of their write-up.
10  Q. That would be -- and that's the next
11  page, it's disciplinary offense report which looks
12  like a write-up?
13  A. Correct.
14  Q. Okay. And so at the bottom of that
15  disciplinary offense report, I notice a line item
16  that says witnesses and a Michael Fuchs. Is that
17  where an inmate would put down that they would like
18  a witness to be called?
19  A. No.
20  Q. Under the line "Inmate Witnesses" that's
21  not where they would put their list of witnesses?
22  A. Correct.
23  Q. Where would they provide that?
24  A. They would hand write a note.
25  Q. So they would have to send a separate

Page 22

1  note?
2      A.  Correct.
3      Q.  Are they informed of that?
4      A.  Yes, it says right here "Submit a list
5  of witnesses for the hearing."
6      Q.  So then why would there be a spot that
7  says "Inmate Witnesses" on this report?
8      A.  That's computer generated, entered in by
9  the officer that wrote the report. That's why
10 it's -- that's why there's an inmate number, which
11 other inmates don't have access to. So it would be
12 moved from the top section, you'd enter it in up
13 there, and it would auto populate down at the
14 bottom.
15     Q.  And I'm sorry, could you go over that
16 again? What would go in the top section? Which
17 section are you talking about?
18     A.  The inmate witness and the employee
19 witness, it's all computer generated.
20     Q.  Down here at the bottom?
21     A.  Correct.
22     Q.  So you're saying this, what looks to be
23 handwriting, is computer generated?
24     A.  That is not computer generated. That
25 was handwritten after the fact.

Page 23

1      Q.  So that's what I'm trying to understand
2  here. So Mr. Briggs would have been given a copy
3  of this?
4      A.  Correct.
5      Q.  And then he would have signed it, which
6  looks to be signed on, what's marked as CCJI291,
7  and then also signed on the front page of Exhibit
8  6, which is CCJI289. And then am I correct in
9  understanding that this would then be returned to
10 the disciplinary team and Mr. Briggs would retain a
11 copy; is that correct?
12     A.  Correct.
13     Q.  But you're telling me that Mr. Briggs
14 would need to set out in a separate form any
15 witnesses that he would want to call?
16     A.  Yes.
17     Q.  When you prepared for this disciplinary
18 hearing in this case, is this the report that you
19 reviewed, which is CCJI290?
20     A.  Yes.
21     Q.  And you said you reviewed the video
22 prior to the report?
23     A.  Yes.
24     Q.  If I can get you to turn in that exhibit
25 list to I believe it's marked as Exhibit 8.

Page 24

1      A.  (Witness complies.)
2      Q.  Can you identify what Exhibit 8 is?
3      A.  It's a major rule infraction hearing
4  report.
5      Q.  And what's the purpose of a Major Rule
6  Infraction Report Hearing or hearing report?
7      A.  It's for the results of the hearing.
8      Q.  Okay. And so what's done with this
9  document? How is it filled out and what's it used
10 for afterwards?
11     A.  It goes in their inmate records.
12     Q.  Is a copy provided to the inmate?
13     A.  Yes.
14     Q.  Do you complete this while you're doing
15 the hearing?
16     A.  Yes.
17     Q.  So on here it's a Miranda Warning. Did
18 you provide Mr. Briggs with a Miranda Warning?
19     A.  Yes.
20     Q.  And did Mr. Briggs ask to have an
21 attorney present?
22     A.  I don't believe so.
23     Q.  And did Mr. Briggs ask to have any
24 witnesses present at the detention hearing?
25     A.  During the hearing I believe he asked

Page 25

1  for a witness, yes.
2      Q.  And do you recall who that witness was?
3      A.  Mike Fuchs.
4      Q.  And did you talk or question Mr. Fuchs?
5      A.  No.
6      Q.  If an inmate asked for an attorney
7  during a detention hearing, would you delay the
8  detention hearing so that they could speak with an
9  attorney?
10     A.  I don't remember.
11     Q.  I'm just saying in general?
12     A.  Right. I don't remember what the
13 protocol was for that.
14     Q.  Oh, okay. You don't recall if you would
15 delay or you would not delay a hearing?
16     A.  Right.
17     Q.  Okay. Based on his Miranda Warning
18 though, an inmate's statement in a detention
19 hearing could be used against them if a charge were
20 to be subsequently filed; would that be correct?
21     A.  Correct.
22     Q.  So in a hypothetical sense, if inmate X
23 assaulted inmate Y, inmate X could be charged with
24 either a misdemeanor or felony assault; would that
25 be correct?

Page 26

1  A. Correct.
2  Q. And so any statements they made at this
3  hearing could be used against them in, say, a
4  future trial or criminal charge?
5  A. Correct.
6  Q. Okay. So I just want kind of want to go
7  over this report here. There's a line here that
8  says "Rights Read and "Hearing Recorded." The box
9  "Rights Read" says no; would that be accurate?
10  A. I would say no, it's not accurate.
11  Q. Can you think of any reason why rights
12  read and then no being checked? Why would no be
13  checked? Can you think of any reason why that
14  would be checked?
15  A. The only reason why I could see it being
16  checked no is if the inmate refused to go to the
17  hearing and we held a hearing without the inmate
18  present.
19  Q. Okay. But from your recollection
20  Mr. Briggs was present at this hearing?
21  A. The only reason why I say that is
22  because there's a not guilty plea entered, but I
23  don't remember for certain if he was there or not
24  there.
25  Q. Oh, okay. So just for clarification

Page 27

1  purposes, from my perspective, my understanding,
2  since there's a not guilty entered, that's the
3  basis of your reasoning that he was present at the
4  hearing?
5  A. Correct.
6  Q. Okay. The next line there says "Hearing
7  Recorded," yes or no. It looks like the box no is
8  checked. So was this hearing recorded?
9  A. No.
10  Q. Do detention -- or excuse me,
11  disciplinary hearings, are they ever recorded?
12  A. They were a long time ago like in
13  2009/2010. Then once we went to the new jail,
14  nobody knew where the recorders went, so.
15  Q. So was there a policy to record
16  detention hearings?
17  A. No.
18  Q. So then why were they recorded?
19  A. For situations like this.
20  Q. But that policy stopped because somebody
21  lost the recorders?
22  A. I don't believe it was ever a policy.
23  Q. So that practice stopped because
24  somebody lost the recorders?
25  A. Correct. But it wasn't a practice on

Page 28

1  every hearing that we did.
2  Q. Were there any detention center
3  hearings -- or excuse me, disciplinary hearings
4  recorded after 2010?
5  A. I don't know.
6  Q. Any disciplinary hearings that you
7  participated in as a detention officer, were they
8  ever recorded?
9  A. I believe so.
10  Q. How many to your recollection?
11  A. I have no idea.
12  Q. So which ones would be recorded and
13  which ones wouldn't be recorded?
14  A. I don't know.
15  Q. Why would you record one hearing and not
16  the other?
17  A. I don't know.
18  Q. So basically it would just be an
19  arbitrary decision on your part?
20  A. I don't know.
21  Q. Of those hearings that were recorded,
22  what did you do with those recordings?
23  A. They should have been burned to a CD and
24  put into the inmate file.
25  Q. And where would that inmate file be

Page 29

1  stored?
2  A. At the time in booking.
3  Q. The next line on this report says
4  "Evidence Present." Do you know why that line is
5  on there, evidence present?
6  A. Sometimes if they have, say, confiscated
7  a homemade knife or pruno or something to that
8  effect, we'll bring in to the hearing.
9  Q. Okay. The next line here says
10  "Witnesses." Why would that line be on there?
11  A. If there is a witness that was at the
12  hearing, that would be their statement line.
13  Q. And the next line says "Lay-Advisor."
14  Why would that line be on there?
15  A. They may have a hearing and a
16  lay-advisor. Their name and information would be
17  right there.
18  Q. Do inmates ever have lay-advisors?
19  A. Occasionally.
20  Q. What is a lay-advisor?
21  A. Someone that was in the jail that would
22  represent them as an in-house lawyer.
23  Q. Would that be another inmate?
24  A. Yes.
25  Q. And they would be allowed to -- would

Page 30

1  they provide testimony or would they just sit in on
2  the hearing?
3      A.  They would, from what I remember, just
4  sit in on the hearing.
5      Q.  Would they be able to speak at the
6  hearing?
7      A.  I believe so.
8      Q.  So if they were allowed to speak at the
9  hearing, what would a lay-advisor typically speak
10 about?
11     A.  I don't know.  I can only think of maybe
12 one or two instances that it's ever happened.
13     Q.  The next line there says "Inmates
14 Statements (if not recorded)."  Were there any
15 statements provided by the inmate at this hearing
16 provided by Mr. Briggs at this 2/26/15 hearing?
17     A.  I don't believe so.
18     Q.  If he had made statements, would they be
19 recorded there?
20     A.  Yes.
21     Q.  The next one is inmate plea.  In looking
22 at this form what was Mr. Briggs' plea?
23     A.  Not guilty on one fighting charge and
24 not guilty/plead guilty to throwing food.
25     Q.  So was there two different charges on

Page 31

1  this disciplinary hearing?  And you can refer to a
2  prior exhibit if you need to.
3      A.  This is for a different hearing though,
4  right?  This isn't for --
5      Q.  Well, this is 2/26.  There may be one in
6  the exhibit list for a different hearing as well,
7  yeah.  I believe the report was Exhibit 6.
8      A.  Okay.  So it looks like charges for
9  fighting and one for being rude or disrespectful,
10 which would be throwing food.
11     Q.  And sorry, is that the disposition
12 you're talking about then?
13     A.  No, that's the charges.
14     Q.  Oh, that's the charges, okay.  So the
15 next line down is disposition and what does that
16 line indicate to you?
17     A.  Guilty for fighting, 35 days lockdown
18 with credit for time served.
19     Q.  So on disposition, that's what I'm
20 trying to understand, it just says "Guilty for
21 fighting."  So is this 35 lockdown specifically
22 just for fighting?
23     A.  Correct.
24     Q.  Was there any disciplinary action taken
25 for throwing food?

Page 32

1      A.  According to this, no.
2      Q.  Okay.  Now it just says "Guilty for
3  fighting" then.  It looks like there was two
4  charges or write-ups, major write-ups for fighting.
5  Is this "Guilty for fighting" just for one of those
6  or both of those?
7      A.  If I had to guess I'd say for one of
8  them.
9      Q.  So what about the other one?
10     A.  Not guilty.
11     Q.  So not guilty on the other one.
12         Do you recall which one he was guilty on
13 and which one he was not guilty on?
14     A.  No.
15     Q.  What evidence then supported a finding
16 of guilty?
17     A.  I'm pretty sure in this hearing he
18 refused to talk.
19     Q.  So then you would have had to rely on
20 something besides Mr. Briggs' statements?
21     A.  Correct.  And the fact that it says
22 "refusal to answer questions can be used as an
23 element of guilt in this hearing."
24     Q.  Okay.  So if they refuse to talk then or
25 they don't make a statement, that doesn't

Page 33

1  necessarily mean they aren't guilty?
2      A.  Right.
3      Q.  Okay.  So it could just be an inference
4  then?
5      A.  Correct.
6      Q.  So would you still need to base that
7  finding off of other evidence?
8      A.  Yes.
9      Q.  So what other evidence supported a
10 finding of guilty?
11     A.  Video.
12     Q.  Was there anything else?
13     A.  Steele's hearing.
14     Q.  Mr. Steele's hearing?
15     A.  Yes.
16     Q.  And what was found out at Mr. Steele's
17 hearing?
18     A.  I don't know.
19     Q.  There's no record of Mr. Steele's
20 hearing on here?
21     A.  Correct.  That's Kevin Briggs' hearing
22 report.
23     Q.  Would you have relied on any statements
24 from Officer Waliser who wrote the initial
25 disciplinary report?

Page 34

1  A. Yes.
2  Q. If I can have you look back at
3  page -- or excuse me, Exhibit 6 again. If I can
4  have you look down at "Offense Details," I believe
5  it's the third paragraph down. Do you see that, it
6  starts out with video evidence?
7  A. Yes.
8  Q. Okay. So if you could please read
9  on -- for the record then, if you could read that
10 paragraph that starts out "Video evidence"?
11 A. Video evidence shows that both inmates
12 Steele and Briggs were involved in a verbal fight
13 on 2/8/15 at approximately 0645 hours and that in
14 fact Steele did punch Briggs with a closed right
15 fist once in the face right outside of D-101.
16 Although Briggs did not assault Steele in any way,
17 I am writing Briggs up for his role in instigating
18 this fight and refusing to lock himself down, thus
19 removing himself from the situation."
20 Q. Okay. And the next one down, the fourth
21 paragraph, it looks like it relates to the 2/11/15
22 incident. Could you please read that paragraph?
23 A. "Video evidence shows that both inmates
24 Steele and Briggs were involved in a verbal fight
25 on 02/011/15 at approximately 2002 hours and that

Page 35

1  in fact Steele did punch Briggs with a closed right
2  fist twice in the face right by the D-Pod phone.
3  Although Briggs did not assault Steele in any way,
4  I am writing Briggs up for his role in instigating
5  this fight and refusing to lock himself down, thus
6  removing himself from the situation."
7  Q. Would you have reviewed any other
8  reports besides this disciplinary offense report?
9  A. If there was another officer report.
10 Q. Would that be a disciplinary report or
11 an incident report?
12 A. Incident report.
13 Q. Do you recall reviewing any incident
14 reports for this hearing?
15 A. I don't remember.
16 Q. So I'm looking at those two paragraphs.
17 It says in the middle, "Although Briggs did not
18 assault Steele in any way." What does that
19 indicate to you?
20 A. That he did not throw a punch.
21 Q. Okay. And then in the fourth paragraph
22 I believe it says the same thing, "Although Briggs
23 did not assault Steele in any way." What does that
24 indicate to you?
25 A. That he did not throw a punch.

Page 36

1  Q. So then what would be the basis for
2  finding Mr. Briggs guilty of one incident of
3  fighting if he didn't throw a punch?
4  A. And not the other?
5  Q. Well, both. It says he didn't throw a
6  punch in either.
7  A. Right.
8  Q. And I believe it was your prior
9  testimony that he was only found guilty of fighting
10 in one instance. So I'm curious then, two-part
11 question; one, which one of these was he found
12 guilty of fighting?
13 A. I don't know what charge he was -- what
14 incidence he was found guilty on a charge -- or
15 found guilty for fighting for.
16 Q. So then my second question then is: If
17 either of these he did not throw a punch, what was
18 the basis of finding him guilty of fighting?
19 A. To cut him a break.
20 Q. Could you explain that for me?
21 A. Sure. So, say, someone gets a DUI,
22 right?
23 Q. Sure.
24 A. And they run a stop sign.
25 Q. Okay.

Page 37

1  A. And the person, the defendant gets
2  written for failure to stop at a stop sign and a
3  DUI.
4  Q. Uh-huh.
5  A. They get found on guilty on a DUI and
6  the stop sign gets dismissed.
7  Q. Okay. So you're saying because he was
8  found guilty on -- and I'm just trying to make sure
9  I understand you. I don't want to put words in
10 your mouth. Because he was found guilty on one
11 fighting, he was found not guilty on the other?
12 A. Correct.
13 Q. So wouldn't a finding of not guilty mean
14 that he did not, in fact, fight or use physical
15 force with regards to Mr. Steele?
16 A. Do you have a copy of the Inmate Manual?
17 Q. I do actually. I believe this right
18 here is the relevant sections with regards to
19 disciplinary hearings. Is that what you want to
20 refer to?
21 A. No, the Inmate Manual.
22 Q. I believe that would be the Inmate
23 Manual which was provided.
24 A. Do you have the Inmate Manual prior to
25 March 3rd, 2015?

Page 38

1  Q. This is the one that was provided by
2  your counsel.
3  A. Okay.
4  Q. Are you saying this is not the accurate
5  Inmate Manual?
6  A. I don't know. Effective date on that is
7  after this hearing.
8  Q. So was there a different Inmate Manual
9  prior to this?
10 A. I'm assuming so if that one was
11 effective March 3rd, 2015, or whatever the date
12 might be on there.
13 Q. Well, I'm just asking because this is
14 what we requested and this is what we provided, so.
15 Maybe you weren't part of that?
16 A. I wasn't.
17 Q. Okay. So then what would be in an
18 Inmate Manual then that would support your
19 conclusion there?
20 A. I guess, I think of it, MCA subsections
21 of the crime.
22 Q. Uh-huh.
23 A. So the elements of the crime for
24 fighting, physical force. It kind of breaks down
25 what the criteria is for that particular charge.

Page 39

1  It doesn't necessarily have to be physical force.
2  Q. So when you go through a disciplinary
3  hearing, fighting, use of physical force, do you go
4  off of the MCA, the Montana Code?
5  A. No, I used it as a reference.
6  Q. Okay, I apologize. Again, I just want
7  to make sure.
8     So then when you look at an inmate,
9  specifically Mr. Briggs who's been charged with
10 fighting or use of physical force here in these two
11 instances, what are you looking for?
12 A. Well, without the proper Inmate Manual,
13 I can't answer that question.
14 Q. Well, he was found guilty and you were
15 part of that, so what was the basis for finding him
16 guilty?
17 A. At the time he met the criteria for the
18 description of the charges.
19 Q. And again, that leads me back to my
20 question. It says "Briggs did not assault Steele
21 in any way." And I believe your testimony was that
22 that would mean Mr. Briggs did not throw a punch.
23 So what would be the criteria then for finding him
24 guilty of fighting or use of physical force?
25 A. I just answered that. It met the

Page 40

1  criteria in the Inmate Manual for that charge.
2  Q. And what was that criteria?
3  A. I can't recall because I don't have a
4  current copy of the Inmate Manual.
5  Q. Also in this section it says "I'm
6  writing Briggs up for his role in instigating this
7  fight, refusing to lock himself down, thus refusing
8  to leave the situation." Would that be part of the
9  criteria?
10 A. Possibly.
11 Q. If an inmate were assaulted, are they
12 required to go lock themselves down?
13 A. Yes.
14 Q. It also says Mr. Steele and Briggs were
15 involved in a verbal fight. Did you review the
16 video prior to this disciplinary hearing?
17 A. Yes.
18 Q. Does the video contain audio?
19 A. No.
20 Q. So then what was the basis for a
21 determination that this was a verbal fight?
22 A. You can see their looks moving and their
23 body language.
24 Q. Does that necessarily mean they're
25 fighting?

Page 41

1  A. It's a pretty good indicator.
2  Q. But it doesn't necessarily mean they are
3  fighting. Is it possible they could also be having
4  a conversation?
5  A. Slim possibility.
6  Q. Is it possible that, say, Mr. Steele
7  could be verbally assaulting Mr. Briggs?
8  A. Yes.
9  Q. Is it possible that it could be
10 Mr. Steele calling Mr. Briggs names?
11 A. Yeah.
12 Q. Is it possible that it could be
13 Mr. Steele taunting Mr. Briggs?
14 A. Yeah.
15 Q. So without any sort of audio we really
16 wouldn't know that, would we?
17 A. No.
18 Q. If Mr. Fuchs were there during that
19 fight, would he be able to shed some light on that?
20 A. Possibly.
21 Q. But you didn't interview him?
22 A. Correct.
23 Q. Would you at least want to talk to him
24 to see what he had to say even though he was a
25 friend or a relative in your opinion?

Page 74

1 witnessing here is a security video I believe from
2 the Gallatin County Detention Center, April 13th,
3 2015. So if we want to hit play on that.
4     MR. BOWEN: Yeah, we're starting at timestamp
5 17:17:30:656 at the top of the screen.
6     MR. BIDDULPH: And go ahead and hit play.
7     THE WITNESS: Can you repeat your question?
8 BY MR. BIDDULPH:
9     Q. I was just -- I believe the question
10 was -- well, we're asking you just basically did
11 you ever review the video and you said you hadn't,
12 so.
13    A. I said I did.
14    Q. You said you did but you didn't recall
15 when it took place --
16    A. Correct.
17    Q. -- or what was on the video; am I
18 correct in that?
19    A. Yes.
20    Q. Okay. So if we're playing a video
21 there -- have you hit play yet?
22    A. No.
23    Q. Okay. Go ahead and hit play.
24    A. (Witness complies.)
25    Q. So after reviewing that video, just from

Page 75

1 a foundational standpoint, do you know who was
2 seated there at the table?
3    A. Kevin Briggs.
4    Q. Okay. And do you know who came out of
5 the detention cell there?
6    A. No.
7    Q. Would you have any reason to disagree
8 that it was Mr. Smith?
9    A. No.
10   Q. Okay. At any time there did you see
11 Mr. Briggs strike Mr. Smith?
12   A. No.
13   Q. Sorry, I didn't hear you?
14   A. No.
15   Q. At any time there did you see Mr. Smith
16 strike Mr. Briggs?
17   A. Sidebar.
18   Q. Sorry, what?
19   A. Can I have a sidebar?
20   Q. A sidebar?
21   A. Yeah.
22   Q. I need you to answer my question.
23      At any time did you see Mr. Smith strike
24 Mr. Briggs or an individual strike Mr. Briggs?
25   A. Whoever the person that came out of the

Page 76

1 cell was, yes.
2    Q. But you did see them strike Mr. Briggs?
3    A. It appeared to be, yes.
4    Q. Okay. And you would agree that there's
5 no audio on that video?
6    A. Correct.
7    Q. Prior to Mr. Briggs being hit, from your
8 observation what was Mr. Briggs doing?
9    A. So I can't have a sidebar?
10   Q. After you answer my question.
11   A. That's what you said after I answered it
12 the first time.
13   Q. After you answer this question: Prior
14 to, what was Mr. Briggs doing?
15   A. It looks like antagonizing the person
16 that was in that cell.
17      Sidebar?
18   MR. STACEY: Can we take a break?
19   MR. BIDDULPH: How long do we need?
20   MR. BOWEN: 20 seconds.
21   MR. BIDDULPH: Just 20 seconds, okay.
22      (Whereupon, a brief
23      recess was taken.)
24   MR. BIDDULPH: So we're back on the record?
25   MR. BOWEN: Yeah.

Page 77

1 BY MR. BIDDULPH:
2    Q. Okay. I believe the question asked is
3 prior to getting hit what was Mr. Briggs doing?
4    A. He appeared to be antagonizing the
5 inmate that was in the cell.
6    Q. How do you know he was antagonizing the
7 inmate in the cell?
8    A. Based on Briggs' prior history and
9 demeanor at the jail and the way his body language
10 was and the way his face was presented towards the
11 inmate in the cell.
12   Q. So based on his prior history, we're not
13 talking about that specific incident?
14   A. It's the totality of the circumstances.
15   Q. So you've reviewed other videos of
16 Mr. Briggs?
17   A. Previous interactions.
18   Q. Which previous interactions?
19   A. Previous hearings that I conducted on
20 him.
21   Q. Which hearings are you referring to?
22   A. I can't tell you off the top of my head.
23   Q. You don't recall which hearings you're
24 referring to?
25   A. No, I don't. He had several write-ups

Page 78

1 while he was incarcerated in the jail.
2  Q. Well, that's what I'm asking then. If
3 you're basing it on his prior interactions and
4 prior videos, which ones?
5  A. I can't say for certain which ones
6 particularly.
7  Q. Is it you don't recall which ones for
8 certain?
9  A. Yes.
10  Q. So if you don't recall which ones for
11 certain, then how are you basing it on his prior
12 history?
13  A. Because I have a much better memory with
14 someone's personality and how they act versus a
15 specific video.
16  Q. So then what instances are you basing
17 this belief on?
18  A. It's a totality of all of the
19 circumstances, all of the interactions.
20  Q. Okay. But I'm looking for those
21 interactions. Which ones are they?
22  A. I don't have records of them.
23  Q. Well, you just said you remembered which
24 ones. So I'm asking you which ones? Not which
25 records, which ones? Which interactions?

Page 79

1  A. Just in general. It doesn't take long
2 to figure out his type of personality.
3  Q. Previously you testified though you were
4 a booking officer; is that correct?
5  A. Correct.
6  Q. And you were not a housing officer?
7  A. Correct.
8  Q. But occasionally you would rotate in?
9  A. Correct.
10  Q. So as a housing officer, how often would
11 you interact with Mr. Briggs?
12  A. As a housing officer?
13  Q. Uh-huh.
14  A. It would be twice a week.
15  Q. So at least twice a week you were
16 rotating in as a housing officer?
17  A. Oh, I thought you were meaning how often
18 does a housing officer have interaction.
19  Q. No, I'm asking you personally?
20  A. Oh, maybe twice a month, three times a
21 month.
22  Q. And then as a disciplinary officer would
23 you be on Mr. Briggs' hearings?
24  A. Not all of them.
25  Q. But you would be on some of them?

Page 80

1  A. Correct.
2  Q. So was the majority of your interactions
3 with Mr. Briggs as a housing officer or as a
4 disciplinary officer?
5  A. Say housing.
6  Q. So as a housing officer, what kind of
7 interactions would you have with Mr. Briggs?
8  A. As far as interactions as far as what?
9  Q. Well, what was the nature of those
10 interactions? How would you engage with him? What
11 was he doing and why would you be having any sort
12 of interaction with him?
13  A. If requesting hygiene products or to go
14 to the law library or special requests or
15 visitations, stuff like that.
16  Q. Okay. Was it ever breaking up fights?
17  A. I don't believe I ever broke up one of
18 his fights.
19  Q. Was it ever inserting yourself into any
20 sort of argument he may have had with another
21 inmate?
22  A. I don't believe so.
23  Q. So then where's the basis of your belief
24 though that his body language is indicative of him
25 instigating a fight?

Page 81

1  A. Just based on my experience in general.
2  Q. What experience?
3  A. Life experience working at the jail.
4  Q. So you're basing it on other inmates?
5  A. Basing it on the totality of all of the
6 circumstances.
7  Q. Well, that's what I'm trying to figure
8 out is the pieces of that totality.
9    Are you basing it on other inmates and
10 the way they behave or Mr. Briggs specifically?
11  A. Both.
12  Q. So with regards to Mr. Briggs though, as
13 a housing officer you just testified your only
14 interactions with him were, say, making requests
15 for certain commissary items, taking him to visits?
16  A. I didn't say those were my only. I said
17 those were some.
18  Q. Right. But then I asked you if you
19 ever, say, broke up a fight or got into an argument
20 that he had with another inmate and you said no.
21    So I'm asking you, I guess, what
22 instances did you have to base your opinion on
23 where Mr. Briggs was arguing or fighting with other
24 inmates?
25  A. I can't think of a specific instance.

Page 82

1  Q. Okay. Did you have any contact with, I
2  believe it was, Corporal Lauchnor or David Lauchnor
3  prior to this April disciplinary hearing?
4  A. I don't remember.
5  Q. Do you recall ever receiving any e-mails
6  from Corporal Lauchnor?
7  A. I don't remember. I'm sure I received
8  lots of e-mails from him.
9  Q. Did you review all those e-mails?
10  A. Yeah.
11  Q. If there's going to be a disciplinary
12  hearing that you would be sitting on, would you
13  take Mr. Lauchnor's reports if he was the reporting
14  officer?
15  A. If he was the reporting officer I don't
16  think he'd be allowed to sit on the panel for the
17  review.
18  Q. Okay. But you as the disciplinary team,
19  would you take his disciplinary report and also
20  other statements that Corporal Lauchnor may have
21  made about the incident?
22  A. Take it where?
23  Q. Would you take that into account in your
24  determination?
25  A. Yeah.

Page 83

1  Q. Okay. So if I could have you turn to
2  what's previously being entered as Exhibit 4.
3  A. Do you have an Exhibit 1 by chance?
4  Q. That was in a different deposition.
5  A. Okay. I just wanted to make sure it was
6  in order.
7  Q. No, you're fine.
8    This is an e-mail sent Tuesday, April
9  28, 2015 from Corporal Lauchnor. If you'd like to
10  take a moment to review the to list, I believe your
11  name is on there, but you can certainly, if you
12  need to take the time.
13  A. On the to list?
14  Q. Where it's being sent to the
15  individuals, yes.
16  A. Yeah.
17  Q. Is your name on that list?
18  A. Yeah.
19  Q. Okay. So in the body of this e-mail,
20  can you please read what Mr. Lauchnor is stating?
21  A. Kevin Briggs, lockdown pending review
22  for fighting. Appears to have been a victim rather
23  than the aggressor, but we will follow through with
24  our disciplinary process as normal. Razor --
25  Q. So -- oh, go ahead.

Page 84

1  A. Razor with supervision or razorless
2  shave gel. Lockdown during razor pass or officer
3  standby in the case that he is shaving, and does
4  not move below medium classification.
5  Q. So then you're on the disciplinary team
6  and Mr. Lauchnor is stating that Mr. Briggs is a
7  victim rather than the aggressor. My question then
8  is why would you still go through a disciplinary
9  process with Mr. Briggs?
10  A. Because he was written up for it.
11  Q. So would a victim be found guilty of
12  fighting?
13  A. It doesn't say he was a victim. It says
14  appears to have been.
15  Q. Well, you watched the video, did he
16  throw a punch?
17  A. It doesn't take two people to throw
18  punches to be in a fight.
19  Q. That's not my question.
20    Did Mr. Briggs throw a punch?
21  A. No.
22  Q. Okay. Were you aware if Mr. Briggs
23  appealed this decision, the disciplinary
24  determination from the April 2015 hearing?
25  A. Was I aware at the time or am I aware

Page 85

1  now?
2  Q. Well, did you know at the time? Were
3  you ever made aware that he had put in an appeal?
4  A. No, I don't remember.
5  Q. Did you ever become aware that he had
6  put in an appeal?
7  A. Yes.
8  Q. When did you become aware that he had
9  put in an appeal?
10  A. Last week.
11  Q. That's the first time?
12  A. Yeah. That I can recall for certainty,
13  yes.
14  Q. Okay. I'm going to enter this as
15  Exhibit 14 -- 15.
16    (Whereupon, Deposition
17    Exhibit Number 15 was
18    marked for identification.)
19  BY MR. BIDDULPH:
20  Q. Have you look at number -- what's been
21  marked as Exhibit 15. Do you recognize that?
22  A. Yeah.
23  Q. And can you describe what Exhibit 15 is?
24  A. It's Corporal Evans on an e-mail saying
25  that Briggs is off of disciplinary, he's now in Ad

Page 86

1 Seg. And then I asked "Who amended it and why?"
2 And he said "It was JJ." He sent a
3 special request saying so but I never saw -- never
4 sent an e-mail.
5 Q. So it sounds like you were made aware
6 that this -- his disciplinary determination was
7 amended?
8 A. I guess so, yes.
9 Q. Okay. And then you also asked why. Was
10 there any reason for your concern?
11 A. Well, earlier you asked if I was aware
12 of an appeal, which I was not. This is an amended
13 one, so.
14 Q. Well, how else would a disciplinary
15 determination be amended?
16 A. The administrator can do whatever he
17 wants.
18 Q. Okay. So then would an administrator
19 look into a disciplinary decision on his own from
20 your experience?
21 A. Well, he got put on Ad Seg, so I'm
22 assuming that based on their team meetings that's
23 what happened.
24 Q. Are you on that team?
25 A. No.

Page 87

1 Q. Okay. But your response is to the
2 amendment. It was "Who amended it and why?"
3 A. Correct.
4 Q. Okay. So I'm just asking the reason for
5 that concern?
6 A. To make sure it wasn't misplaced in the
7 disciplinary team's notebook, make sure it was
8 actually someone of authority or rank that was
9 doing it.
10 Q. Has that ever happened before?
11 A. No.
12 Q. So then why would there be concern that
13 it would be done now?
14 A. It's not the first time I've asked that
15 question.
16 Q. Okay. Do you know why Mr. Briggs was
17 placed on Administrative Segregation?
18 A. I don't.
19 Q. Are you ever informed why inmates are
20 placed on Administrative Segregation?
21 A. Informed?
22 Q. As a detention officer, are you ever
23 told why an inmate is placed on Administrative
24 Segregation?
25 A. Sometimes, I suppose.

Page 88

1 Q. Do you feel it is beneficial for you to
2 know?
3 A. If it has something to do with safety,
4 security of the facility, yeah.
5 Q. Okay. But that's not a decision that
6 you're a part of at all?
7 A. No.
8 Q. All right. When an inmate is placed on
9 Administrative Segregation, as a detention officer
10 how are you provided notice?
11 A. Through e-mail.
12 Q. Is there anything that's done in the
13 jail system?
14 A. Yes, they update their classification.
15 Q. Is there any reasons put in a system?
16 A. I can't recall.
17 Q. Okay. So certainly if an inmate were,
18 say, placed on -- hypothetically, if an inmate were
19 placed on Administrative Segregation because they
20 were making threats to detention staff, is that
21 something you would want to be made aware of?
22 A. Yes.
23 Q. If an inmate were, say, placed on
24 Administrative Segregation because they were
25 suicidal, is that something you would want to be

Page 89

1 made aware of?
2 A. Yes.
3 Q. Is that information that they were, say,
4 making threats to staff or being suicidal, is that
5 something that should go into the jail management
6 system as an incident report?
7 A. Should it?
8 Q. I'm just asking your opinion.
9 A. My opinion would be yes.
10 Q. Why would it be important to be put in
11 there?
12 A. So that there's documentation and other
13 officers can read what happened.
14 Q. Okay. So e-mail may not necessarily be
15 the best method to communicate that information?
16 A. Everyone gets e-mail, so I would say
17 it's just as good.
18 Q. Did you ever take place in a search of
19 Mr. Briggs' cell?
20 A. Yes.
21 Q. When did that take place?
22 A. I can't remember the exact date.
23 Q. Can you remember a rough time frame?
24 A. Between 2014 and 2016.
25 Q. That's a pretty big time frame.

Page 90

1  Was it in 2014?
2  A. I don't know.
3  Q. Okay. So let's take it maybe in chunks.
4  Was it before Mr. Briggs was convicted?
5  A. I don't know.
6  Q. Okay. So you would want to go back off
7  of your reports possibly?
8  A. Yes.
9  Q. Okay. So I'm going to hand you what's
10 been provided as a confidential criminal justice
11 information. We'll mark that as Exhibit 16,
12 please.
13         (Whereupon, Deposition
14          Exhibit Number 16 was
15          marked for identification.)
16 BY MR. BIDDULPH:
17 Q. Can you identify that document that I
18 just handed to you as Exhibit 16?
19 A. Yes, it's an incident report from
20 myself.
21 Q. Okay. And who completed this incident
22 report?
23 A. I did.
24 Q. And what's the details of this incident
25 or rule infraction?

Page 91

1  A. It's not a rule infraction, it's an
2  incident report.
3  Q. Okay. What's the difference?
4  A. It's an incident versus a rule
5  infraction, so you can't get in trouble for it.
6  Q. Okay. So what's the details of this
7  incident?
8  A. You want me to just read it verbatim?
9  Q. Yeah, that's fine.
10 A. On the above date and approximate time,
11 which is 9/3/2014 at approximately 1500 hours
12 Officer Metcalf informed me, Brian Taylor, that
13 Sergeant Eckhardt had wanted me to perform a
14 unclothed body search and a full search of Inmate
15 Briggs. While Officer Hartsell and I were
16 searching through his property, I noticed a picture
17 of an unclothed female. The picture was in a
18 packet that was labeled "Discovery." I continued
19 scanning through other papers in the file and
20 noticed that there were a lot more pictures of the
21 same nature. I notified Sergeant Eckhardt and
22 handed the packet over to her. There is nothing
23 further to report at this time.
24 Q. So in taking -- in doing this cell
25 search, what was this picture that was labeled in

Page 92

1  the packet "Discovery"?
2  A. It appears to be a picture of an
3  unclothed female.
4  Q. Do you recall what it looked like?
5  A. A naked girl.
6  Q. What was the size of the photo?
7  A. I don't remember.
8  Q. Was it contained with other legal
9  documents?
10 A. I'm not sure.
11 Q. Was it contained with other discovery of
12 Mr. Briggs' underlying case?
13 A. I'm assuming so since that was labeled a
14 packet called discovery.
15 Q. And did you hand that packet labeled
16 discovery to Officer Eckhardt?
17 A. Sergeant Eckhardt yes.
18 Q. Excuse me, Sergeant Eckhardt.
19 A. Yes.
20 Q. Yes?
21 A. Yes.
22 Q. Thank you.
23     And that was the entirety of the packet?
24 A. I believe so, yes.
25 Q. And did that packet get returned to

Page 93

1  Mr. Briggs?
2  A. I don't know what Sergeant Eckhardt did
3  with it after I handed it to her.
4  Q. Okay. So after you handed it to
5  Sergeant Eckhardt, you had no other involvement in
6  that packet of information?
7  A. Correct.
8  Q. Are officers supposed to -- detention
9  officers -- remove discovery from inmates'
10 possession?
11 A. Are we supposed to?
12 Q. Correct.
13 A. There's no rule against it.
14 Q. Do you ever take discovery from inmates?
15 A. This contained contraband inside of a
16 packet that was labeled discovery.
17 Q. Did every page in that packet contain
18 contraband?
19 A. I don't know. I just simply scanned
20 through it and saw that there was other naked
21 pictures in there.
22 Q. But you turned the entire packet over?
23 A. Correct.
24 Q. So the ones that you found though, I'm
25 talking about the ones that didn't contain anything

Page 94

1  labeled -- characterized as contraband, why were
2  those taken?
3      A.  The papers that weren't?
4      Q.  Uh-huh.
5      A.  Because it was within the whole package
6  of evidence at that point.
7      Q.  So you removed contraband as well as
8  other discovery items?
9      A.  Correct.
10     Q.  An inmate's allowed to have their
11 discovery from their pending legal case in their
12 cell; is that correct?
13     A.  As long as it doesn't involve any nude
14 pictures.
15     Q.  Did you conduct any other cell searches
16 of Mr. Briggs?
17     A.  I don't remember.
18     Q.  What was your general impression of
19 Mr. Briggs?
20     A.  My general impression?
21     Q.  Uh-huh.
22     A.  He was an inmate at the detention
23 center.
24     Q.  Did you have any other thoughts or
25 opinions on him?

Page 95

1      A.  That he was manipulative.
2      Q.  Why do you think that?
3      A.  Just based on my previous interactions
4  with him.
5      Q.  But what's the basis of that, what
6  previous interactions?
7      A.  I always felt that he was trying to
8  paint himself as a victim and --
9      Q.  Why did you think that?
10     A.  -- provoke people.
11     Q.  I'm sorry, I didn't mean to cut you off.
12     A.  And provoke people.
13     Q.  Why did you think that?
14     A.  Based off all of his interactions with
15 all of his write-ups.
16     Q.  But did you see any of those instances?
17 I'm talking about your personal observations.
18     A.  I can't think of the specific time.
19     Q.  So did you ever see him engage in
20 behavior that you would deem manipulative,
21 personally see?
22     A.  Just my personal observations.
23     Q.  Yes.  And that's what I'm asking.  Your
24 personal observations, did you personally observe
25 him engage in behavior that you would consider

Page 96

1  manipulative?
2      A.  Yeah.
3      Q.  What was that behavior?
4      A.  I believe when he attempted his suicide
5  attempt with his tongue, that was an attempt to try
6  to escape from the hospital.
7      Q.  Why do you believe that?
8      A.  That's just my personal opinion, just my
9  instincts.
10     Q.  I guess that's what I'm trying to unpack
11 then is you say your instincts?
12     A.  Uh-huh.
13     Q.  What made you believe that that was an
14 attempt to escape from the hospital?  What
15 objective, observable facts led you to the
16 conclusion that this was an attempt to escape from
17 the hospital?
18     A.  Given that he knew cutting his tongue in
19 half would make him go to the hospital.  It's not
20 enough to kill yourself.
21     Q.  How do you know that he knew that?
22     A.  Because he's a pretty smart guy.
23     Q.  So how do you know he's a smart guy?
24     A.  Just based off the way he talks and
25 writes.

Page 97

1      Q.  So did you have access to his writings?
2      A.  On his like handwriting, like special
3  requests, the way he words them.
4      Q.  Okay.  Did you engage in conversations
5  with him?
6      A.  I'm sure I did, but I don't recall what
7  they were.
8      Q.  Okay.  So other than just simply cutting
9  his tongue, what other objective facts led you to
10 believe that that was a manipulative act?
11     A.  I'm just saying based on my personal
12 observations that's what I believed him to be, is
13 manipulative.
14     Q.  So that's it, just cutting of the
15 tongue?
16     A.  No, there's tons of other things that I
17 can't recall specifically, but it doesn't take very
18 long to be around somebody to learn what kind of
19 behavior they are -- what kind of person they are.
20     Q.  I don't have any other questions.  Do
21 you?
22     MR. STACEY:  Let me look here.  I might have
23 just a couple questions.
24 ///
25 ///

Page 98

```
 1           EXAMINATION
 2  BY MR. STACEY:
 3     Q.  Mr. Taylor, I think you testified that
 4  you started as a detention officer or a hearing
 5  officer or a housing officer March 2009; is that
 6  accurate?
 7     A.  Yeah. March 11th, 2009.
 8     Q.  So by the time Mr. Briggs was
 9  incarcerated with you guys you had been working
10  with the detention center for roughly five years or
11  so?
12     A.  Yes.
13     Q.  By that point had you dealt with inmates
14  who, as you describe, were manipulative with the
15  system?
16     A.  Yes.
17     Q.  Did you feel like you had a pretty good
18  ability to figure out which inmates were more on
19  the manipulative side as opposed to not
20  manipulative?
21     A.  Yes.
22     Q.  So would it be fair to say that based on
23  your previous interactions with other inmates in
24  the past, you knew what patterns to look for when
25  it came to Mr. Briggs?
```

Page 99

```
 1     A.  Correct.
 2     Q.  And as far as witnesses go in these
 3  disciplinary hearings, has there been incidences
 4  where you've allowed a witness to be called and the
 5  witness got up or told the hearing officer things
 6  that weren't true?
 7     A.  Yes.
 8     Q.  How often do you think that happened
 9  prior to the disciplinary hearings with Mr. Briggs?
10     A.  I'd say probably about 50 percent.
11     Q.  Fifty percent of the time you allow an
12  inmate witness they don't fully tell the truth?
13     A.  Correct.
14     Q.  And I think you testified that prior to
15  the February disciplinary hearing of Mr. Briggs,
16  you had reviewed video, reviewed the disciplinary
17  reports, and maybe spoken to some inmates as well,
18  correct?
19     A.  Correct.
20     Q.  Do you have any reason to believe you
21  wouldn't do the same for the potential April
22  disciplinary hearing?
23     A.  No.
24     Q.  And so when you -- or when Slyngstad
25  went to Mr. Briggs' cell and told him that it was
```

Page 100

```
 1  time for his hearing and Mr. Briggs refused to
 2  participate, would it be fair to say that you
 3  considered Mr. Briggs' previous history, previous
 4  disciplinary reports and hearings in conjunction
 5  with the refusal to attend the April disciplinary
 6  hearing?
 7     A.  Along with the reports and the video,
 8  yes.
 9     MR. STACEY:  That's all I have.
10          Sean, do you have any questions?
11     MR. BOWEN:  I'm good.
12     MR. BIDDULPH:  I just have a quick follow-up
13  based on the review of the video.
14
15          REEXAMINATION
16  BY MR. BIDDULPH:
17     Q.  In the February 2015 hearing, did
18  Mr. Briggs ask to review the video at his hearing?
19     A.  I don't remember.
20     Q.  Would he have been allowed to review the
21  video at his hearing?
22     A.  It wouldn't be my decision to make.
23     Q.  Well, you're on the disciplinary team,
24  so.
25     A.  Right. But as far as transporting him
```

Page 101

```
 1  to a place where he could watch the video, that's
 2  not a decision that would be mine to make.
 3     Q.  Would an inmate be allowed to review the
 4  surveillance video prior to their disciplinary
 5  hearing?
 6     A.  Like I said, it's not my decision. It's
 7  above my pay scale.
 8     Q.  In your experience as a disciplinary
 9  hearing officer, do inmates review video prior to
10  or during their hearings?
11     A.  I don't think so due to it being a risk
12  of security.
13     Q.  So even if Mr. Briggs would have
14  requested, he would not have been allowed to review
15  the video?
16     A.  That's my opinion. So I don't know what
17  the policy is on that.
18     Q.  Would you allow it?
19     A.  I'm not an administrator.
20     Q.  I'm asking you though personally. If an
21  inmate is in front of you, as a disciplinary
22  hearing officer, and says I would like to review
23  the video, would you allow that?
24     A.  Not if it's violating policy.
25     Q.  So would that violate policy?
```