```
 1    UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
 2                  MONTANA, BUTTE DIVISION
 3    _____
 4    KEVIN BRIGGS,
 5              Plaintiff,
 6         vs.                  Case No. 18-0010-BU-BMM-JCL
 7    GALLATIN COUNTY AND
      JOHN DOES 1-8, AS
 8    INDIVIDUALS AND IN THEIR OFFICIAL
      CAPACITY AS DETENTION OFFICERS,
 9
                 Defendants.
10    _____
11            DEPOSITION UPON ORAL EXAMINATION OF
12                      BRETT SLYNGSTAD
13    _____
14         BE IT REMEMBERED, that the deposition upon oral
15    examination of BRETT SLYNGSTAD, appearing at the
16    instance of Plaintiff, was taken at
17    510 West Hemlock, Suite B1, Bozeman,
18    Montana 59715 on the 17th day of July
19    2019, beginning at the hour of 11:09 a.m. pursuant
20    to the Federal Rules of Civil Procedure, before
21    Marla Jeske, Court Reporter - Notary Public, CSR.
22
23
24
25
```

Page 6

1  each other. So if I ask a question, please wait
2  for me to get the entire question out before you
3  provide an answer and, of course, I'll try to wait
4  for your answer before I ask my next question, that
5  way again, we can get everything down and on the
6  record.
7       Since this is being transcribed for a
8  written transcript, we want to make sure that any
9  questions that are in the affirmative or the
10 negative, yes or no questions, are answered yes or
11 no. Let's try to avoid huh-uh's or uh-uh's or
12 nodding of head, again so that we can get a clear
13 record.
14      If I ask a question that you don't
15 understand or that you need clarification on or
16 have any questions about, please feel free to ask
17 that of me to clarify the question. I want to make
18 sure you understand the question before you provide
19 an answer so that we're both on the same page as
20 far as what we're talking about. Although, if you
21 don't ask for clarification or you don't ask a
22 question or follow up or anything, I'm going to
23 assume you understood the question and then your
24 answer will be relative to the question that I
25 asked.

Page 7

1       Lastly, this is of course not a -- well,
2  we're not here to see how long you can go sitting
3  in the hot seat. So if you need a break at any
4  given time, feel free to ask for whatever reason.
5  It's not an endurance test. So if you do need a
6  break, just ask. The only thing I do ask that is
7  if I've asked a question, please answer the
8  question before we go to break, okay?
9       A. (Witness nods head.)
10      Q. And, of course, I mean we're up against
11 the lunch hour, so if you're okay going through the
12 lunch hour, if we need to. I'm not sure how long
13 this will take but I don't anticipate it's going to
14 take through the end of the day. But if we need a
15 break, go for lunch, you know, if you've got
16 something going on, let me know, okay?
17      A. (Witness nods head.)
18      Q. So prior to today I guess in getting
19 prepared for today's deposition, what did you do to
20 prepare for the deposition today?
21      A. I have looked back at the reports that
22 were written for Mr. Briggs and basically looking
23 for the reports that I was involved in, and past
24 that -- and just having a meeting last week. That
25 is really the only thing I've done.

Page 8

1       Q. And what was your meeting last week?
2  Who was that with?
3       A. That was just to prepare for this. That
4  was with our attorneys.
5       Q. Okay. Did you speak with anybody else
6  besides your attorneys about this deposition?
7       A. No.
8       Q. What documents did you review besides
9  the reports that you completed?
10      A. Everything that we had prepared. I'm
11 not sure if there's an official name given to that,
12 I apologize. But everything that we had prepared
13 for that meeting last week and then just again,
14 like I said, the reports that we have on record for
15 when he was at our facility.
16      Q. Okay. Did you review any audio or video
17 recordings?
18      A. I did not, no.
19      Q. If I can just get a little bit of your
20 background. What's your education background?
21      A. All the way through -- I've done some
22 college, I did not graduate college. And I guess
23 that would be education.
24      Q. Where did you go to school?
25      A. I went some here at MSU and did a little

Page 9

1  bit up in Missoula and then landed back here in
2  Bozeman and then ended up at the sheriff's office.
3       Q. Okay. And outside of MSU and
4  Bozeman -- or excuse me, Missoula, is that
5  University of Montana, Missoula?
6       A. Yes.
7       Q. Have you gone to school or training
8  anywhere else?
9       A. Obviously with my job in law enforcement
10 I've had numerous trainings. But as far as
11 specifically education based like college, no, it
12 was just those two universities.
13      Q. What did you study at MSU and U of M?
14      A. At MSU it was general studies. I
15 did -- I apologize, you're asking me to go way far
16 back. At one point I did journalism and then at
17 another point I did -- I don't remember the exact
18 name but it was basically like -- it wasn't
19 computer science but it was a form of computer
20 science.
21      Q. And then what's your current employment
22 position?
23      A. I'm a detention officer with the
24 Gallatin County Sheriff's Office.
25      Q. And how long have you been doing that?

Page 10

A. I have been -- that's a little complicated. I have been a detention officer with them for 11 years. I was a deputy with that same office for two years.

Q. And just so I'm clear, a deputy with that office?

A. A deputy sheriff is basically a sworn, a sworn member of the office. As detention officers we are not sworn.

Q. Okay. So as a sworn deputy then you could also, say, work on the streets --

A. Yes.

Q. -- and make arrests?

A. Yes, and that's typically what we refer to it as is working the street. And that's what I did for two years and then I went back to the jail as a detention officer and I've been doing that for 11 years. So in total I've been with the sheriff's office for 13 years.

Q. So it was detention, then street, then detention?

A. Correct.

Q. Any reason for those changes in your --

A. I'm kind of -- I call myself a backwards person. Most people work detention and they go on

Page 11

to the street and that's what I attempted to do and I did get to do that. But I actually like the detention setting better, so I went back.

Q. So that's why you went back, was just you enjoyed the work?

A. Uh-huh.

Q. Why did you enjoy the work more?

A. Just, I don't know, the interaction that we have with the inmates. It's a little different than you have with people you encounter on the street, whether it be -- whether you're taking them to jail or whether you're just helping them out changing a flat tire. Just the interaction at the jail I find that -- I don't know, it's just better fitting for me.

Q. How so?

A. Being able to talk to them about just what's going on I guess, you know, things in their life, you know, why they're back, why they are maybe here for the first time and how maybe we can help them.

Q. Do you ever provide any kind of counseling or help that way?

A. No, no. It's mainly just conversation.

Q. Okay. Prior to your time with the

Page 12

sheriff's office, what did you do employment-wise?

A. I was at the Bozeman Daily Chronicle as a -- I'm trying to remember what they called it. It was a circulation manager. I was in charge of hiring people to get the paper delivered.

Q. So in your role now as a detention officer, and I don't want to -- is there a rank or is it officer?

A. I'm just an officer. That's fine.

Q. Okay. All right. So what's your current role, your daily duties?

A. We -- so it's kind of a long role. Do you want me just to start and --

Q. Yeah, so I can understand just in a general sense.

A. Okay. So basically show up in the morning, we do head count. That's where we -- we announce head count. We go in. We make sure everybody is where they're supposed to be. Then we go on about -- we pass meals, breakfast. And then between breakfast and lunch we have various programs that come in. We have public defenders that come in wanting to see different people, so programs, public defenders. We do have visitation throughout the day. So that could be in the

Page 13

morning, could be in the afternoon, it just really depends where a certain person is housed in the detention center. And then obviously we have court. We have -- court can be very complicated. We -- to keep it simple we have city court and justice court and district court, but a lot of times we can have things like -- we can have a federal court come up where somebody has to come in, pick up an inmate and take them to a certain destination. So those things are -- it's day by day, we don't know.

So after lunch we have another lockdown for one hour and then they come off that lockdown and then we go back to more attorneys, more programs. And all throughout the day we do what are called rounds. And every half an hour and every hour we are in the pods interacting with the inmates, just making sure everything is going okay, where they're housed.

Q. Do you serve in any sort of administrator or supervisory capacity?

A. I do not.

Q. Are you familiar with the plaintiff in this case Mr. Kevin Briggs?

A. Yes, I am.

Page 42

1  disciplinary hearing or how does that work out with
2  the witness?
3      A.  First of all, he's notified and then if
4  he agrees to it, he comes to the hearing and then
5  he can give what he saw or didn't see and he can
6  come to the hearing.  They also have the ability to
7  decline and not be a witness if they do not want to
8  be a witness and that is up to the inmate.
9      Q.  Okay.  So you're saying the inmate has
10 the ability to decline?
11     A.  The person who has been called as a
12 witness.
13     Q.  Okay.  Does the disciplinary team
14 though, are they obligated to bring in the
15 witnesses, back in 2015 I understand.  We'll keep
16 it in 2015.
17     A.  Again, I wasn't a member of the
18 disciplinary team, but.  Unless there was some
19 outstanding reason, I -- I don't know why they
20 wouldn't be unless there was a reason for it.
21     Q.  If an inmate wanted a witness and the
22 witness wasn't called, would you let the inmate or
23 the witness know why that witness wasn't called?
24     A.  Again, I can't really answer that not
25 being on the disciplinary team.  I apologize, I

Page 43

1  just don't have enough knowledge of the exact
2  disciplinary functions just because what I did,
3  more or less, is I either wrote the disciplinary
4  report or I proof read them if an officer wrote one
5  to make sure it was okay and fit the bill and
6  signed off on it, but I didn't -- I wasn't in
7  charge of the disciplinary team to make sure their
8  policies and procedures were sound and up to speed.
9  I don't know enough about their policies and
10 procedures.
11     Q.  Okay.  I'm going to hand you
12 here -- this is -- what exhibit are we up to?  This
13 is 6.  We'll mark this as Exhibit 6 here.
14         Do you recognize this document which
15 we'll mark as Exhibit 6?
16         (Whereupon, Deposition
17         Exhibit Number 6 was
18         marked for identification.)
19     THE WITNESS:  Uh-huh, I do.
20 BY MR. BIDDULPH:
21     Q.  And what is this document?
22     A.  It's a major rule infraction or a report
23 of a major rule infraction, excuse me.
24     Q.  Okay.  So what's the purpose of this
25 document?

Page 44

1      A.  This is to let the inmate know of what
2  they are being charged with or what rule they have
3  allegedly broken at the detention center and that
4  they are -- eventually they're going to have a
5  hearing and this is what is going to be presented
6  to the disciplinary team.
7      Q.  Okay.  So on the front page here I'm
8  looking at --
9      A.  Uh-huh.
10     Q.  -- it says reporting officer on this one
11 for a 2-8-15 and 2-11-15, so that would be Officer
12 Waliser?
13     A.  Uh-huh.
14     Q.  Is that correct?
15     A.  That is.
16     Q.  So other inmates involved would be
17 Mr. Steele, it looks like?
18     A.  Uh-huh.
19     Q.  And then at the bottom there's some
20 signatures?
21     A.  Yep.
22     Q.  It looks like Mr. Briggs is the inmate
23 signature?
24     A.  Uh-huh.
25     Q.  It says hearing officer, do you know

Page 45

1  whose signature that is?
2      A.  That is my signature.
3      Q.  Okay.  So then would you have presented
4  this report to Mr. Briggs?
5      A.  Yes, I would have.
6      Q.  Okay.  And this would have been done
7  prior to his hearing?
8      A.  Yes, prior to.  This would have made him
9  aware of it.
10     Q.  So this is the notice document
11 basically?
12     A.  Uh-huh, yep.
13     Q.  I see, thank you.
14         So then on the second page there's a
15 report attached?
16     A.  Uh-huh.
17     Q.  And I'm assuming because on the front
18 page it says "Description of Incident: See report."
19     A.  I'm sorry, can you say that last part
20 again, description of?
21     Q.  Excuse me, yeah.  So on the Major Rule
22 Infraction Report page, under description of
23 incident it says "see report"?
24     A.  Oh, yes, yes.  I'm sorry, yeah.
25     Q.  And then the next page it looks like

Page 74

1  correct?
2    A.  Yes, it is from me.
3    Q.  It says to Jason Jarrett?
4    A.  Uh-huh.
5    Q.  And who is Jason Jarrett?
6    A.  He is the jail administrator.
7    Q.  And the subject line states?
8    A.  Disciplinary grievance.
9    Q.  Okay. And so this is basically your
10 response to Mr. -- excuse me, Lieutenant Jarrett --
11   A.  Uh-huh.
12   Q.  -- about disciplinary grievance?
13       So can you please read the body of that
14 e-mail?
15   A.  Yeah. "Due to what video footage shows,
16 I recommend the following: Fighting/physical force
17 be amended to rude and/or disrespectful to inmate
18 and his lockdown time be amended to 10 days.
19 Briggs was placed on lockdown on April 27th until
20 May 4th where he was moved to Ad Seg. He has
21 served 7 of his 10 days, should he come off of Ad
22 Seg, he will have 3 days of disciplinary lockdown
23 remaining to serve."
24   Q.  So it looks like you did review the
25 video as part of a grievance or an appeal?

Page 75

1    A.  Yes, sir, I did.
2    Q.  Okay. And your finding then was I guess
3  fighting/physical force should be amended to rude
4  or disrespectful?
5    A.  Yes, sir. That is correct.
6    Q.  Do you recall why you made that
7  recommendation?
8    A.  I would assume that -- as we looked at
9  the video closer, I would assume that the video
10 footage showed that it was what the e-mail says,
11 that the fighting/physical force probably wasn't
12 there and so we just amended down to again what it
13 says, and that his lockdown time be amended
14 appropriately.
15   Q.  And do you recall what Mr. Briggs did
16 that was rude or disrespect to Mr. Smith?
17   A.  I do not.
18   Q.  Did you speak with Mr. Briggs at all
19 about his role in this incident?
20   A.  I'm sure I let him know that this was
21 being amended. Prior to this I -- short of the
22 hearing, I don't recall.
23   Q.  Did you ever -- did you ever I mean
24 speak with Mr. Briggs about, let's say, his version
25 of the events or side of the story prior to the

Page 76

1  hearing, the disciplinary hearing?
2    A.  No, not prior to the hearing. I mean at
3  the hearing where he tells us that, yes.
4    Q.  Did Mr. Briggs provide his version of
5  the events?
6    A.  At the hearing, yes. That's where
7  they're given their opportunity to.
8    Q.  But did he provide them?
9    A.  Yes, I would assume he did. I don't
10 recall exactly.
11   Q.  Okay. And that's why I want to be
12 clear.
13   A.  Yeah.
14   Q.  If you don't recall or he didn't?
15   A.  I do not recall exactly, I apologize.
16   Q.  That's okay. I'm just trying to be
17 clear for the record.
18   A.  No, it's fine.
19   Q.  Yeah, we don't want to put words in your
20 mouth.
21   A.  Nope, I understand.
22   Q.  Did you speak with any other inmates
23 about this April incident?
24   A.  No, sir.
25   Q.  Did you speak with Inmate Smith about

Page 77

1  this incident?
2    A.  Again, at the hearing but not prior to.
3    Q.  At --
4    A.  At his hearing.
5    Q.  Oh, at Smith's hearing?
6    A.  Yes, yes.
7    Q.  Thank you.
8        And do you recall what Inmate Smith
9  said?
10   A.  No, sir, I do not.
11   Q.  And you don't recall talking to
12 Mr. Smith at any time or at his hearing I guess?
13   A.  Not -- not like in conversation of what
14 we would. I mean we would have talked about the
15 incident, but I don't recall what he said or what
16 he didn't say exactly.
17   Q.  Did you ever write a narrative of what
18 Mr. Smith told you?
19   A.  Are you asking like during the hearing?
20   Q.  At any time.
21   A.  No, sir. Short of -- and it wasn't me
22 that wrote the report. It would have been the
23 officer's report of what happened. But short of
24 that, any conversation wouldn't have been recorded,
25 I guess is the word.

Page 78

Q. Okay. I'm going to hand you another couple of documents I'll enter as Exhibit 13.
     (Whereupon, Deposition Exhibit Number 13 was marked for identification.)
BY MR. BIDDULPH:
Q. Do you recall forwarding an e-mail to Jamie Young, what's contained on the second page of Exhibit 13?
A. I don't recall this. I mean if it's here, it obviously took place. I'm not disputing that but, I just don't recall it.
Q. Do you recall meeting with Inmate Smith?
A. If we pulled him out of the pod, myself and Officer Taylor, to talk to him then we would have. I just don't -- I don't have the memory in my mind that hey, we did this on this day. I just don't have that.
Q. Sure. And I mean as part of this it says on April 28 you and Officer Taylor --
A. Uh-huh.
Q. -- discussed a disciplinary matter with Inmate Smith. Was this Inmate Smith's disciplinary hearing --
A. No.

Page 79

Q. -- or was this part of an investigation?
A. This would have been more of an investigation. We wouldn't have held the hearing at the door of another pod. We hold that in a separate room altogether.
Q. And the last paragraph -- and I'm just going to read it -- says, "Due to this being the third injury that Briggs has sustained while incarcerated and the questionable nature of these injuries, it is my recommendation that Briggs be placed on Administrative Segregation for his own personal safety."
    Why did you think that his injuries were questionable?
A. There was one -- I don't recall, oh, Exhibit 11 --
Q. Uh-huh.
A. -- Officer Eckhardt wrote up a report about -- well, actually wrote him up. It would have been a minor -- or I'm sorry, it was a major, but it was for making a false statement about a black eye, something there. We had the two instances, one with Steele, then we had the one with Smith, about the fights. So we were beginning to see this pattern of -- we didn't -- we weren't

Page 80

able to see where the black eye came from. He said it was from the rec yard. The rec yard video footage didn't show us anything that hey, he got a black eye in the rec yard. So we were like well, where did that come from? We didn't know. Now I don't think we ever did find out, if memory serves.
    Now we have an inmate saying that he wants to get hit, and this is not us saying that we believe this inmate, but then we also have Mr. Briggs, who's been involved in two other fights with Mr. Steele and Mr. Smith and this time. So at that point in time it's okay, if he's not integrating well into general population, what else can we do in the interest of his personal safety. And at the time the only thing we had at that point was administration segregation and --
Q. So --
A. I'm sorry.
Q. No, go ahead.
A. I just think that's what this e-mail is is -- maybe I'm wrong, but I do know I sent another e-mail to -- whether it was JJ or Jamie, about whether it was this time or another time. It was like Ad Seg might be the best route to go for now, and until the further time during one of our team

Page 81

meetings then we'll see what bridge we can cross there.
Q. So then you were saying to put him in Ad Seg because he was assaulted twice by Mr. Steele and once by Mr. Smith?
A. It wasn't who was doing it or whatnot, it was the pattern that was emerging. It was wherever we put him, whether it was in DPOD or EPOD, he was getting hurt. Whether it was if he was instigating the fight or if somebody else was instigating a fight with him, something was going on as to where he wasn't meshing well with that population and so we had to look at other ways of keeping him safe while he was at the jail. And at the time the only thing we had -- because of all of our other pods being full, the only thing we had was Ad Seg.
Q. Was CPOD ever considered?
A. No, it was not.
Q. Why not?
A. It just never came up during our team meetings. It was never thought of to put him in CPOD. He didn't fit that criteria.
Q. I guess why didn't he fit that criteria?
A. It just -- it never came up in

Page 82

1 conversation to put him in CPOD. It never did. In
2 the team meetings it was never even discussed.
3     Q. Did you ever hear or did you ever hear
4 of Mr. Smith or Mr. Steele taunting Mr. Briggs?
5     A. I didn't, no, sir.
6     Q. Did you ever hear Mr. Steele or
7 Mr. Smith making fun or name calling Mr. Briggs?
8     A. No, sir.
9     Q. Did you ever hear of either of those two
10 men threatening Mr. Briggs at any point?
11     A. No, sir.
12     Q. I'm just curious your thoughts on if the
13 video was reviewed prior to his disciplinary
14 hearing and he was found guilty of fighting, why
15 wasn't that amended down a few weeks later to rude
16 or disrespectful after reviewing the video? Does
17 that make sense?
18     A. I see the question. I understand what
19 you're getting at. But without going back and
20 actually seeing the video, because I don't even
21 recall what's in the video, and without going back
22 and having the conversations I probably had with
23 both JJ and Jamie, I can't answer that. I just
24 don't remember those specifics.
25     Q. I guess and, you know, to put it more

Page 83

1 succinct is, if the video doesn't show him striking
2 Mr. Smith, why was he found guilty of fighting?
3     A. Often times we have people that are
4 found guilty of fighting even though they don't
5 throw a punch because they're still involved in the
6 fight. We tell people at the jail all the time, if
7 there is going to be an issue, you need to go to
8 your cell and lockdown. Let us know that. We have
9 the intercom that I was telling you about.
10 Lockdown in your cell, hit the intercom, tell us
11 there's an issue and we'll come in and deal with
12 it. So just because somebody does not throw a
13 punch, does not mean that they're not guilty of
14 fighting.
15     Q. All right. I guess, you know, just in
16 review of Mr. Lauchnor's report, it sounds like
17 Mr. Briggs was just sitting at a table eating lunch
18 when Mr. Smith struck him?
19     A. I understand.
20     Q. So what was Mr. Briggs' role in the
21 fight?
22     A. And again, without having that
23 information presented again, I can't guess that
24 right now. I just don't recall that specific
25 information.

Page 84

1     Q. So what information would you then need
2 to make that determination that Mr. Briggs was
3 guilty of fighting?
4     A. There would be video footage of that.
5 Something had to have happened with him sitting at
6 that table, whether it was an inmate coming up and
7 him responding to that inmate or I think that might
8 have been the incident where he might have thrown
9 the food and that inmate responded or whatever that
10 was. That's the type of information we're looking
11 at when we look at that video.
12     Q. If Mr. Briggs just didn't enter a plea,
13 should he be found guilty on that solely?
14     A. I'm sorry, can you --
15     Q. Let me rephrase that.
16        If Mr. Briggs did not -- well,
17 Mr. Briggs didn't enter a plea at this hearing --
18     A. Okay.
19     Q. -- would you agree with that?
20     A. I don't believe he did, no.
21     Q. So should that be the sole reason for
22 him being found guilty?
23     A. It has been for other inmates in the
24 past. I'm not saying it should be for Mr. Briggs.
25 It all depends on what's in the evidence. So

Page 85

1 again, without looking at that specific
2 information, I can't really say yes or no because a
3 lot of that evidence leads one way or the other, if
4 that makes sense.
5     Q. Yeah. And so you're saying though you
6 would still review the evidence?
7     A. Absolutely.
8     Q. And that determination would be made
9 based on the evidence?
10     A. Absolutely.
11     Q. Not just based on --
12     A. Not just --
13     Q. -- an inmate not entering a plea or
14 remaining silent?
15     A. Yes, sir. Yes, sir.
16     Q. So Mr. Briggs was placed in
17 Administrative Segregation after this; is that
18 correct, it's your understanding?
19     A. I don't remember the exact dates, but I
20 do know that he did go back to APOD after one of
21 his fights. I do know that. I don't remember if
22 it was this specific one.
23     Q. Well, after April when you made this
24 recommendation on May 3rd-ish or April 28th --
25     A. Okay.

Page 86

1  Q. -- he remained in Administrative
2  Segregation, would you agree with that?
3  A. I know he went back to APOD, yes.
4  Q. Do you know why he was placed in
5  Administrative Segregation?
6  A. I know this is probably part of it, the
7  fighting and whatnot. Past that, I do not know. I
8  mean obviously to keep him safe because we were
9  seeing the pattern that I was just talking about.
10 Past those instances, no, sir, I do not.
11 Q. Was there a concern that he was
12 suicidal?
13 A. He had made those attempts before, but I
14 don't think -- I don't want to say "think." It
15 wasn't brought up in the team meeting that those
16 concerns were still there. I don't recall him
17 making those threats when he was put back in APOD.
18 Q. Was there ever a concern -- kind
19 of going off of I guess this statement of
20 Mr. Smith -- that Mr. Briggs being assaulted in
21 detention would be beneficial to his case?
22 A. I remember it being talked about at a
23 team meeting, but to what extent I don't recall.
24 But I do remember it coming up.
25 Q. Was there ever a concern of him, say,

Page 87

1  appearing in court with a black eye or an injury?
2  A. That I do not recall.
3  Q. Do you recall ever being part of a
4  search of Mr. Briggs' cell?
5  A. I'm sorry, a search of his cell?
6  Q. A search of his cell, yeah.
7  A. Off the top of my head, no, I do not
8  recall. It is entirely possible though that I was
9  because we've searched lots of cells.
10 Q. Sure. I believe this would have taken
11 place in 2014, not 2015.
12 A. Okay. Yeah, again, it's entirely
13 possible. But to immediately answer, I would say
14 no, I do not recall it.
15 Q. Did you ever sit in on -- well, I guess
16 you were part of these team meetings when
17 Mr. Briggs was in Ad Seg?
18 A. Yes, sir.
19 Q. Was it ever discussed in those team
20 meetings what Mr. Briggs needed to do to get off Ad
21 Seg?
22 A. That's actually -- that's not really a
23 yes or no question. There isn't really one or two
24 set things that a person does to get off Ad Seg.
25 It's more of they're being observed to see how

Page 88

1  they're doing and that's what's discussed every
2  week, to see if they're progressing along and
3  that's what's discussed that Monday. And then they
4  come back that next Monday and say, okay, how we
5  doing? Are we ready to go to DPOD or EPOD and so
6  on and so forth? So yes, it was discussed like how
7  do we feel about here and then it might be well,
8  no, let's do another week. But it's not really a
9  set, well, he hasn't done this or that yet, if that
10 makes sense? There's not really a direct one or
11 two things he can do or can't do. It's more of
12 observation and what are the officers seeing when
13 they're interacting with him.
14 Q. So then do you know why Mr. Briggs
15 remained in Ad Seg?
16 A. I would assume that the team meeting
17 felt that he was not ready to move to those pods
18 yet.
19 Q. But I mean, looking at objective
20 reasons, why was he not able to move to those pods?
21 A. I can't answer for the jail
22 administrator.
23 Q. Is that solely up to the jail
24 administrator?
25 A. Where they move from Ad Seg, yes, it is

Page 89

1  up to him. The team meeting can make the
2  recommendation, but the decision lies with the jail
3  administrator.
4  Q. And so then would you help me out with
5  that? Does the team make a recommendation and
6  present it to the jail administrator or?
7  A. No, he's at the meetings.
8  Q. Okay.
9  A. Yeah, he's at the meetings.
10 Q. So he has that final say?
11 A. Uh-huh. Yes, sir.
12 Q. So was Mr. Briggs ever put on, say, a
13 behavior plan or any sort of program or plan as to
14 where he could get out of Administrative
15 Segregation?
16 A. Not that I recall.
17 Q. Was he ever given any kind of
18 expectation that, you know, this is what it will
19 take for you to get out of Administrative
20 Segregation?
21 A. I do not recall that either.
22 Q. If Mr. Briggs had, say, a minor
23 violation while he was in Ad Seg, would that be
24 sufficient grounds to keep him there?
25 A. A minor, I mean yes, it could. But most

Page 90

1  minors do not.
2      MR. BIDDULPH: If we can go off the record
3  for two seconds, would that be all right? Do you
4  want to take a break?
5      THE WITNESS: I need to just use the rest
6  room.
7          (Whereupon, a brief
8          recess was taken.)
9      MR. BIDDULPH: So we're back on the record.
10 BY MR. BIDDULPH:
11     Q.  So just for my benefit, reading through
12 some of this there's a term that's called
13 bulldogging. Do you know what bulldogging is? Are
14 you familiar with that?
15     A.  It's kind of one person in the pod, an
16 inmate, being in charge of everything else.
17     Q.  Uh-huh. And what does that person do, I
18 mean to get that mark?
19     A.  They might -- oh, I'm sorry, what do
20 they --
21     Q.  What do they do? How do they bulldog
22 somebody? What are the objectives or observations
23 you have?
24     A.  They just kind of -- another term we
25 use, we call them kind of pod boss.

Page 91

1      Q.  Uh-huh.
2      A.  And that's what we see. But things they
3  just kind of get or that they expect are things
4  like extra food. If they're in a pod that might
5  have a vending machine, maybe somebody who's buying
6  a pop or a candy bar maybe buys them just a pop or
7  a candy bar, just extra little perks here and
8  there, just because they know that that's the guy.
9  And it's just little things like that. And when
10 those things aren't given, it's not that there's a
11 problem right then, right there on that day, but if
12 it doesn't happen for a couple of days in a row or
13 three or four days in a row, maybe there's going to
14 be a problem. Sometimes there's a warning given,
15 sometimes there isn't and then you have an issue.
16     Q.  If an inmate is the subject of, say, of
17 somebody that's bulldogging, what typically happens
18 with that inmate who's, let's say, the victim of
19 bulldogging?
20     A.  The victim of?
21     Q.  Uh-huh.
22     A.  Typically we try -- first of all, we try
23 to find out who that person is, the actual person
24 doing the bulldogging because we don't want that
25 person to remain in that pod because it's going to

Page 92

1  cause more problems. If we can't always find that
2  out, we will try and get that victim to another pod
3  because it's not -- it's not going to be conducive
4  to us to put the victim of that into like APOD.
5  That doesn't help us and it's not good to
6  discipline somebody who didn't do anything wrong.
7  So right there I mean we'll try to move them
8  to -- if they're in D, maybe we can move them to
9  EPOD. And if they're in E, maybe we can move them
10 to the other side, and what we have is H or IPOD.
11     Q.  So they'd stay in the same level of
12 classification, just a different pod?
13     A.  Most of the time, yes, they do stay the
14 same class, we just make an exception of where
15 they're housed and let them go to another pod due
16 to what's happening.
17     Q.  Would you ever move them down a pod or,
18 say, move them to CPOD?
19     A.  No.
20     Q.  Why not?
21     A.  Because CPOD again falls under a very
22 special classification -- not classification,
23 excuse me. It just falls under a very special
24 bracket of where we call that special management
25 and those people are -- typically they are going to

Page 93

1  get -- which we've seen in the past, they are
2  victimized by not just people who are bulldogging
3  them but people who are just -- they automatically
4  see, like I said, somebody who is developmentally
5  disabled and they know that I can get maybe extra
6  food off this guy's lunch tray or his dinner tray
7  or I can take the remote from him and watch my TV
8  program, things like that. And they can do it day
9  in, day out, day in, day out and so those people
10 are victimized no matter where they're at, so
11 that's why we have CPOD. The other people, the
12 people that have been bulldogged, they can still
13 stand up for themselves, maybe it's just one
14 instance with one individual person that they were
15 having issues with. The people in CPOD are -- it's
16 a different classification, a different group of
17 people that we're very selective with.
18     Q.  If somebody had ever I guess been
19 engaged in bulldogging or anything like that, would
20 they ever be put in CPOD?
21     A.  I'm sorry, can you --
22     Q.  If they were labeled somebody who
23 bulldogs other inmates, would they be put in CPOD
24 at any point in time?
25     A.  If they were the person doing the

Page 94

1  bulldogging?
2     Q.  Uh-huh.
3     A.  No.  No, sir.
4     Q.  Are inmates ever classified or labeled
5  as a predator?
6     A.  When you say "labeled" what exactly do
7  you mean?
8     Q.  Well, I mean as part of the
9  classification process an individual is a predator?
10    A.  They're not classed that in our system.
11 They're classed, like you said, either high,
12 medium, we have low.  And then we do have a section
13 that says special management, but we do not have
14 anything that said predator.
15    Q.  Predator is not a label that's ever
16 assigned to an inmate?
17    A.  No, sir.
18    Q.  Okay.  I don't have any other questions.
19 If you do?
20    MR. STACEY:  I just got a few I think.
21
22          EXAMINATION
23 BY MR. STACEY:
24    Q.  Brett, earlier in your deposition you
25 testified about the differences between the

Page 95

1  different pods at the detention center, do you
2  recall that testimony?
3     A.  Yes, sir.
4     Q.  And it's a little beyond the scope of
5  the direct but, is there an another section of the
6  detention center that you didn't cover?
7     A.  Mainly what I was talking about is what
8  we call the west side.  There is a different side
9  of the detention center called the east side and
10 that's where we have FPOD, GPOD, HPOD and IPOD.
11    Q.  Okay.  And what are the differences
12 between those?
13    A.  So right -- right now F and GPOD -- FPOD
14 is basically what we call them classification or
15 general population females.  GPOD is -- it can be
16 special management, but it is most of the time high
17 classification females.  HPOD and IPOD are just low
18 security males.
19    Q.  And then is booking a separate area of
20 the jail?
21    A.  Booking is a separate area, yes.
22    Q.  And is there -- what's the difference
23 between booking and the different pods?
24    A.  Booking is where new arrests are
25 typically brought in to the booking area.  They are

Page 96

1  booked under whatever charges they are currently in
2  the detention center for.  And based on their
3  charges and their criminal history and to behaviors
4  that we have either seen in the past, if we're
5  familiar with them, or that we are seeing at that
6  given point in time, they are classified and that
7  helps us determine where they will be housed in the
8  detention center.
9     Q.  Okay.  You also answered questions about
10 inmates requesting attorneys prior to disciplinary
11 hearings, do you recall that testimony?
12    A.  Yes, sir.
13    Q.  And for my own sanity, and I got a
14 little confused, if an inmate requests their
15 attorney prior to, I guess I'll call it an in-house
16 hearing, you guys don't delay the hearing or
17 provide an opportunity for the inmate to get their
18 attorney, do you?
19    A.  They get -- we are going to hold the
20 hearing one way or the other.  We're not going to
21 wait until their attorney comes in.  If their
22 attorney comes in to see them before they go
23 to -- whether it's video court or go to court in
24 person, they have the absolute right to see that
25 attorney and we will afford them that right.  But

Page 97

1  if that attorney is trying to be there on behalf of
2  that hearing, that is not afforded to them.  Those
3  are two separate things.
4     Q.  Okay.  And then, say, an inmate has an
5  incident with another inmate and they're charged
6  criminally for whatever they did prior to any
7  criminal proceedings, do you allow the inmate to
8  speak with their attorney?
9     A.  Absolutely.
10    Q.  I was just trying to make sure the
11 distinction was there because I got a little
12 confused.
13        And then finally -- and maybe we can go
14 back to Exhibit 6 that you answered questions
15 about.
16    A.  That's going to be up here somewhere.
17 All right.
18    Q.  I don't have Exhibit 6 in front of me
19 but I believe one of the pages is a disciplinary
20 offense report --
21    A.  Uh-huh.
22    Q.  -- authored by Sergeant Waliser.  And
23 one of the pages is the Major Rule Infraction
24 Report.  Thank you.
25    A.  Uh-huh.

Page 98

1    Q.  And Mr. Biddulph pointed out that on the
2  disciplinary offense report, the bottom left corner
3  it lists inmate witnesses as Michael Fuchs, do you
4  see that?
5    A.  Yes, I do.
6    Q.  And then on the Major Rule Infraction
7  Report where it leaves a blank for witnesses,
8  nothing is written; do you see that?
9    A.  Uh-huh, yes.
10    Q.  If an inmate witness is listed on the
11  disciplinary offense report, is that different than
12  listing them under the Major Rule Infraction Report
13  and how so?
14    A.  It can be.  I'm trying to
15  remember -- excuse me, but I'm just trying to
16  remember how this worked.  It's so many years ago.
17  Typically they're given -- so this -- let me just
18  jump ahead real quick.  The disciplinary offense
19  report, this is just a copy of the report that the
20  inmate gets, okay?  The inmate is not required
21  to -- I mean I know there's a spot for their
22  signature up there.  They are not required to sign
23  this and give it back to the -- if they don't want
24  to sign it, they don't have to.  But this is given
25  to them, the Major Rule Infraction Report and

Page 99

1  that's what tells them there's going to be a
2  hearing and here I even put there's a hearing on
3  February 26, 2015, the time was to be determined.
4  Just because they put the witnesses on the
5  disciplinary offense report, this isn't a sheet
6  that they turn back in to the disciplinary officer
7  or whoever that hearing officer might be.  So
8  that's where this might have been misconstrued as
9  having Mr. Fuchs on there.
10    Q.  So would it be fair to say that the
11  Major Rule Infraction Report is an inmate's
12  opportunity to list what witnesses they want?
13    A.  Again, without me being actually
14  officially on the disciplinary team at that time,
15  this is my recollection.  I do believe this was
16  their opportunity to put that inmate witness down,
17  but as I said, that's my -- that's my memory
18  serving, but I'm not 100 percent on that.  So if I
19  can just -- a little leeway on that, I do not
20  recall 100 percent on that.
21    Q.  Sure.  I think you testified that even
22  if a witness is listed or requested by an inmate,
23  it may be declined by the disciplinary team?
24    A.  They can be, yes.
25    Q.  What are the circumstances that they

Page 100

1  might decline a request?
2    A.  It can be a number of things.  It can be
3  based on the history of that inmate with basically
4  maybe his number of write-ups.  Maybe he's
5  currently on lockdown for a separate incident that
6  he wasn't even in there for and they just want
7  their best buddy at the report -- or at the
8  hearing, excuse me.  So there's a whole list of
9  things.  They could have asked for -- a lot of
10  times it is their friend who is in the same pod as
11  them that is just, you know, kind of -- he was in
12  the area so I'll ask him to come and he'll say
13  something on my defense.  Sometimes it's somebody
14  that all of the sudden that inmate has been
15  spending a lot of time with.  That's something
16  that's kind of out of the ordinary for us so we pay
17  attention to those things because those typically
18  don't add up when you're going to hold a hearing,
19  especially for a serious one where -- this one here
20  is serious, it's for fighting, which typically
21  inmates get 15 to 30 days for.  Now it's 15 to 30,
22  back then it was even longer, so.  So there is a
23  number of reasons where they can be declined.
24    Q.  And then final question:  On a document
25  such as the Major Rule Infraction Report or a Major

Page 101

1  Rule Infraction Report Hearing, for example, I
2  think one of them from the April hearing just had
3  your signature?
4    A.  Uh-huh.
5    Q.  Does that mean that you were the hearing
6  officer or are you able to sign that on behalf of
7  somebody else?
8    A.  I'm able to sign that on behalf of them.
9    Q.  Okay.
10    A.  Just to clarify, are you talking about
11  this sheet, the Major Rule Infraction Report?
12    Q.  I'm talking about, yeah, that and I
13  don't know what exhibit it is, but.
14    A.  Okay.  So just this sheet of paper; is
15  that correct?
16    Q.  Correct.
17    A.  Okay.
18    Q.  And a Major Rule Infraction Report
19  Hearing, which looks like they're separate
20  documents here.
21    A.  Oh, okay.  I see it here.  The one with
22  the Miranda on it?
23    Q.  Correct.
24    A.  Okay.
25    Q.  So if your signature is the only one