```
             IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MONTANA

                         BUTTE DIVISION




   KEVIN BRIGGS,                  ) CV18-0010-BU-BMM-JCL

              Plaintiff,          )

      v.                          )

   GALLATIN COUNTY and JOHN DOES  )

   1-8, as individuals and in     )

   their official capacity as     )

   detention officers,            )

              Defendants.         )


             DEPOSITION OF BOWMAN SMELKO, Psy.D.


       BE IT REMEMBERED, that the deposition upon

   oral examination of BOWMAN SMELKO, Psy.D.,

   appearing at the instance of Defendants, was heard

   at the Law Office of McKeon and Doud Law, 808

   Great Northern Boulevard,, Helena, Montana, on

   the 23rd day of July, 2019, beginning at the hour

   of 8:30 a.m., before Laurie Crutcher, Registered

   Professional Reporter, Notary Public.

                         * * * * *
```

1

## Page 3

I N D E X

WITNESS                                    PAGE
BOWMAN SMELKO, Psy.D.
    Examination by Mr. Cal Stacey .. 4
    Examination by Mr. Biddulph . . . 70


E X H I B I T S

Exhibit No.   Exhibit Description          Page
29            Dr. Smelko's Report          4

## Page 4

WHEREUPON, the following proceedings were had and testimony taken, to-wit:
* * * * *
(Whereupon, Deposition Exhibit No. 29
Dr. Smelko's Report
was marked for identification)

BOWMAN SMELKO, Psy.D.,
Having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. CALVIN STACEY:

**Q.** Sir, could you state your full name for the record, please.
**A.** Dr. Bowman Smelko, S-M-E-L-K-O.
**Q.** Doctor, what is your profession?
**A.** I'm a licensed psychologist in the states of Montana, Colorado, and Alaska, and I'm also board certified by the American Board of Forensic Psychology.
**Q.** Have you ever had your deposition taken before?
**A.** I have.
**Q.** Roughly how many times would you say?

## Page 5

**A.** A dozen.
**Q.** Would that be solely as an expert witness, or perhaps in another capacity, or a combination?
**A.** No, always as an expert.
**Q.** What type of cases do you usually get hired on to act as an expert witness?
**A.** It's a plethora.
**Q.** Why don't you just run through general topics, please.
**A.** So I do both civil and criminal forensic psychology. So criminally I do a lot of sex offender matters; mental state at the time of the offense; fitness to proceed, or in Federal Courts, competency to proceed.

I've served as an expert -- I do a lot of educational testimony on stuff like battered wife syndrome, child sexual abuse syndrome, how there is not a lot of research behind them, and misapplication of data and research around those.

I've done -- I'm trying to think. My mind is going blank -- eye witness identification education; as well as I've testified on different matters related to line-ups and police interrogation.

## Page 6

I know I'm leaving something out. My vitae really outlines a lot more of this.

I've done death penalty clemency hearing; I've done numerous violence risk assessments for different matters; stalking assessments.

I've served in the capacity civilly in custody and parent termination; officer evaluation, so firearm capability evaluations; personal injury obviously -- what we're working with here.

I've also served in the capacity of looking at systems such as best practices with inside various systems psychologically, treatment centers, as far as that goes. I know I'm obviously leaving something out because it's all off the top of my head.

But in Montana when you're board certified in forensic psychology, and you're the only person, you end up with a lot of depth and breadth of different issues to work on, so --
**Q.** Fair enough. Splitting percentage-wise between criminal and civil cases, do you have any rough estimate?
**A.** Well, it really gets skewed because it

1  ebbs and flows for years. The Department of
2  Family Service would hire me on those parental
3  termination cases, and that was a fairly large
4  percentage; and then when their budget crisis
5  happened, they stopped being able to hire
6  psychologists as much, and so that decreased and
7  other areas went up.
8      I would say it's probably 65, 70 percent
9  criminal, the other 30 percent civil, is my best
10 guess.
11     Q. Of the civil, when you mentioned
12 personal injury such as this case, any breakdown
13 there of the civil, that would be personal injury
14 versus some of the other matters?
15     A. So if I took that 30 percent and chunked
16 it up, I would say it's probably about 20 percent.
17     Q. What type of personal injury cases have
18 you worked on prior to this one?
19     A. Primarily sexual abuse cases. That's
20 the large plethora of them, when somebody sexually
21 abuses somebody, and they want to know what the
22 aftermath of that is.
23     Q. So would you be hired typically by the
24 victim, the Counsel for the victim suing someone,
25 on a sexual abuse?

                        7

1      A. I have been primarily, yes.
2      Q. What is your education, Doctor?
3      A. Well, I graduated here from Carroll
4  College with my undergrad. I went on to get my
5  masters and doctorate from Springfield, Missouri,
6  Forest Institute of Professional Psychology.
7      I then received my predoctoral training
8  at the Children's Center in Salt Lake City, Utah,
9  followed by post-doctoral residency hours at the
10 University of Utah Neuropsychiatric Institute.
11 And then the Colorado Boys Ranch in LaJunta.
12     I was licensed then in 2004 in Colorado,
13 and was hired by the Colorado Mental Health
14 Institute in Pueblo as a staff psychologist. And
15 primarily I was placed on the sex offender
16 division ward for supervision, treatment,
17 evaluation of sexual offenders who were also found
18 not guilty by reason of mental illness, and/or who
19 were in limbo in a competency proceeding; kind of
20 how do we manage the risk management piece there.
21     At the same time I started a private
22 practice in Pueblo, and did a broader forensic
23 practice, and ended up building that up over the
24 years before we left and selling it; but it was
25 both civil and criminal, what I've just already

                        8

1  described.
2      After two years at the State Hospital
3  kind of on that track, I was promoted to the
4  clinical director of a joint venture between the
5  Colorado Mental Health Institute and the Division
6  of Youth Corrections, and built up and from the
7  ground up really programmatically, and actually
8  physically in some respects, sold this to the
9  Youth Service Center, which was for the twenty
10 most violent and/or sexually aggressive mentally
11 ill youth in the state of Colorado.
12     After two years there I was promoted to
13 all of Colorado's sex offender divisions, but at
14 the same time, was assigned to do competency
15 evaluations and assisting mental state at the time
16 of the offense evaluations.
17     I'm trying to remember the year. 2010
18 we moved back to Montana, which was solely a
19 family decision, because Pueblo -- I don't know if
20 you've ever been down there, but it can be rough.
21 It has a lot of gang activity. And so we had a
22 five year old, and we had another one on the way,
23 and we said, "Well, this probably isn't the best
24 place to raise kids."
25     So this is where I'm from. I went to

                        9

1  Capital High, and Carroll, and we came back here
2  for family.
3      I started at Intermountain Children's
4  Home, and then was quickly promoted to Clinical
5  Director of the Outpatient Services, and brought
6  all those services together initially; and once I
7  got everything rolling, I was also starting a
8  private practice, and I resigned there and went
9  full-time in a private practice.
10     And I teach law, justice, and forensic
11 psychology at Carroll.
12     In addition, I'm on the faculty for the
13 American Board of Forensic Psychology, and so I'm
14 on the Examination Committee. So I review
15 people's work nationally who want to have that
16 credential, and twice a year fly down to Atlanta,
17 and administer oral examinations of professionals.
18     Q. Is your private company Capital City
19 Consultants?
20     A. It is, yes.
21     Q. Doctor, I'm going to hand you what's
22 been marked as Exhibit 29, and I know you have
23 your own copy in front of you.
24     A. I can use yours. I don't have any marks
25 on it.

                        10

**Page 11**

1    Q. Whatever works best. I'd like to go
2 through the report with you.
3    A. Sure.
4    Q. I think that's the easiest way to take
5 your deposition. Looking at the report, it's
6 called a Personal Injury Psychological Evaluation
7 Report. Is there any magic to those words?
8    A. No. It's just the best descriptor that
9 can try to condense exactly what I'm trying to
10 achieve in this report, and it drives kind of the
11 data collection that I have.
12    Q. I notice there is a date of April 16,
13 2019 on the report. Do you recall off hand when
14 you were first contacted in regard to acting as an
15 expert witness in this case?
16    A. I do not have that knowledge off the top
17 of my head. I know that I eventually made it down
18 there a year before in October of 2018 to
19 Crossroads, but I know there was some obviously
20 setting up and prior communications to that, so --
21    Q. The first paragraph on Page 1 talks
22 about you going to the Crossroads Correctional
23 Facility in Shelby on October 24, 2018?
24    A. Yes.
25    Q. So obviously you would have been

**Page 12**

1 contacted sometime before then.
2    A. Yes, sir.
3    Q. And what was the purpose of you going to
4 meet with Mr. Briggs on October 24, 2018?
5    A. It was to collect data relevant to the
6 referral question of whether or not his time in
7 correctional facilities had a negative
8 psychological impact on him.
9    Q. I notice in this paragraph it says you
10 conducted the initial data collection; what does
11 that mean, initial data collection?
12    A. So if we go to the Evaluation
13 Procedures, just those tests that I administered,
14 and those interviews that I put in. The reason I
15 put that in that I conducted it is at times, like
16 when I was in Pueblo, there was different kinds of
17 evaluations where I would send a psychological
18 technician to do that, and I would note that if a
19 technician collected the data. But in this case I
20 specifically collected all the data, so that's why
21 I have that in there.
22    Q. And the data would be information from
23 interviews, for example?
24    A. It would be, yes.
25    Q. And then it says that, "This evaluation

**Page 13**

1 and its conclusions are limited to the data
2 sources described below, some of which depend on
3 the client's self-report." Would the data sources
4 be the items referred to on Pages 2 and 3 under
5 Evaluation Procedures?
6    A. Yes, primarily two and three,
7 absolutely, because some of the historical
8 documentation is also his self-report, too.
9    Q. Do you recall when you met Mr. Briggs,
10 had you reviewed any records related to him, or do
11 you do that after meeting him?
12    A. The time sequencing, if I had them ahead
13 of time I would have reviewed them. I don't want
14 to guess.
15    Q. In that first paragraph where I left off
16 it said, "The evaluation and its conclusions are
17 limited to the data sources described below, some
18 of which depend on the client's self-report."
19 What do you mean by "client's self-report"?
20    A. It's just language to say that Mr.
21 Briggs is providing me the information from him.
22 And so it's always important to note that there
23 are certain things that I can't corroborate, and
24 so I try to through the collateral data, but at
25 times there is things I can't corroborate.

**Page 14**

1    Q. Is that typically referred to like
2 taking a history from a patient? Would that be --
3    A. Well, no, a history would be an example
4 of that. That wouldn't be what it is. So that
5 covers everything from his report to me on certain
6 tests, especially where he's providing the data
7 directly to me. It could be history, it could be
8 let's say a medical documentation where he went in
9 to a doctor and he said, "I'm having these
10 symptoms." Right?
11      So all I know is what he provided to
12 that doctor. I don't know exactly if that was
13 really occurring or not.
14    Q. Jumping to Page 2 and 3, the Evaluation
15 Procedures. It says that when you met with him on
16 October 24, 2018 you administered a number of
17 tests?
18    A. Uh-huh.
19    Q. And for purposes of the deposition --
20    A. Yes. Sorry.
21    Q. That's fine. Do you know how long it
22 took for each of these tests to be administered on
23 October 24th?
24    A. I don't. It was the better part of a
25 morning because he was concerned about making it

**Page 15**

Q. to lunch. So I know it was the better part of three plus hours.

Q. That you would have spent there at Crossroads?

A. Yes.

Q. Is that the only time that you've been there to meet with him?

A. With him, yes.

Q. Have you talked to him on the phone either before or after that?

A. I have not.

Q. Looking again at Page 2 under Evaluation Procedures, you indicated that you made phone calls to individuals which knew Mr. Briggs prior to and after incarceration who would be listed below.

Let's go through -- I think that's on Page 3. I'm assuming these bullet points -- phone interview with Jim Delduca, D-E-L-D-U-C-A -- those are the three people you talked to?

A. They are.

Q. I didn't look real closely in the materials you brought today, but did you keep notes of those interviews?

A. I did. I thought I had provided those.

**Page 16**

I can dig for you real quick.

MR. CALVIN STACEY: Why don't you just take a quick look and see if you can find those. We'll go off the record for a minute.

(Off the record briefly)

MR. CALVIN STACEY: Back on.

Q. (BY MR. CALVIN STACEY) Doctor, in looking at the documents you brought here, it doesn't appear we can find any notes of the three phone interviews indicated on Page 3 of Exhibit 29, and they may be in your computer. I guess I'd ask when you get an opportunity to take a look, and let Dan know if you've got them, send them to Dan, and he will send them on to us.

A. Absolutely.

Q. Today do you remember who these people are, and perhaps what you learned from them, and where you got their names, and things like that?

A. So I can start with where I got their names. I got their names directly from Mr. Briggs. He provided me individuals that could discuss what he looked like before, during, and currently when I evaluated him in the correctional system.

As far as who is who in this, I'm going

**Page 17**

to have to go back and look at my notes, but that's the context of each of the interviews. And really what these interviews help me is look at what others' perceptions of him are, which I note in my report, so --

Q. How important is a perception of someone who knows the individual at issue?

A. It's pretty important because they're the only timekeepers that I have, and so the more that I can get, the better. Sometimes when I only have three, it's limited. I like to get as many as I possibly can. But they have to provide me with those names and phone numbers. Otherwise I would have no idea where to look or where to search for that.

Q. So the individual that you ask to provide the information, he or she can elect to give you one name, or ten names, or select the names that he or she thinks may be of assistance to you?

A. That is true.

Q. You don't go out and independently investigate, and see if there is other people that haven't been listed that may be favorable or less favorable?

**Page 18**

A. If I'm aware of people through records or through other sources, then I would have that knowledge, and I would ask to speak with those people. But outside of that, no, I don't have a private investigator's license, and I don't go out and search for people myself.

Q. Today do you recall any one of these three people as to who they are, what their contact was with Mr. Briggs, and perhaps what, if any, of them said, other than what may be generally reflected in your report?

A. No, other than I would have to go back and look at my notes, is what I would say.

Q. All right. Then looking at Page 3, and also Page 2, these bullet points, they list the items, the documentation that you relied upon and reviewed in reaching your opinions?

A. Yes.

Q. And many of these documents appear to me to be medical, or counseling, or psychological records; they have some Court documents; records from correctional facilities like Pine Hills, Montana State Prison. Is that just a general description?

A. That's a good synopsis.

**Page 19**

1 Q. And I think most of the records that
2 you've brought today kind of fall within those
3 categories?
4 A. Yes.
5 Q. I don't want you to go back through, but
6 are the testing and test results reflected in the
7 documents that you brought today?
8 A. Yes.
9 Q. It looks like there were -- Were there
10 five tests administered on October 24, 2018?
11 A. (Examines document) If you count the
12 clinical interview with mental status examination
13 as a test, it would be six. The one that is not
14 listed here for some reason, which I documented
15 here, is the M-FAST, and I'm not sure what my
16 oversight on that was.
17 But the M-FAST is a test of feigning of
18 symptomology, to see if somebody is feigning
19 symptomology. It's actually documented and
20 discussed in my report. So there were five tests
21 plus the clinical interview with mental status
22 examination.
23 Q. Going back to Page 1 of Exhibit 29,
24 please. Under the Referral Question/Presenting
25 Problem topic, it says, "Mr. Briggs was referred

**Page 20**

1 for a psychological evaluation by his attorney Dan
2 Biddulph." Had you ever worked with Mr. Biddulph
3 before this matter?
4 A. You know, I don't recall since it's been
5 a couple years. It doesn't stand out to me.
6 Q. It says, "Mr. Biddulph suspected his
7 client may have suffered psychological injury
8 during his incarceration while in Bozeman,
9 Montana, as well as Montana State Prison and in
10 Shelby, Montana."
11 So that sentence, I take it, that was
12 kind of what Mr. Biddulph asked you to look at?
13 A. Again, yes, it was a personal injury
14 report, and so it was the identification of the
15 events that may have had a negative impact on his
16 client's psychological well-being.
17 Q. Of course to do that, you had to run
18 your tests, meet Mr. Briggs, and review all
19 relevant documentation?
20 A. Yes.
21 Q. As well as talk to the three individuals
22 that we talked previously about?
23 A. Yes.
24 Q. And it says, "The purpose of this
25 evaluation is to determine psychological damages

**Page 21**

1 Mr. Briggs may have experienced in relation to
2 events which occurred throughout his stay in
3 correctional facilities." Can you tell me what
4 you meant by correctional facilities, identify
5 those facilities?
6 A. Well, they're identified above:
7 Gallatin County correctional facility, Montana
8 State Prison, Crossroads Correctional facility in
9 Shelby, Montana.
10 Q. How about Pine Hills?
11 A. I absolutely considered Pine Hills and
12 discussed the events that occurred there in his
13 behavior and diagnostics. I think that the claim
14 from the client focused on current day situations
15 and not past, so --
16 Q. Cascade County's correctional facility,
17 I think you have records on those.
18 A. Sure. That did not come to my attention
19 at the beginning of the evaluation that that was
20 of concern, so --
21 Q. And in evaluating his current status, is
22 that what you were asked to do, his current
23 status, and related to his previous treatment that
24 he received in correctional facilities?
25 A. No. What I'm asked to do in a personal

**Page 22**

1 injury situation is to compare and contrast his
2 functioning prior to whatever events are alleged
3 to have impacted the individual, and contrast that
4 with how they're psychologically functioning after
5 those events or during that period of time up
6 until the current day.
7 So when we look at it, it's how were
8 they functioning before, how did they function
9 after, how does it persist to affect that
10 individual today.
11 Q. And I think you listed the correctional
12 facilities as being Bozeman, MSP, and Shelby?
13 A. Yes.
14 Q. Those were the three that you kind of
15 focused on?
16 A. Those are the three, yes.
17 Q. Of course before he -- Can you tell me
18 what you recall --
19 (Off the record briefly)
20 Q. (BY MR. CALVIN STACEY) Bozeman, MSP,
21 and Shelby are what you kind of focused on in your
22 report. Before that, though, the records show
23 that Mr. Briggs had been to a couple other
24 correctional facilities?
25 A. Correct.

**Page 23**

Q. I think he started out with Cascade County?

A. Well, Pine Hills I would say would be his first, right?

Q. I got a little lost yesterday. We took his deposition. I think he was at Cascade County as a juvenile, and then he ended up at Pine Hills, and after Pine Hills he maybe went to MSP.

A. Yes.

Q. Does that sound about right?

A. That sounds correct, yes.

Q. And then it gets a little fuzzy. I haven't outlined it. He may have made parole, and then he got revoked, and then he was in jails in Oregon.

A. It took me a couple of times through his records to --

Q. -- figure it out?

A. -- to figure it out, too. It's a little cloudy.

Q. Would all of those previous incidents before Bozeman, MSP, and Shelby have impacted his emotional condition, or eventually what you're reaching your conclusions on in this case?

A. Sure. Again, though, what I focus on is

**Page 24**

I absolutely look at what did they talk about. Like let's take Pine Hills, for instance. They talked about him being very obstinate, having difficulties there, actually being diagnosed with a post traumatic stress disorder, making claims of sexual and physical abuse, all these different items that need to be considered. And then what we're seeing there today, was it really the new events that caused any problems, or were they already existing? Had anything subsided, and then came back?

So not just the correctional facilities, but the whole life events pattern prior to these events have to be taken in consideration to kind of create a baseline for Mr. Briggs, about where he was.

It's not necessarily, well, he went to this jail, and this jail, and this jail, it's about what did his life look like up to that point, and how did that psychologically impact him. And then from that point forward, are we seeing something new, are we seeing something different, has it gotten worse because of that, those kind of things; and specifically what made it worse, if anything.

**Page 25**

I'm not just trying to establish does he have a mental health issue. It's has something created that since that period, or did it already exist?

Q. Page 3 of your report. Under Plan of Report, you kind of outline you'll begin by reviewing Mr. Briggs' history prior to the time of his incarceration and subsequent experiences leading up to the present day. That's what we have just been talking about, isn't it?

A. Yes.

Q. His history prior to the time of his incarceration, we're talking about incarceration in Bozeman at the county detention center, his incarceration after that to Montana State Prison, and where he is currently up in Shelby?

A. Yes.

Q. And you say the second part of the report deals with events that occurred throughout his incarceration and the immediate aftermath through his perception and recorded data. What are we talking about there in the second part of your report?

A. So what we're talking about that is when he is getting to Bozeman, when he's going to MSP,

**Page 26**

Shelby, those kind of things, like what now is he saying had a negative effect on him, what is it that we're seeing as far as data consistent with collateral reports, what were other mental health professionals seeing at those times through those periods of time. Did it have a negative impact? If so, to what degree? And what did I ultimately conclude from that?

Q. When you met with him on October 24, 2018, and you had the information as of that date, from that point forward through the present date, have you received new information that you reviewed and considered, or can we just work off of this report as your opinions?

A. I would say the only caveat to that was I jumbled something in his legal history, and I had to make a correction to it. And he had caught that and said, "Hey, did you see this?" And so I went back, and I was like, "Oh, yeah, that's wrong." So it was a correction, not any new information, nor did it change my opinion.

Q. Let's work backwards. From October 24, 2018 when you met him, and you had the information, he'd been in Shelby at the correctional facility for some period of time?

**Page 27**

1  A. Yes.
2  Q. We can outline that. I'm not sure if
3  it's real easy to figure out how long he'd been
4  there.
5  A. Sure.
6  Q. But during that time at that facility,
7  what events -- I'm not sure how to ask that --
8  Through self-reporting, or through documentation,
9  or through whatever means, what events, if any,
10  did you focus on that would be relevant to your
11  opinions in this case just at the Shelby stay?
12  A. Well, first and foremost, I was curious
13  as to whether he had been in any counseling there,
14  or was on any medication, what his daily routine
15  looked like; what, if any, events had occurred
16  that may have had a negative impact on him.
17      I also wanted to see if there was some
18  residual effect in the sense that had he been
19  developing a way of interacting with people based
20  on prior incarceration experiences, was there some
21  kind of post traumatic reaction that he was
22  having.
23      When we look at Shelby in particular, as
24  of the day I went up there, he was not in any
25  counseling, he was not on any medication. He was

**Page 28**

1  very actively involved in spiritual religious
2  groups.
3      He did report increased anxiety and
4  paranoia, but it was due to fear of being hurt by
5  other inmates, and not protected by the guards for
6  it. So he had developed a nickname of Escapo
7  Rapo, and this was something where others used it
8  as a way of bullying him, and he felt like the
9  guards didn't care about that.
10     So his anxiety and paranoia around those
11  issues were heightened, but his life in general
12  was pretty functional. He was the leader of some
13  -- I forget the spiritual group name -- but he was
14  very actively involved in different activities
15  there, functioning in a pretty good manner.
16     So it didn't come to me that anything
17  psychologically was pushing on him beyond that
18  general uneasiness, and anxiety, and depression
19  that he was facing around, "I might get beat up."
20  Q. So he wasn't getting counseling. I
21  noticed that in your report. I assume Crossroads
22  has counseling capabilities?
23  A. Minimally. I mean I'm being fair. They
24  have a hard time employing counselors up there,
25  and psychiatry is really hard. I think they do

**Page 29**

1  tele-med stuff. So to say that it's not readily
2  available, but I think you can get it if you
3  really, really need it. But to be fair, I don't
4  think it's great opportunities up there.
5  Q. And medicine, he wasn't on any
6  prescriptive medicines?
7  A. None that I noted, no.
8  Q. Before getting there, he was at Montana
9  State Prison after being sentenced out of Gallatin
10  County, and he was there for some period of time.
11  What events, if any, were of any significance at
12  MSP?
13  A. Let me quickly look, just because I'm
14  getting some jumbled in my head. But really from
15  what I remember -- that's Gallatin. I'm glad I
16  looked. Really there was -- he flew a lot of
17  kites, and wanted to be assessed, and there wasn't
18  a lot of emphasis on people corroborating that he
19  had a mental illness. I think there was a lot of
20  belief that there was inflated feigning of
21  symptomology, drug seeking behavior, those kind of
22  things.
23  Q. At MSP?
24  A. Yes.
25  Q. Looking at your report -- I'm jumping

**Page 30**

1  around. I apologize. Maybe I shouldn't have
2  jumped around so early. But on Page 3, just a
3  couple quick questions. You took a developmental
4  history that I assume came primarily, if not
5  solely, from Mr. Briggs?
6  A. Yes. Anything you see there is from my
7  personal history that I took in an oral fashion.
8  Q. He told you that he'd been raised by his
9  mother until the age of eight, followed by his
10  grandmother, and briefly his father?
11  A. That's what he said.
12  Q. And his mother had physically, verbally,
13  and emotionally abused him?
14  A. Yes.
15  Q. And emotional abuse by his grandmother?
16  A. Yes.
17  Q. And then from an educational work
18  history, he told you that he had an associates
19  degree from MSU Billings?
20  A. That's what he said.
21  Q. With a 3.79 GPA?
22  A. That's what he said.
23  Q. Did you ever see any transcripts from
24  MSU-B?
25  A. I did not.

**Page 31**

Q. And did he talk to you about his goals in education, what he was attempting to obtain beyond the associates degree that's referred here?
A. He did not discuss that, no.
Q. Do you recall him mentioning he wanted to go to MSU in Bozeman and major in chemical engineering?
A. I don't recall that.
Q. He had some work history, and again, I don't have a timeline, but did you get the impression that from age 16 on, he spent most of his time in correctional facilities, and not a great deal of time out in the real world working?
A. I would say that would be an accurate statement.
Q. Because he said, he reported to you doing some oil and gas work in 2011; he said that lasted about two or three months. He worked at Hastings as a clerk.
   So from a work history -- and again, I don't have a timeline, but it seemed to me that most of his pre-adult from age 16 and adult life, he's been involved in criminal matters that have required him to be incarcerated?
A. Correct.

**Page 32**

Q. Never been married, doesn't have any children, is what he told you. Did he tell you that he had any goals once he gets out of prison in regard to what he wanted to do in the future?
A. I don't know if he's seeing that far in the future right now. That was not a major focus.
Q. Is that because he's not eligible for parole for some period of time?
A. I would be speculating if I answered that.
Q. Under Substance Abuse History, he identified certain drugs that he had used when he was not in jail.
A. Uh-huh.
Q. And mental health history, he discussed when his parents apparently were going through a divorce, or there was a custody dispute, he first saw a shrink is what he described?
A. Yes.
Q. And this incident at Pine Hills that put him in Pine Hills at age 16, it was a sexual intercourse without consent issue?
A. That's what I understand, yes.
Q. Did you know the facts of what Mr. Briggs was alleged to have done that caused him to

**Page 33**

be incarcerated?
A. I reviewed the psychosexual evaluation, but I don't recall it right now off the top of my head.
Q. Was that from Mike Sullivan, by chance?
A. I think it was either Mike Sullivan or Bob Page.
Q. We had an Exhibit 26, a discharge report from Pine Hills. And this wasn't the one I was referring to. I'm curious. Did you discuss any of the crimes that he had committed?
A. No.
Q. Never? And could you tell whether or not he had accepted responsibility for the crimes that he had committed in the past when you met with him?
A. This was not the focus of my evaluation currently. I wasn't focused on recidivism or any of those kind of referral questions. So I didn't spend a lot of time on his accountability.
Q. So you don't have any opinions as to whether or not if he gets out, whether he'll be a repeat offender?
A. I have no opinion for you because I did not assess that paradigm.

**Page 34**

Q. In evaluating Mr. Briggs as you've done, is it relevant as to whether or not he has changed his behavior which caused him to get in trouble or not? Does that have any relevancy?
A. No. This is not a parole evaluation.
Q. You were aware of his attempts to commit suicide?
A. I'm aware of his suicidal presentations, yes.
Q. Was that relevant in any way in reaching your opinions in this case on the issues that you were asked to look at?
A. So it was relevant in the sense that he had demonstrated unstable maladaptive ways of coping in the past, which are relevant in the sense of the severity and intensity that he was going through during those time periods. I also took into consideration, however, where people saw those as manipulative acts as well, and cries for attention or substances.
Q. When you evaluated him, did it appear to you from a professional standpoint that he is a suicide risk at the present time?
A. He was not when I evaluated him, no.
Q. So on Page 4, "Events that occurred in

**Page 35**

the course of his experience in prison, and the immediate aftermath," so you do start with Pine Hills in your discussion.

A. Yes.

Q. In Pine Hills he claimed verbal and physical abuse from the guards?

A. Yes.

Q. Did that seem to be a theme throughout his stay in the various correctional facilities, problems and issues with guards?

A. He had problems and issues with guards at every facility he was at, yes.

Q. It goes on here that, "After the claimed verbal and physical abuse from guards at Pine Hills," and did he describe to you what that verbal or physical abuse was?

A. It wasn't very detailed, but it was just more of a, "I was beaten and yelled at constantly by the guards, and grew to dislike the guards."

Q. Would that incident that happened when he was 16, 17 years old, does that have any impact on how you saw him in October of 2018 and evaluated? Is that something that is important in your evaluation?

A. It is. It creates a baseline that says

**Page 36**

his time in Bozeman, MSP, Shelby was not his first interaction with guards, and people develop ways of interacting or believing how to interact with people from prior experiences. And so his interactions or perceived negative interactions with guards at Pine Hills would have had an effect, yes.

Q. Then we go on, and it says, "After being re-violated, sent to MSP, documentation suggests he claims sexual assault by a guard." So again, this seems to be consistent of a guard being accused of doing something to him?

A. Yes.

Q. Do you know the details of the sexual assault allegation?

A. Just that he claims that he was sexually assaulted by the guard.

Q. You go on to say, "He also reported multiple instances of physical aggression and emotional abuse from the staff and from inmates;" I assume that's at Montana State Prison?

A. Yes.

Q. So at this point in time, and this is before he gets to Bozeman, to MSP, and Shelby, this is yet another time that he's in the

**Page 37**

correctional facility, and he is having multiple instances of physical aggression and emotional abuse coming from staff, which I assume could include guards?

A. Yes.

Q. And as well as other inmates?

A. Yes.

Q. In your work in dealing with the criminal system, is it unusual for inmates to treat other inmates badly from time to time?

A. No.

Q. It would seem to me that that happens frequently.

A. Yes.

Q. I don't know if it's called bullying, or harassing, or -- I mean can it escalate to physical assaults as well?

A. It often does.

Q. Then it says, "Despite this, no diagnosis or referrals were made when he was seen by mental health at the Montana State Prison." So what is the significance of that statement?

A. The significance of that statement is that the professionals at the Montana State Prison at least at that time didn't see that he had

**Page 38**

mental health issues. They felt that he was having a hard time adjusting, and that his cries for help were more manipulative than not, so --

Q. He eventually was discharged. He was 25 years of age. He reported starting school at MSU. And that is about the time he got charged with attempted sexual intercourse without consent, aggravated assault, assault on a peace officer, and possession of dangerous drugs, escape, and failure to, what register, as a sex offender or as a -- is that what it is?

A. Sex offender, yes.

Q. Was it your understanding those were the charges that led to him being held at the Gallatin County Detention Center?

A. Yes.

Q. Have you ever been to the Gallatin County Detention Center?

A. Multiple times.

Q. And so you know how it's laid out?

A. I do.

Q. Do you know the jail administrator or any of those?

A. Yes.

Q. Have you --

**Page 59**

1  the whole gamut, but specifically he's saying that
2  he never sexually assaulted.
3      Q. And he says that despite going to trial
4  and a jury convicting him of these crimes?
5      A. Yes.
6      Q. So just stopping at that point, he's
7  still -- I'm not going to say in denial. He has a
8  right to deny doing the crimes -- but he's not
9  accepting that he was convicted of these crimes;
10 and doing time for these crimes; he challenges
11 that he shouldn't even be in prison for these
12 crimes, or least the sexual assault crime?
13     A. So just so that I can clarify, he's not
14 delusional thinking he wasn't convicted. He knows
15 he was convicted. He doesn't believe they got it
16 right.
17     Q. Then as you say in this sentence, "And
18 being placed in solitary confinement when it was
19 not his fault." It seems to kind of be consistent
20 with the theme that, "I shouldn't be in prison
21 because I didn't really commit these crimes, and
22 they got it wrong, and I shouldn't have been in
23 solitary confinement because it wasn't my fault to
24 be in solitary confinement;" is that --
25     A. Slightly. His perception on the first

**Page 60**

1  is that he was convicted, but unjustly so.
2         On the solitary confinement, it was in
3  his perception, "I was placed in solitary
4  confinement," for a lack of a better understanding
5  because he was the victim of an assault, and the
6  best way to handle that was to remove him, as
7  opposed to take care of everyone else that wanted
8  to hurt him. So he feels it was unjust that he
9  was placed in solitary confinement when he was a
10 victim of a crime.
11     Q. He's upset and traumatized because he
12 did nothing wrong, and was placed in segregation
13 versus actually being in segregation?
14     A. Yes. It was the unjustness of the
15 actions, and the perception that Corrections
16 wronged him in those settings for placing him in
17 there.
18     Q. So you go on in your report on Page 7 --
19 and let me just take a look here. I note under
20 "Clinician Administered PTSD scale," the last
21 paragraph underneath that he talks about blaming
22 others for what has happened to him, and feels
23 he's been unfairly prosecuted; it's kind of what
24 we were just talking about a little bit?
25     A. It's exactly what we were just talking

**Page 61**

1  about.
2      Q. "Feels the guards do not stick up for
3  him," and that's I assume here, or at Shelby at
4  the current location?
5      A. In general.
6      Q. "Summary of Data." You say, "The
7  current evaluation has been conducted to explore
8  the negative psychological impact Mr. Briggs'
9  exposure to solitary confinement and/or prison
10 life in general has had over time. In an effort
11 to do so, one must consider Mr. Briggs'
12 pre-existing conditions --" which we've been
13 talking to some extent?
14     A. Yes.
15     Q. "-- and how they may have been
16 exacerbated and/or originated from the prison
17 environment."
18        Then you go on and talk like we have,
19 "He was physically, emotionally abused early in
20 life, went to Pine Hills." At Pine Hills he had
21 some problems there, evaluated. "After Pine Hills
22 he had multiple traumas, including being raped,
23 assaulted, experienced traumatic events, such as
24 being stabbed by his girlfriend, being involved in
25 car accidents."

**Page 62**

1        "He continued to have legal
2  difficulties, ultimately made his way to MSP,
3  where he made a claim he was sexually abused by a
4  guard. He reported physical abuse from other
5  inmates."
6        He was released. He again committed a
7  sexual act. "Mr. Briggs to this day denies he
8  engaged in his reported sexual behavior, feels
9  wrongly convicted, and noted that his conviction
10 creates great distress and paranoia."
11        So I'll stop there. That again we've
12 talked about. It appears to me that he believes
13 that he has been mistreated, I guess by the legal
14 system, and unjustly and wrongfully convicted of a
15 crime?
16     A. Yes.
17     Q. He is innocent of the crime and
18 shouldn't be in prison?
19     A. That is his belief, yes.
20     Q. The next sentence, "He escaped from
21 Gallatin County correctional facility." He was
22 seen by mental health professionals. You have
23 some of those records in your file?
24     A. Yes.
25     Q. "They did not diagnose him with post

**Page 63**

traumatic stress disorder, rather an adjustment disorder to his life circumstances." Then it goes, "During my conversation with Mr. Briggs, the experience of isolation did not seem to bother him as much as the injustice he felt."

We've talked about that. That kind of sums up how he perceives it. He's more upset with the fact that he was placed in solitary confinement wrongfully because he was the victim of an assault or assaults, rather than just sitting in the cell and being traumatized by sitting in the cell?

A. That's what I gathered, yes.

Q. "He reported he was placed in isolation as he was seen as a problem for the facility as he was being assaulted." You don't have any opinion on whether or not that is true or not true, that statement?

A. I have no idea why the facility decided to place him in isolation.

Q. Then, quote, "These injustices seem to bother him significantly and created greater paranoia and anxiety for him." So again, that's what we've just been talking about?

A. Yes.

**Page 64**

Q. Not on medication, not received counseling at Crossroads. Then you say, "He does not demonstrate symptoms consistent with post traumatic stress, anxiety, or depression." Is that based upon your clinical look at him, or is that the exam, talking to him, plus the test results?

A. All of the above.

Q. So from a testing standpoint, and as a clinician, and taking a history, and talking to other people like we've talked about, he does not show symptoms of post traumatic stress disorder?

A. He does not.

Q. He does not show symptoms of anxiety?

A. Let me back up. He shows anxiety symptoms, as I noted. He shows feelings of persecution and paranoia due to his circumstances that he's in.

So the symptoms are there, but the I would not diagnose him with a diagnosis of post traumatic stress disorder -- he doesn't meet the full gamut by any stretch of the imagination -- or a diagnosis of anxiety or diagnosis of depression which would require treatment, both medically and/or through counseling.

**Page 65**

I believe that because one exhibits some depression, or anxiety, or small symptoms like that from time to time due to life circumstances, that doesn't mean it's a diagnosis. That means it's a life event.

Q. So the record is a little clearer on that. You would try to diagnose people I assume when you --

A. That's one of my jobs, yes.

Q. In this case, you did not reach a diagnosis?

A. I did not reach a diagnosis, no.

Q. And the diagnosis is something you just don't pull out of the air, it's based upon all of the testing, and all of the information, and then requirements to meet that diagnosis?

A. Yes.

Q. And he did not reach that level of making that type of diagnosis for those conditions?

A. Correct. He didn't have a reliable pattern of symptoms consistent with a DSM5 or an ICD diagnostic.

Q. Again, in your report you say people that knew him prior to Bozeman, their impression

**Page 66**

is he's only improved in personality, as well as emotional and behavioral presentation, describe a more stable and well rounded individual?

A. Yes.

Q. That's what everybody -- the consensus is?

A. That is.

Q. Does Mr. Briggs believe that? Could you tell if he believes that or not?

A. He was pretty positive about himself and the decisions he's been making. I don't know if I ever directly asked him that question of, "Do you feel better than you did when you were -- before you went into the correctional systems again?"

I think I just gathered data to look at how he reported each period of his life, and each event, and so I didn't get a general synopsis, I guess.

Q. The bottom of Page 8 you say, "While his time in prison has not created new mental health issues," and I take that meaning Bozeman, MSP, and Shelby --

A. Yes.

Q. -- in the term "prison." So while his time at Gallatin County correctional facility,

**Page 67**

1 Montana State Prison in Deer Lodge, and the
2 Crossroads Correctional facility in Shelby "-- has
3 not created new mental health issues, nor have
4 mental health issues persisted, his experiences
5 have exacerbated issues of anxiety, paranoia, and
6 distrust that began in childhood due to his own
7 family instability and his personal abuse."
8     That's the last sentence of your report.
9 Does that kind of sum up your opinion?
10   A. Yes.
11   Q. So as I read that last sentence, and
12 breaking it down -- just my one chance to ask you
13 questions before trial -- your opinion, based upon
14 everything that you reviewed while he was at
15 Bozeman, Deer Lodge, and Shelby, did not, number
16 one, create any new mental health issues?
17   A. Correct.
18   Q. When you say, "nor have mental health
19 issues persisted," does that mean -- explain to me
20 what that means.
21   A. It means that as he had his new
22 experiences, nothing arose to the level of a
23 diagnosis or stayed on.
24     When we have life events in general, we
25 look at them as life events, whether it's a meteor

**Page 68**

1 striking the earth, and how do we perceive that,
2 how do we deal with it, of course we're going be
3 shooken initially, but do they stick around, and
4 when we start getting into acute stress disorder,
5 and later post traumatic stress, or long term
6 depression, or long term anxiety.
7     And I didn't see any residual effects
8 that persisted beyond just his experiences of
9 different matters. So while it makes sense that
10 he would be shooken if somebody wants to beat him
11 up, or anxious or paranoid about that, it hasn't
12 persisted into long term problematic effects
13 beyond what he already was experiencing before
14 incarceration.
15   Q. And finally the last of it, I think you
16 just touched upon it, "His experiences have
17 exacerbated issues of anxiety, paranoia, and
18 distrust," all of which began many years earlier
19 in his childhood, family instability, and all of
20 the things that led up to getting to Gallatin
21 County, to MSP, and to Shelby?
22   A. They were all there, yes.
23   Q. And those issues of anxiety, paranoia,
24 and distrust, again, don't reach a level of an
25 official psychological diagnosis?

**Page 69**

1   A. Currently to date, no.
2     MR. CALVIN STACEY: Let's just take a
3 minute break.
4     (Recess taken)
5     MR. CALVIN STACEY: Let's go back on.
6   Q. (BY MR. CALVIN STACEY) I'm just about
7 done. I've just got some housekeeping matters. I
8 had mentioned whether or not you could recall any
9 of the Gallatin County psychologists or counselors
10 that may have seen Mr. Briggs when he was there.
11 I have some names here, and I just was curious if
12 you knew any of these people.
13   A. Okay.
14   Q. John Karath, K-A-R-A-T-H.
15   A. I don't know him personally. Like I've
16 not met this person.
17   Q. David Powell.
18   A. I've not met that person.
19   Q. Adrian Utsch, U-T-S-C-H.
20   A. Not somebody I recall.
21   Q. James Murphey, M-U-R-P-H-E-Y, a licensed
22 clinical psychologist.
23   A. I know of Dr. Murphey. I've read some
24 of his work. I've not met Dr. Murphey.
25   Q. Emily Tutvedt, T-U-T-V-E-D-T.

**Page 70**

1   A. I do not know that individual.
2     MR. CALVIN STACEY: I think that's it.
3 That's all I have. Thanks for your time this
4 morning.
5     MR. BIDDULPH: I just have some quick
6 follow up questions for you, Dr. Smelko.
7     THE WITNESS: Sure.
8
9         EXAMINATION
10 BY MR. BIDDULPH:
11   Q. I'm just going to jump to Page 8 I
12 believe of the evaluation, your report.
13   A. Okay.
14   Q. The last, it looks like mid page talking
15 about, "Experience of isolation did not seem to
16 bother him as much as the injustice he felt." The
17 next sentence, "He reported he was placed in
18 isolation as he was seen as a problem for the
19 facility and he was being assaulted. These
20 injustices seem to bother him significantly, and
21 create greater paranoia and anxiety for him."
22     Then also I just want to kind of preface
23 my questioning with the last paragraph under
24 "Implications and Recommendations" for Mr. Briggs
25 also on Page 8.