Kevin A. Briggs
Montana State Prison
700 Conley Lake Road
Deer Lodge, MT 59722

Plaintiff, pro se

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| KEVIN BRIGGS, | Case No. 18-0010-BU-KLD |
| Plaintiff, | Hon. Judge Kathleen DeSoto |
| vs. | PLAINTIFF'S BRIEF IN SUPPORT OF RULE 59 |
| GALLATIN COUNTY, | MOTION TO ALTER OR AMEND |
| Defendant. | |

## BRIEF

A Motion for New Trial may be filed if the verdict is against the weight of the evidence or otherwise unfair to the moving party. Cummings Inc. v. BP Prods. N. Am., 648 F. Supp. 2d 969 (2009 MD    ). Rule 59 confirms a trial court's historic power to grant a new trial based on its appraisal of the fairness of a trial and the reliability of a jury's verdict. Generally, when a district court determines that the verdict is against the weight of the evidence, that court has a duty to grant a new trial , as well as when the reliability of the jury's verdict is questioned. Holmes v. City of Massillon, 78 F.3d 104 (1996) (CA6 Ohio 1996).

When deciding whether to grant a new trial under Rule 59, a court is not required to review evidence in a light most favorable to the verdict in district court or on appeal.

Plaintiff asks this Court in light of the above authority to alter or amend its judgment and to grant a new trial because the trial was unfair due to the errors detailed below.

-1-

1. The District Court Failed to Properly Instruct the Jury

A. It Is the District Court's Responsibility to Properly Instruct the Jury

Even if both parties submit erroneous instructions, it is the duty of the district court to ensure that the instructions received by the jury are a proper statement of law.

"Merely submitting an erroneous instruction does not waive a later challenge, so long as there is no evidence that the [party] considered and rejected a correct instruction 'for some tactical or other reason.'" United States v. Perez, 116 F.3d 840 (9th Cir. 1997), n.7.

At its core, Ninth Circuit precedent addresses the abnormal civil cases where there is an errant jury instruction, such as one that affects substantive rights. Each party is entitled to an instruction about their theory of the case if it is supported by law and has a foundation in the evidence. Blade Room Grp. LTD. v. Emerson Elec., 20 F.4th 1231 (9th Cir. 2021), citing Tex. Advanced Optoelectronics Sols., Inc. v. Renesas Elecs. Am., Inc. 895 F.3d 1304, 1316 (Fed. Cir. 2018)("The general rule is that if a jury could find liability according to multiple theories, and one of them is legally erroneous, we reverse, unless we can tell that the jury came to its decision using only correct legal theories.")

Whether jury instructions accurately state the law is reviewed by circuit courts de novo. Dang v. Cross, 422 F.3d 800, 805 (9th Cir. 2005. However 59 grants district courts the discretion to promote judicial economy by reviewing potential errors prior to

B. The "Some Evidence" Standard of Hill Does Not Apply to
   Pretrial Detainees

In 1985, the Supreme Court held "that the requirements of due
process are satisfied if some evidence supports the decision by
the prison disciplinary board to revoke good time credits. This
standard is met if 'there was some evidence from which the
conclusion of the administrative tribunal could be deduced' ...
[T]he relevant question is whether there is any evidence in the
record that could support the conclusion reached by the
disciplinary board." Superintendent v. Hill, 472 U.S. 445,
445-456 (1985).

The "some evidence" standard thus became the de rigueur metric
for evaluating whether prison disciplinary boards had accorded convicted
prisoners adequate substantive due process rights in revoking
privelages in which convicted prisoners had a liberty interest.

"The requirements of due process are flexible and depend on
a balancing of the interests affected by the relevant government
action." Id., 454. Hill cited Cafeteria & Restraunt Workers Union
v. McElroy, 367 U.S. 886, 894 (1961), where it was written that "The
very nature of due process negates any concept of inflexible proc-
edures universally applicable to every imaginable situation... 'Due
process, unlike some legal rules, is not a technical conception with
a fixed content unrelated to time, place and circumstances.' It is
'compounded of history, reason, the past course of decisions...'
Joint Anti-Fascist comm. v. McGrath, 341 U.S. 123, 162-163
(concurring opinion)."

In other words, the requirements of due process vary from one
situation to another. A criminal trial requires more due process
protections than a prison disciplinary hearing, which Hill stated
explicitly:

   [A liberty interest in good time credits] must be accomodated in the
   distincttive setting of a prison, where disciplinary proceedings 'take
   place in a closed, tightly controlled environment peopled by those who
   have chosen to violate the criminal law and who have been lawfully
   incarcerated for doing so." [Wolff v. McDonnell, 418 U.S. 539] at 561."

The "some evidence" standard, while not acceptable for a criminal court, was deemed sufficient for a disciplinary hearing involving "those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so."

While many pretrial detainees have in fact chosen to violate the criminal law, some have not, and none have been sentenced to jail for having done so, but rather detained to ensure their presence at trial. "A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.' Bell v. Wolfish, 441 U.S. 520, 536.(1979).

The Supreme Court's intention in Hill was clear: "those who have chosen to violate the criminal law" id., 561, did not refer to "[a] person [who] has not been adjudged guilty of any crime" Bell, 536, be they a pretrial detainee or a criminal defendant standing trial. Expressio unius est exclusio alterius.

"[P]retrial detainees... possess greater constitutional rights than [convicted] prisoners." Stone v. City & County of San Francisco, 1992 U.S. App. LEXIS 14436, n. 10.

Because "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that [the Supreme Court has] held are enjoyed by convicted prisoners," Bell, 545, de minimus rights conferred upon convicted prisoners set the floor for pretrial detainees' rights. Their limitation, however, does not set the ceiling.

In the context of pretrial detainees, a court would not be wrong in ruling that a disciplinary tribunal's decision must be supported by "some evidence". Deciding that "some evidence" is all that is needed, however, is erroneous.

C. Previous Decisions Affecting Pretrial Detainees Cannot Be Disregarded

In 1974, Wolff v. McDonnell, 418 U.S. 539 (1974) established procedural due process rights for convicted prisoners, which set the floor those of pretrial detainees.

Wolff held that due process required provision of:

1. Advance written notice of the claimed violation,
2. A written statement of the evidence relied upon and the reasons for the disciplinary action, and
3. The calling of witnesses and presentation of evidence when doing so would not be unduly hazardous to institutional safety or goals.

Since convicted prisoners had a right to the Wolff provisions, pretrial detainees had a right to at least the same procedural due process.

Bell v. Wolfish, 441 U.S. 520, 539 dealt explicitly with pretrial detainees. It held that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment". Conversely, if a restriction or condition is not reasonably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissably may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees qua detainees."

Hewitt v. Helms, 459 U.S. 560 (1983) held that convicted prisoners could reasonably expect confinement in quarters that were less amenable and more restrictive than others "and thus did not have a liberty interest in remaining free from such restrictions as could reasonably be expected "within the sentenced imposed." Such language was clearly intended to exclude pretrial detainees.

However, the Court in Hewitt was "persuaded that repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest."

The takehome message was that convicted prisoners did not have a liberty interest in remaining free from restrictive confinement unless one was conferred by mandatory language in a state statute or institutional policy. This meant hat such language also created a liberty interest for pretrial detainees. Pretrial detainees, however, retained their right to procedural due processes before they are subjected to more severe conditions of confinement than other detainees. See Mitchell v. Dupnik, 75 F.3d 517, 545-525 (9th Cir. 1996), and Shorter v. Baca, 895 F.3d 1176, 1190 (9th Cir. 2018). "The detainees have no sentences to encompass such disciplinary confinement." Mitchell, 525.

As previously discussed, Hill decided in 1985 that a disciplinary tribunal overseeing convicted prisoners much reach conclusions that are supported by at least "some evidence" but not necessarily more.

Cato v. Rushen, 824 F.2d 703 (9th Cir. 1987) clarified that information lacking indicia of reliability was not sufficient to meet Hill's "some evidence" standard.

Regardless, the Supreme Court's use of language in Hill that specifically excluded pretrial detainees indicated that they were entitled to more substantive due processes. Since the decision was not about pretrial detainees, Hill did not specify exactly what that entailed.

Sandin v. Conner, 515 U.S. 472 (1995) limited the liberty interests that can be established by substantive predicates to freedom from restraint which imposes "atypical and significant hardship", but only "within the sentence imposed" upon a convicted prisoner. Pretrial detainees thus retained the liberty interests conferred by substantive predicates that Hewitt affirmed.

The minimum procedural protections of Wolff as well as the substantive predicates of Hewitt thus survive for pretrial detainees. They join with Bell's protections against government action that is arbitrary, purposeless, or excessive. Lastly, Hill showed that pretrial detainees are entitled to disciplinary decisions that are based on more than just "some reliable evidence."

6

D. Government Action Toward Pretrial Detainees
   Must Be Objectively Reasonable

   In 2015, the Supreme Court observed that "The Bell Court
applied [an] objective standard to evaluate a variety of prison
conditions, including a prison's practive of double-bunking. In
doing so, it did not consider the prison officials' subjective
beliefs about the policy. Id. at 541-543, 99 S. Ct. 1861, 60 L. Ed.
2d 447. Rather, the Court examined objective evidence," Kingsley
v. Hendrickson, 576 U.S. 389, 398 (2015).

   "Bell's focus on 'punishment' does not mean that proof of
intent (or motive) to punish is required for a pretrial detainee
to prevail on a claim that his due process rights were violated.
Rather, as Bell itself shows (and as our later precedent affirms),
a pretrial detainee can prevail by providing only objective
evidence that the challenged governmental action was not rationally
related to a legitimate governmental objective or that it is
excessive in relation to that purpose." Id.

   Applying the above anlysis, the Supreme Court held that
under 42 U.S.C., a pretrial detainee must show only that the
force purposely or knowingly used against him was objectively
unreasonable to prevail on an excessive force claim. Id., 391-404.
"Our standard is also consistent with out use of an objective
'excessive force' standard where officers apply force to a person
who, like Kingsley, has been accused but not convicted of a crime,
but who, unlike Kingsley, is free on bail." Id., 399.

   In Castro v. Cty. of Los Angeles, 388 F.3d 1060, 1070 (9th
Cir. 2016), the 9th Circuit recognized en banc that "[t]he
[Kingsley] Court did not limit its holding to 'force' but spoke
to 'the challenged governmental action' generally." Perceiving
that the scope of Kingsley was broader than the excessive force
claim it addressed, the en banc court applied the "objectively
reasonable" standard to a pretrial detainee's failure-to-
protect claim.

   "Under Kingsley, the second question in the failure-to-protect
context would then be purely objective: Was there a substantial risk
of serious harm to the plaintiff that could have been eliminated

7

through reasonable and available measures that the officer did not take, thus causing the injury that the plaintiff suffered?" Id.

The objective standard in Kingsley also applies to a pretrial detainee's right to medical care. Gordon v. Cty. of Orange, 888 F.3d 1118, 1120 (9th Cir. 2018).

As Kingsley pointed out, the Bell Court properly asked whether challenged government action such as double-bunking was objectively unreasonable treatment of pretrial detainees. Likewise, a decision to subject a pretrial detainee to more severe conditions of confinement than other detainees must be objectively reasonable, rather than merely supported by "some evidence" A decision may easily be supported by "some evidence" and yet be objectively unreasonable when substantial evidence indicates to the contrary. Instead, an objectively reasonable decision should be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

The Supreme Court used that exact phrase to define "substantial evidence." Consolo v. Federal Maritime Com., 383 U.S. 607, 619-620 (1996). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Id.

A review of long-standing law thus reveals that a decision to subject a pretrial detainee to more severe conditions of confinement must be supported by substantial evidence and not merely some evidence in order to comport with Bell and Kingsley.

Kingsley found that "a court must make [a determination of objective reasonableness] from the perspective of a reasonable officer on the scene, including what the officer knew at the time." Id., 397.

This must, of course, take into accoutn what an officer reasonably should have known at the time as well. For instance, Wolff concluded that even convicted prisoners have the right to call witnesses and present documentary evidence when doing so would not be unduly hazardous to institutional safety or goals.

An officer who fails to talk with witnesses or review documentary evidence cannot make an objectively reasonable decision. <u>Wolff</u>, <u>Bell</u>.

Officers must also abide by the laws and procedures in place in the state and institution where they work. Failure to do so is not reasonable, as <u>Hewitt</u> affirmed. <u>Sandin</u> did not diminish such requirements of reasonable treatment for pretrial detainees.

In sum, <u>Kingsley</u> and <u>Castro</u> claried <u>Bell</u>'s holding mandating that government action toward pretrial detainees must be objectively reasonable. This means that disciplinary tribunals must accord pretiral detainees at least the procedural protections set forth in <u>Wolff</u> as well as those contained in mandatory language in local statutes and procedures. Reaching an objectively reasonable decision that is supported by substantial evidence is necessary to protect against the evil warned of in <u>Bell</u> - punitive measures cloaked as enactments of government interests.

E. <u>The Court's Jury Instructions Merit a New Trial</u>

i. <u>"Some Evidence"</u>

a. <u>The Court Erroneously Permitted the Defense To Question
   Briggs About Legal Conclusions, Then Wrongfully
   Impeached Him Over  Those Conclusions</u>

On Day 3 of trial, Defense Counsel Cal Stacey questioned
Briggs about the "some evidence" standard, improperly calling for
legal conclusions. Briggs replied that the "some evidence" standard
of <u>Hill</u> did not apply to pretrial detainees. (Plaintiff's <u>Declaration</u>).

Instructions F-13 and F-20 stated that a finding of guilt on a
disciplinary charge must be supported by some evidence in the record
(Jur. Inst. F-13 and F-20) but that this standard is satisfied if
there is some evidence in the record that supports the conclusion
reached by the disciplinary board (Jur. Inst. F-20).

A trial court's erroneous interpretation of a jury instruction
"vividly illustrates" that the jury "could no more than guess at the
correct rule." <u>Deck v. Jenkins</u>, F.3d 954, 983 (9th Cir. 2016).

When a court instructs a jury in such a way that they may
reasonably infer that a witness's statement is false, a reasonable
juror may infer that the witness lacks credibility. Any reasonable
jur<u>ist</u> can recognize how such an attack on Briggs's credibility
compromises the fairness of a trial and prejudiced Briggs.

No reasonable jury member will conclude that a lay witness is
correct, while the Court is not, even if that actually is the case.

b. <u>The Court Wrongfully Mandated a Finding Against Briggs</u>

During the settling of jury instructions on Day 4, counsel
for Briggs requested that, at a minimum, the word "reliable" should
be added between "some" and "evidence" in Inst. F-13, while counsel
for the Defense requested that it be removed that it be removed from
F-20. <u>Declaration</u>. Plaintiff objected on the basis of Briggs' status
as a pretrial detainee at all relevant times, and the requirement of
law that evidence must be reliable to meet the "some evidence"
standard divised in <u>Hill</u> for convicted prisoners. <u>Id</u>.

10

Counsel for Briggs attempted to cite Sira v. Morton, 380 F.3d 76-77 (2nd Cir. 2004) during the settling of jury instructions but was cut off by the Court, which advised that Briggs's request was "denied." Id. Sira states, in relevant part, "In a recent discussion of the 'some evidence' stanard, this court observed that only 'reliable' evidence can constitute 'some evidence'. Luna v. Pico, 356 F.3d at 488. The principle is not new. A reliability inquiry has long been required when confidential source information is relied upon to satisfy the 'some evidence' standard." Id.

The Ninth Circuit adopted a similar holding in Cato v. Rushen, 824 F.2d 703 (9th Cir. 1987). Two years after Hill, Cato dealt with the reliability of informants, as in the instant case, where the only evidence in the record beyond video of Briggs getting assaulted with no audio was statements by Briggs' assailants, inmates Smith and Steele.

Citing precedent on Hill from the 7th and 10th Circuits, Cato held that information lacking indicia of reliability, such as that of jailhouse informants, was not sufficient to qualify as "some evidence" under the Hill standard, even if it was bolstered by the use of polygraphs. The higher courts have consistently upheld the well-known requirement that "some evidence" be reliable.

Further, it has been previously shown that the Hill standard was delineated specifically for convicted prisoners and not for pretrial detainees.

The Court had a duty to instruct jurors that Gallatin County's officers need substantial evidence in order to subject Briggs to more severe conditions of confinement than other pretrial detainees. It must consist of such relevant evidence as a relevant evidence as a reasonable officer might accept as adequate to support a conclusion.

The District Court's instruction was an improper statement of law. The Court applied a standard that was less stringent than that for convicted prisoners to a pretrial detainee. This affected Briggs' substantive rights, which mandates reversal. Blade Room.

A reasonable juror, acting on the Court's instructions, would be well within bounds in concluding that the memorandum wherein

only "some evidence" was necessary. Since the disciplinary tribunal supposedly needed neither reliable nor substantial evidence to support its conclusion, the jury may have concluded that failure to address other evidentiary concerns could not have prejudiced Briggs once "some evidence" was obtained.

The Court's clear misstatement of well-established law thus resulted in substantial prejudice against Briggs.

Rule 59 motions empower district courts to correct manifest errors of law or fact. "A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent." Oto v. Metropolitan Life Ins. Co., 224 F.3d 601 (7th Cir. 2000).

The Defense who deliberately elicited legal conclusions from Briggs, while knowing it was improper to do so. It should therefore not be surprised or find cause to cry foul when its actions then result in reversal.

When the Court failed to recognize controlling precedent prohibiting such a line of questioning, Briggs was left with no choice but to reply with the answer as he understood it. That answer turned out to be correct, but the Court misapplied Hill and then disregarded the reliability mandates of Cato, Sira, et al. This not only forced the jury to rely on an improper standard but erroneously discredited the Plaintiff for being correct.

ii. Briggs Was Entitled To An Instruction on Punitive Damages

The Defense also improperly asked Briggs for legal conclusions about punitive and other damages. His opinion that punitive damages were warranted and available was also subjected to discredit by the Court, which decided that punitive damages were not available and removed their provisions from jury instructions and the verdict form.

The Supreme Court has held that "Any punishment might be unconstitutionally severe if it is inflicted without penological justification. McClaskey v. Kemp, 481 U.S. 279 (1987).

The Ninth Circuit cited McClaskey recently in Bearchild v.

Officer Slyngstad claimed that inmate Smith said that Briggs said that getting assaulted would help his criminal case and had provoked Smith's assault, constituted 'some evidence' of Briggs' guilt and mandated a finding in favor of the Defense.

In reality, the Defense's tactical decision not to call Smith, who it had listed as a witness, rendered such "evidence" inadmissible hearsay within hearsay. It lacked trustworthiness because Slyngstad had reason to misrepresent Smith's statement, and Smith had reason to misrepresent Briggs'. The jury was not given an opportunity to judge Smith's demeanor, and Smith was not given the opportunity to verify or deny his alleged statements (which themselves contained hearsay) to Slyngstad. It thus failed to qualify for a hearsay exception or possess sufficient indicia of reliability under Cato and Hill.

c. The Verdict's Reliability Was Irreparably Undermined

The jury heard vague and unsubstantiated testimony from Briggs' jailers that he was somehow too manipulative to be placed in any form of protective custody less restrictive than administrative segregation, such as the jail's "C Pod" unit for vulnerable detainees. Declaration. The only supporting example of Briggs' "manipulative" behavior was Nurse Young's unsupported conclusion that his suicide attempts must have been manipulative in nature rather than an authentic response to emotional distress.

A juror told that "some" supporting evidence precludes a finding in favor of Briggs may reasonably conclude that "some evidence" supported her conclusion, however feeble. In fact, this statement was boltered when, in the eyes of the jury, Briggs manipulatively misstated the law to the jury and had to be corrected by the Court. They had no idea that the Defense was wrong in manipulatively calling for conclusory legal statments or that Briggs and not the Court correctly stated the law.

Similarly, the jury may have reasonably believed that failure to permit Briggs to call witnesses, review documentary evidence, and receive a statment of the evidence relied upon and the GCDC's reasons for "disciplinary action" failed to prejudice Briggs since

13

Cobban, 947 F.3d 1130 (9th Cir. 2020). It held that when no "legitimate penological purpose" was served by government action, "malicious and sadistic intent" is presumed.

In the instant case, the Defense needed an improper statement of Hill to justify its actions. A proper review of substantial evidence adduced at trial shows that the GCDC's actions lacked legitimate penological purpose and were actually intended to unconstitutionally and maliciously punish Briggs for crimes of which he had not been convicted, some of which he never was convicted. Punitive damages were warranted.

iii. <u>The Jury Did Not Receive An Instruction Specific To Briggs' 116 Day Placement on Administrative Segregation</u>

The closest the Court came to instructing the jury on the GCDC's punitive use of "Ad Seg" was Inst. 26, which spoke vaguely of "conditions or restrict ions" without tying them in by any clear language to anything on the Special Werdict Form (Doc. 197).

"Because the District Court did not contemplate the instruction ... as being pertinent to ... [the Plaintiff's specific Constitutional claim], one oculd hardly expect the jury to make such an inference. Bearchild, citing Deck.Such a problem arises precisely because a jury is presumed to follow its instruction., and instruction directed the jury that the Plaintiff "must prove [certain] elements." without explaining that if they found certain elements, a constitutional claim was established."Id.

In the instant case, the Court abdicated its duty to instruct the jury that any particular set of facts could result in a verdict in favor of Briggs for his claim regarding punitive use of administrative segregation. This resulted in a prejudicial situation wherein Briggs had no way he could win.

2. The Court should have granted Briggs summary judgment, or in the alternative, entered a directed verdict for GCDC's failure to allow Briggs to call witnesses to his disciplinary hearing

<u>Wolff</u> requires that jail authorities allow an inmate who faces disciplinary proceedings and whose liberty interest is threatened to call witnesses in his defense, when permitting him to do so will not be unduly hazardous to institutional safety and correctional concerns. <u>Mitchell</u>, 75 F.3d at 525 (citing <u>Wolff</u>, 418 U.S. at 566.)

In deciding summary judgment, the Court found that genuine issues of material fact remained as to concerns:

1. Whether it was sufficient for Briggs to handwrite Fuchs' name on the Disciplinary Offense Report in the line labelled "Inmate Witnesses"

2. Whether Fuchs was not allowed to testify as a witness for one of the reasons set forth in the inmate manual.

The second is erroneous for several reasons. First, Briggs's right to call witnesses under <u>Wolff</u> is independent of what a particular institutions rules <u>say</u>. Sgt. Slyngtad, who took part in Briggs's hearing, testified in his deposition (106:5-9) that calling inmate Fuchs would not pose a threat to institutional safety, the safety of the witness, or the safety of third persons. This alone was sufficient to meet the criteria in <u>Wolff</u> regardless of institutional policy, and it was uncontested by any evidence.

Furthermore, Slyngstaad was specifically questioned about policy-related reasons for not calling Fuchs, and admitted that in fact none of them applied (pp. 105-109). Specifically:

1. Calling Fuchs would not pose a security threat (106:1-9)

2. Mr. Fuchs' testimony would not be redundant or immaterial (106:10-23).

3. Although he was concerned that Fuchs' testimony might concern the general character of Briggs (106:24-25, 107:1-7), nobody verified that it did (107:8-10), and ultimately the only way to figure out what was said when available video had no audio would be to talk with witnesses (108:3-24)

4. Staff were not concerned that Fuchs' actions would be inappropriate at the hearing (107:18-22)

5. Briggs did not waivea right to call witnesses by failing to show up at a hearing (107:11-17)

It was abundantly clear at the summary judgment phase that policy did not prohibit calling Fuchs and that no reason in <u>Wolff</u> was present. This was not an issue of material fact, nor was it in any way contested at trial.

The remaining factor was whether writing in Fuchs' name on the Disciplinary Offense Report's "Inmate Witness" line was sufficient for Briggs to have properly requested for staff to call Fuchs as a witness.

Slyngstad testified (104-105) that writing Fuchs' name on the form might well have been sufficient but that the GCDC essentially had a practice of not calling witnesses, such that he'd only ever seen one witness be called.

Sgt. Waliser stated in his deposition that he served Briggs the disciplinary report (34:12-14) and that the section labelled "Inmate Witnesses" where Briggs wrote in "Michael Fuchs" was the correct place for him to do so (35:8-18).

Another officer at Briggs's deposition, Officer Taylor, did contradict their testimony in his deposition (pp. 21-22). He stated that Briggs was supposed to write a list of witnesses on a separate note. This is not supported by any citation to policy and is contradicted by two other staff who concede that Briggs did properly request to call Fuchs. It also defies a common sense reading of the clearly labelled form.

As such, Taylor's deposition was not sufficient to create a genuine issue of material fact so as to oppose summary judgment, which should have been granted to Briggs. However, even if it had been, the GCDC did not call Taylor as a witness to trial or present any other evidence in support of their contention that Briggs's writing of Fuchs' name on the "Inmate Witnesses" line was an improper means of requesting that Fuchs be called as a witness.

Further, no ~~evidence or~~ testimony or other evidence refuted Briggs's deposition where he stated that he also requested that staff call Fuchs verbally at the hearing and before it.

The court therefore should have issued a directed verdict when the GCDC presented no evidence to contradict the testimony of Briggs and its officers that Briggs properly attempted to call Fuchs, who was denied because he was Briggs' friend and not for any reasons supported by Wolff or by policy.

16

CONCLUSION

The scales of justice are often tipped unwittingly, but the best of intentions may nevertheless require reversal. Judicial economy is best served if that reversal comes from the District Court's own edict.

Despite the Court's best efforts, the jury ultimately received misstatements of law as jury instructions while being denied critical causal links to a just verdict. This was the result of the Defense's misdirection. The prejudice incurred by erroneous instruction was compounded by the Defense's unchecked improper questioning of Briggs.

A clear signal that the jury was misled was found in their failure to properly find fault for the GCDC's denial of Briggs's Wolff-sanctioned right to call witnesses to his hearing. Whether through summary judgment or a directed verdict, the Court's responsibility to ensure that the verdict matched the evidence was not satisfied.

Due to manifest errors of fact and/or law, the Court should alleviate appellate court burden by altering or amending its judgment to match the evidence and granting a new trial.

Respectfully submitted this 28th day of June, 2022.

Kevin A. Briggs
Plaintiff, pro se

17